## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED KEETOOWAH BAND OF
CHEROKEE INDIANS IN
OKLAHOMA, OSAGE NATION,
SHAWNEE TRIBE, PONCA TRIBE
OF INDIANS OF OKLAHOMA,
DELAWARE NATION, OTOE-
MISSOURI TRIBE, SAC AND FOX
NATION, THLOPTHLOCCO TRIBAL
TOWN, DELAWARE TRIBE OF
INDIANS, and PAWNEE NATION,
individually and on behalf of other
Native American Indian Tribes and
Tribal Organizations which were parties
to and actively participants in the
underlying proceeding which are
aggrieved by the Order of May 3, 2018.

Case No. 18-1129 (consolidated
with Nos. 18-1135,  18-1148, 18-
1159)

Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES
OF AMERICA

Respondents.

## AMENDED PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 28 U.S.C. §§ 2342 and 2344, 47 U.S.C. §

402(a), and the Federal Rules of Appellate Procedure 15(a), the United Keetoowah

Band of Cherokee Indians in Oklahoma; Osage Nation; Shawnee Tribe; Ponca

Tribe of Indians of Oklahoma; Delaware Nation; Otoe-Missouri Tribe; Sac and Fox Nation; Thlopthlocco Tribal Town; Delaware Tribe of Indians; and Pawnee Nation (collectively, "Petitioners") hereby submit this Amended Petition to this Court for review of the order of the Federal Communications Commission ("FCC") captioned *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Second Report and Order, WT Docket No. 17-79, FCC 18-30 (March 30, 2018), published at 83 FR 19440-02 (May 3, 2018) (the "Order"). A copy of the Order is attached hereto. Venue is proper in this Court pursuant to 28 U.S.C. § 2343.

Petitioners were all parties to and actively participated in the underlying proceeding before the FCC that led to the Order, and are aggrieved by the Order within the meaning of 28 U.S.C. § 2344.

Petitioners seek review of the Order on the grounds that it is arbitrary and capricious, exceeds the FCC's authority by redefining what constitutes an "undertaking" that would trigger the § 106 process under the National Historic Preservation Act, and an abuse of discretion within the meaning of the Administrative Procedures Act, 5 U.S.C. § 701 *et seq*.; exceeds the regulatory jurisdiction of the FCC; conflicts with prior FCC regulatory decisions; is inconsistent with the federal framework of law and regulation providing sovereignty to Native American Tribes; violates other applicable federal laws,

including but not limited to the U.S. Constitution, the Communications Act of 1934, as amended, and FCC regulations promulgated thereunder; conflicts with notice-and-comment rulemaking requirements of 5 U.S.C. § 553 and consultation rights secured to Indian Tribes by federal law; is not based on substantial credible evidence; and is otherwise contrary to law.

Petitioners respectfully request that the Court grant this Amended Petition, hold unlawful, vacate, enjoin and set aside the Order, and provide such additional relief as may be proper.

Dated:  July 2, 2018                    Respectfully submitted,

                                        UNITED    KEETOOWAH    BAND    OF
                                        CHEROKEE INDIANS IN OKLAHOMA
                                        AND OTHER TRIBAL PARTICIPANTS

                                        By:  /s/Joel D. Bertocchi
                                                One of Their Attorneys

Joel D. Bertocchi (joel.bertocchi@akerman.com)
J. Scott Sypolt (scott.sypolt@akerman.com)
Dean A. Dickie (dean.dickie@akerman.com)
Jeffrey J. Mayer (jeffrey.mayer@akerman.com)
AKERMAN LLP
71 S. Wacker Drive, 46th Floor
Chicago, IL  60606
(312) 634-5700
Fax: (312) 424-1926

45666725;1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 2nd, 2018, I electronically filed the foregoing **Amended Petition for Review** with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/Joel D. Bertocchi
Joel D. Bertocchi

Akerman LLP
71 S. Wacker Drive, 46th Floor
Chicago, IL 60606
(312) 634-5700

45666725;1

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Accelerating Wireless Broadband Deployment by | ) | WT Docket No. 17-79 |
| Removing Barriers to Infrastructure Investment | ) | |

**SECOND REPORT AND ORDER**

**Adopted: March 22, 2018**                              **Released: March 30, 2018**

By the Commission: Chairman Pai and Commissioners O'Rielly and Carr issuing separate statements; Commissioners Clyburn and Rosenworcel dissenting and issuing separate statements.

**TABLE OF CONTENTS**

Heading                                                                  Paragraph #

I.   INTRODUCTION ...................................................................................................................1
II.  BACKGROUND ....................................................................................................................9
     A. The Need for Reform ......................................................................................................11
     B. Tribal Consultation Process ...........................................................................................17
III. EXCLUDING SMALL WIRELESS FACILITIES FROM NHPA AND NEPA REVIEW .............36
     A. Statutory Background and Commission Precedent..........................................................46
     B. Legal Analysis ...............................................................................................................58
         1. By Amending Our Rules, We Clarify that Small Wireless Facility Deployment Is
            Neither an Undertaking Nor a Major Federal Action...............................................58
         2. Our Amendment of Section 1.1312 of the Rules Is Consistent with the Public
            Interest. ................................................................................................................60
         3. Other Considerations Raised by Our Prior Rules and Comments in the Record ....82
IV.  STREAMLINING NHPA AND NEPA REVIEW FOR LARGER WIRELESS FACILITIES..........96
     A. Clarifying the Section 106 Tribal Consultation Process.................................................96
         1. Background .............................................................................................................96
         2. Timeline for Initial Tribal Responses ...................................................................100
         3. Tribal Fees............................................................................................................114
     B. Reforming the FCC's Environmental Review Process..................................................131
         1. Environmental Assessments of Facilities Located in Floodplains.........................135
         2. Timeframes for Commission to Act on Environmental Assessments....................146
V.   PROCEDURAL MATTERS ..................................................................................................154
VI.  ORDERING CLAUSES .......................................................................................................157
     APPENDIX A-Comments and Reply Comments
     APPENDIX B-Final Rules
     APPENDIX C-Final Regulatory Flexibility Analysis

## I.    INTRODUCTION

1.    Our country finds itself at the brink of another technological revolution.  Within the next few years, 5G networks, with their massively increased throughput and reduced latency, will make possible once-unimaginable advances, such as self-driving cars and growth of the Internet of Things.  To support these performance improvements and to operate over the available high-frequency bands, however, these next-generation wireless networks, in many cases, will increasingly need to rely on network densification, whereby spectrum is reused more frequently through the deployment of far more numerous, smaller, lower-powered base stations or nodes that are much more densely spaced.  Even today, existing 4G networks are being similarly densified to meet capacity demands.  Facilitating such densification will require the elimination or mitigation of regulatory and other barriers to network deployment.

2.    Today, more than 4.6 million Americans have jobs that depend on the wireless industry, and employing one person in the wireless industry results in 6.5 more people finding employment.[1]  As a result of an estimated $275 billion to be invested over the next decade in next generation wireless infrastructure deployment, an expected three million new jobs will be created and our nation's GDP will be boosted by half a trillion dollars.[2]  Failure to act now to speed deployment and pave the way for enhanced 4G and 5G networks could cost the United States leadership in advanced wireless broadband services, have negative effects on job and economic growth, and risk leaving many behind in today's technology revolution, particularly those in unserved and underserved areas of rural America.[3]

3.    In the *Wireless Infrastructure NPRM*, the Commission began an examination into the extent to which regulatory requirements are unnecessarily impeding deployment of wireless broadband networks and how best to remove or reduce such impediments consistent with law and the public interest.[4]  The record reveals substantial evidence of a regulatory process that is needlessly adding millions of dollars to the cost of infrastructure deployments, delaying wireless infrastructure projects, and in turn risking our country's leadership as we transition to 5G.

4.    In this Second Report and Order (Order), we thus continue our efforts[5] to reduce regulatory impediments, first by reexamining the types of deployments that are subject to review pursuant

---

[1] *See* CTIA Comments at 4 (citing Roger Entner, RECON ANALYTICS, *The Wireless Industry: Revisiting Spectrum, the Essential Engine of US Economic Growth*, at 18 (Apr. 2016), https://www.ctia.org/docs/default-source/default-document-library/entner-revisiting-spectrum-final.pdf; Coleman Bazelon & Giulia McHenry, THE BRATTLE GROUP, *Mobile Broadband Spectrum: A Vital Resource for the American Economy,* at 2, 20 (May 11, 2015), https://www.ctia.org/docs/default-source/default-document-library/brattle_spectrum_051115.pdf.

[2] CTIA Comments at 4; Letter from Scott K. Bergmann, CTIA, to Marlene H Dortch, FCC, WT Docket No. 17-79, at 1 (filed Mar. 13, 2018) (Mar. 13, 2018 *Ex Parte* Letter).

[3] *See* Verizon Reply at 1.  *See also* Testimony of Steven K. Berry, President & CEO, Competitive Carriers Association, Broadband: Deploying America's 21st Century Infrastructure, United States Cong. House. Committee on Energy and Commerce, Subcomm. On Communications and Technology, 115th Cong. 1st sess., at 4 (Mar. 21, 2017), http://docs.house.gov/meetings/IF/IF16/20170321/105740/HHRG-115-IF16-Wstate-BerryS-20170321.pdf.

[4] *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Deployment*, Notice of Proposed Rulemaking and Notice of Inquiry, 32 FCC Rcd 3330 (2017) (*Wireless Infrastructure NPRM*).  More than 400 comments and replies were filed in the record.  Commenting parties are listed in Appendix A.

[5] *See Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Deployment*, Report and Order, 32 FCC Rcd 9760 (2017) (*2017 Pole Replacement Order*) (relieving the historic preservation review requirement for replacement utility poles that meet specified criteria and consolidating FCC historic preservation requirements and procedures into a single rule), *Comment Sought on Draft Program Comment for the Federal Communications Commission's Review of Collocations on Certain Towers Constructed Without Documentation of Section 106 Review*, Public Notice, 32 FCC Rcd 10715 (2017) (*Twilight Towers PN*) (proposing a draft Program Comment to facilitate the collocation of wireless equipment on "Twilight Towers").

to the National Historic Preservation Act (NHPA)[6] and the National Environmental Policy Act of 1969 (NEPA).[7]  Specifically, we begin by explaining, and amending our rules to clarify, that the deployment of small wireless facilities by non-Federal entities does not constitute either a "federal undertaking" within the meaning of the NHPA or a "major federal action" under NEPA and thus that certain federal historic preservation and environmental reviews are not required.  Informed by comments from Tribal Nations and others who have expressed concern about the potential impact of larger facilities, we exclude from certain federal review only those facilities that meet our definition of small wireless facilities.  Our definition includes size limits on antennas, associated equipment, and pole height that are intended to exclude from review those facilities that are least likely to implicate federal environmental and historic interests.  The definition we adopt will ensure that larger facilities continue to be subject to those federal reviews.

5.      As explained below, the record indicates that this reform will make a real difference in promoting this country's leadership in 5G.  Indeed, our revised approach to small cells will cut the NHPA and NEPA regulatory costs of deployment by 80 percent, trim months off of deployment timelines, and incentivize thousands of new wireless deployments—thus expanding the reach of 5G and other advanced wireless technologies to more Americans.[8]

6.      Next, we modify and clarify our practices and expectations for engaging Tribal Nations and Native Hawaiian Organizations (NHOs) in historic preservation review, pursuant to Section 106 of the NHPA, for construction projects located off of Tribal lands, and, in doing so, respond to concerns that have been expressed by both applicants and Tribal Nations.[9]  As detailed below, our approach has benefitted greatly from the Tribal consultation process and the significant points and considerations that Tribal leaders have raised during the course of our extensive consultations.

7.      Specifically, we adjust our practices associated with response timelines for Tribal Nations and NHOs that are notified of proposed undertakings, and we take measures to ensure that Tribal Nations and NHOs are provided the information necessary to comment on these undertakings at the time of such notification.  In light of concerns raised by Tribal Nations, we decline the request lodged by some in industry that the FCC impose a "geographic area of interest" requirement on Tribal Nations, which would have required the FCC to exercise greater control over the designation of Tribal areas of interest.  We also decline the request by industry to regulate Tribal fee amounts.  Separately, we clarify that applicants have no legal obligation to pay up-front fees when providing Tribal Nations and NHOs with an opportunity to comment on proposed facilities deployments.  Further, we clarify that, while applicants are free to engage Tribal Nations or NHOs as paid consultants, when additional consultant services are necessary after identification of the likely presence of a potentially affected historic property, neither the Commission nor the applicant is obligated to hire a particular person or entity to perform such consultant services.  Rather, the obligation is to hire a properly qualified consultant or contractor when such expert services are required, and, to that end, we provide guidance on considerations for determining when a reasonable and good faith effort to identify historic properties requires hiring a Tribal Nation or NHO to provide such consultant or contractor services.  Like the changes we adopt for the Section 106 process, these measures apply only for construction projects located off of Tribal lands.

---

[6] 54 U.S.C. § 300101 *et seq.*

[7] 42 U.S.C. § 4321 *et seq.*

[8] Letter from Colleen Thompson, AT&T, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1-2 (filed Feb. 27, 2018) (AT&T Feb. 27, 2018 *Ex Parte* Letter).

[9] 54 U.S.C. § 306108.  We collectively refer to all 573 federally recognized American Indian Tribes and Alaska Native Villages as "Tribal Nations."  Nothing in the order affects construction projects on Tribal lands, as defined under Section 800.16(x) of the American Council on Historic Preservation's (ACHP) rules, 36 CFR § 800.16(x) ("Tribal lands means all lands within the exterior boundaries of any Indian reservation and all dependent Indian communities.").

8.      Lastly, we examine our rules and procedures associated with NEPA compliance.  First, we determine and amend our rules to provide that applicants ordinarily will no longer be required to prepare an Environmental Assessment (EA) when a proposed project would be located in a floodplain.  Second, we commit to specific timelines for Commission review of EAs.[10]  Collectively, these measures will reduce or eliminate unnecessary costs and burdens on entities seeking to deploy wireless infrastructure and provide greater regulatory certainty, thereby encouraging new wireless broadband service deployments and spurring new investment.

## II.     BACKGROUND

9.      At the outset, we note the need for the FCC to act now to update and modernize the federal historic preservation and environmental review procedures.  As the record in this proceeding makes clear, the per-site cost of compliance with the NHPA and NEPA has been increasing at a time when we are seeing increased deployments across the country, the vast majority of which are small wireless facilities.  Our current approach was developed when all or nearly all deployments involved large macrocell facilities and accordingly failed to consider both the relatively diminutive size of small wireless facilities and the proliferation of these facilities necessary for deployment of advanced wireless technologies.  Thus, the existing process is not tailored to support small wireless facilities.  Moreover, the record shows that even as to larger facilities, there is a need for the FCC to take action to streamline our regulatory processes.  The record shows that taking these steps will deliver benefits for American consumers and help maintain the United States' leadership in wireless.

10.     In this section, we also highlight the substantial efforts that the FCC has taken to consult with Tribal Nations through the course of this proceeding.  Our work in this proceeding has benefited from these consultations.

### A.      The Need for Reform

11.     To enable us to gauge the effects of our environmental and historic preservation requirements on deployment of next generation wireless infrastructure, we sought comment in the *Wireless Infrastructure NPRM* on the costs of review relative to the environmental and historic preservation benefits.[11]  Many commenters in the record have noted high costs related to NEPA compliance.  According to CTIA, Sprint has estimated that it has completed NEPA checklists for 20,000-30,000 sites, at a cost of $2,000 per site, and that approximately 250 sites required an EA to be completed, at an additional $1,300 cost per site.[12]  Sprint notes that it has thus spent tens of millions of dollars completing preliminary NEPA checklists and EAs and that every single review resulted in a finding of no significant impact (FONSI).[13]  T-Mobile comments that EAs, when required under the FCC's rules, are currently not subject to any processing timelines or dispute resolution procedures, and that this lack of structure can cause new facility proposals to languish for extended periods of time.[14]  Further, even when an EA might not be required for a planned facility, parties may still file environmental objections under

---

[10] EAs are required to be submitted to the Commission when a proposed antenna structure may have a significant environmental impact as defined by Section 1.1307 of the Commission's rules.  *See* 47 CFR § 1.1307.

[11] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3343-46, paras. 32-41.  An Accenture Strategy report prepared for CTIA concludes that in 2017 alone, providers spent nearly $36 million on NEPA/NHPA review for small wireless facilities.  *See* Mar. 13, 2018 CTIA *Ex Parte* Letter at 2, Attach. at 1-2.

[12] CTIA Comments at 35.  Letter from Scott K. Bergmann, CTIA, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 5 (filed Feb. 26, 2018) (CTIA Feb. 26, 2018 *Ex Parte* Letter).  *See also* Sprint Comments at 35.  Thus, the majority of NEPA compliance costs are associated with the initial cost of completing the NEPA checklist under 47 CFR § 1.1307(a), which is necessary to confirm if the wireless facility is categorically excluded and does not require an EA.  *Cf.* American Bird Conservancy Comments at 4; S. Quick Comments at 2.

[13] Sprint Comments at 35.

[14] T-Mobile Comments at 60.

the Commission's rules and no timeline currently exists to resolve these disputes.[15]  With respect to floodplains, Verizon states that over a three-year period, no commenter objected to an EA for any site where it received approval from an expert agency to construct in a floodplain, and the Commission approved each site without change.[16]  Verizon argues that in light of the Commission's long history of reviewing floodplain EAs and routinely determining that no adverse environmental impact would occur, the Commission should eliminate the EA submission requirement for these constructions.[17]

12.    In addition to costs related to NEPA compliance, we sought comment on the costs of compliance with Section 106.  The record indicates that the primary source of concern is the cost of the Tribal review process that is part of our Section 106 obligations.[18]  Since the Tower Construction Notification System (TCNS) was launched in 2004,[19] many Tribal participants have made changes in how they participate, and the record indicates that the cumulative impact of these changes has diverted significant resources to regulatory compliance, thereby slowing wireless deployment without any corresponding public benefit.[20]  A number of commenters have offered evidence of increasing costs associated with Tribal participation in Section 106 review.  Furthermore, many of these changes have accelerated in recent years.  In 2012, the Commission was aware of 35 Tribal Nations charging fees.  By 2015 at least 56 charged upfront fees, and in 2018, we estimate that around 104 do.

13.    In addition, some Tribal Nations have been increasing the fees they request to review TCNS submissions.  Between March 2017 and January 2018, twelve Tribal Nations noted new fees or increased fee amounts in TCNS.  The average fee cited in TCNS by Tribal Nations charging fees to comment on new tower construction increased from $372 in 2015 to $532 in 2018, and among those Tribal Nations that broke out separate fees for collocation reviews, the average charge for collocation reviews more than doubled.[21]  Furthermore, many Tribal Nations have expanded the geographic areas for which they seek notification, and as a result, according to staff research, the average number of Tribal Nations notified per project increased from eight in 2008 to 15 in 2017.  Due to the combination of these factors, the per-site cost of review that an applicant pays to invite Tribal participation has increased dramatically.  For example, between 2011 and 2017, one environmental consultant noted that the average number of Tribal Nations expressing interest on its projects increased from five to sixteen, and that total Tribal fees per site increased on average from $2,000 to $11,450.[22]

---

[15] *Id.*

[16] Verizon Comments at 64.

[17] *Id.* at 63-64; *see also* Letter from Cathleen A. Massey, T-Mobile, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 4 (T-Mobile Feb. 26, 2018 *Ex Parte* Letter) (noting that "more than 90 % of its EA filings in the last three years were necessitated solely due to location in a floodplain, and these filings typically delay deployment by four months at an average cost of $12,000").

[18] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3343-45, paras. 35-38.

[19] *FCC Announces Voluntary Tower Construction Notification System to Provide Indian Tribes, Native Hawaiian Organizations, and State Historic Preservation Officers with Early Notification of Proposed Tower Sites*, Public Notice, 19 FCC Rcd 1998 (WTB/CGB 2004).

[20] *See, e.g.*, CTIA/WIA Comments at 6; AT&T Comments at 31; CCA Comments at 43; Clearing the Path for America's Wireless Future at 78.  While our decision going forward no longer to treat deployment of certain small wireless facilities as the Commission's undertaking will relieve some of these effects, in the absence of Commission action they are likely to continue for those deployments that remain subject to Section 106 review.  *See* J. Sharpe Smith, AGL Media Group, "Sprint Commits to Major Macro Tower Expansion, Mobile 5G," Feb. 6, 2018, at https://www.aglmediagroup.com/sprint-commits-to-major-macro-tower-expansion-mobile-5g-by-2019/.

[21] In 2015, four Tribal Nations noted collocation review fees averaging $200; as of 2018, eight Tribal Nations note collocation review fees averaging $562.50.

[22] *See* CCA Comments at 29, citing data provided by White Buffalo Environmental, Inc.

**Federal Communications Commission**                                    **FCC 18-30**

14.     Similarly, Sprint notes that it incurred $173,305 in Tribal fees for 23 cell sites deployed around NRG Stadium in Houston, Texas, in advance of Super Bowl LI.[23]  According to Sprint, an internal review of fee demands as of February 2017 showed that at least one Tribal Nation had raised its review fee to $1,650 per project, one Tribal Nation was charging $1,500, another Tribal Nation was at $1,200, and six other Tribal Nations were charging $1,000 per project.[24]  Sprint further argues that Tribal Nations have the incentive to increase both their fees and their areas of review, and that in the absence of any constraints on these increases, given Sprint's plan to deploy tens of thousands of sites, the company is looking at potentially hundreds of millions of dollars in Tribal fees for historic preservation review.[25]  Sprint contends that the fees it incurs for Tribal historic preservation review have a deleterious effect on its ability to provide coverage and increased capacity for its customers.[26]  It states that it spent over $23 million to date on historic preservation reviews, and that the $23 million could have been used to deploy an additional 657 new sites to increase capacity.[27]  These review fees, however, vary widely based on the location of the project, and while a build in Hawaii or the West Coast may incur fees from $500 to $2,000 per site, a project in Indianapolis exceeds $15,000 per site due to the number of Tribal Nations reviewing each project in that county.[28]  Further, as its costs incurred for purposes other than historic preservation review decrease over time, Sprint estimates that with reforms to Tribal review fees, it could construct 13,408 new sites for what 10,000 sites currently cost.[29]

15.     Other commenters also offer evidence of increasingly high fees.  For example, Verizon asserts that its average cost per site for Tribal review is nearly $2,500.[30]  Likewise, WIA and CTIA state that while it was common for fees to be between $50 and $200 when TCNS was first launched, those numbers have grown over time.  They indicate that as of Fall 2016, one Tribal Nation had raised its review fee to $2,000 per site, three Tribal Nations charged $1,500 per site, and seven additional Tribal Nations charged $1,000 per site.[31]  WIA/CTIA further assert that for a proposed new tower in Wisconsin, an applicant currently faces $19,550 in Tribal review fees, ranging from $200 to $1,500 per Tribal Nation, whereas a similar project last year would have generated $13,075 in Tribal review fees.[32]  Thus, WIA and CTIA contend that these costs increased by approximately 50 percent over the last year alone.[33]

---

[23] *See* Letter from Keith Buell, Sprint, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed May 17, 2017) (Sprint May 17, 2017 *Ex Parte* Letter).  *But see* Navajo Nation and the Navajo Nation Telecommunications Regulatory Commission Reply at 7 (suggesting that the costs asserted by Sprint may not accurately reflect the costs associated with the Super Bowl LI deployment and may go beyond that build); Northern Cheyenne Tribe Tribal Historic Preservation Office "On the Super Bowl Project" Comments (filed June 15, 2017) (stating that the reported costs were inflated to include projects across the State of Texas and that the Tribe responded once it had complete documentation of the proposed construction projects).

[24] Sprint Comments at 20.

[25] *Id*. at 15.

[26] *See* Letter from Keith Buell, Sprint, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 2 (filed February 21, 2018) (Sprint Feb. 21, 2018 *Ex Parte* Letter).

[27] *Id*.

[28] *Id*.

[29] *Id.*

[30] Verizon Comments at 45.

[31] CTIA/WIA Comments at 15.

[32] *Id.* at 16 n.35.

[33] We recognize that some Tribal Nations, when approached by a carrier with a batch of collocations or small deployments, will negotiate reduced fee terms not noted in their TCNS responses.  Nonetheless, the record as a whole demonstrates per-site Tribal fees of a sufficient level to impede deployment.

16.     The above examples collectively reveal that the costs of Tribal review and NEPA compliance create a significant impediment to deployment, and this impediment is only growing.[34] Maintaining the integrity and usefulness of the historic preservation and environmental review processes requires that we take a hard look at whether our applicants—and by extension, the Commission—are being asked to do more than is legally required or appropriate in the public interest.

### B.     Tribal Consultation Process

17.     As an independent agency of the federal government, the FCC recognizes that it has a trust responsibility to, and a government-to-government relationship with, federally recognized Tribal Nations.[35] As the Commission stated in its Tribal Policy Statement, it is our policy to consult with Tribal governments prior to implementing any regulatory action or policy that will significantly or uniquely affect Tribal governments, their land, and their resources.[36] Although none of the changes we make in the order will apply on Tribal lands, because some of the actions we take here implicate Tribal interests, the Commission, in the *Wireless Infrastructure NPRM*, directed the Office of Native Affairs and Policy (ONAP), in coordination with the Wireless Telecommunications Bureau (WTB), to conduct government-to-government consultation.[37] Prior to the release of the *Wireless Infrastructure NPRM*, Commission staff developed consultation plan goals designed to ensure responsiveness to a potentially large number of consultation requests from various levels of Tribal government; to assist Tribal Nations, intertribal organizations, and other Tribally-related entities in getting salient comments and reply comments into the record; and to fully integrate and coordinate the efforts of WTB and ONAP in supporting Commissioners and their advisors' direct participation in government-to-government meetings.

18.     As discussed below, the FCC engaged in extensive consultations.  Commissioners and FCC staff visited at least nine different states, including Arizona, California, Connecticut, New Mexico, North Carolina, Oregon, South Dakota, Virginia, and Wisconsin.  This is in addition to consultations at FCC headquarters and numerous, widely-attended conference calls.  One of the in-person consultations was attended by over 70 representatives of more than 50 Tribal Nations and organizations.

19.     Outreach efforts on the issues raised in the NPRM began in 2016 when Commission staff met with Tribal representatives and members of industry. On November 21, 2016, Commission staff met with representatives from the National Congress of American Indians (NCAI), the National Association of Historic Preservation Officers (NATHPO), the United South and Eastern Tribes (USET), CTIA, and

---

[34] *See* Letter from Henry G. Hultquist, AT&T, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 at 1-3 (filed Feb. 23, 2018) (AT&T Feb. 23 *Ex Parte* Letter) (discussing overall NHPA and NEPA costs and delays); Letter from Tamara Preiss, Verizon, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1 (filed Feb. 23, 2018) (estimating that NEPA and NHPA costs for review ranged from 19 percent to 37 percent of total deployment costs in five markets); CTIA Feb. 26, 2018 *Ex Parte* Letter at 2-4 (discussing examples of costs for NHPA reviews); Letter from Rebecca Murphy Thompson, CCA, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 2-3 (filed Feb. 26, 2018) (citing examples of costs for NHPA review, including one CCA member operating in portions of Kansas, Colorado, and Nebraska who paid "an average of over $15,000 per tower, solely for tribal review fees."); Letter from Donald J. Evans, Counsel to PTA-FLA, Inc. to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1 (filed Feb. 27, 2018) (estimating 100 to 300 percent increase in Tribal fees since 2015.  In view of the information in the record regarding costs, we disagree with arguments that there is insufficient evidence to justify taking steps to update and modernize the historic preservation and environmental review process.  *See* Letter from City Council of the City of Rye, New York, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) (City of Rye Mar. 14, 2018 *Ex Parte* Letter) at 3 (noting that there is "no evidence that federal rules … must be revised" particularly since "all four major nationwide carriers are engaged in what they characterize as "aggressive deployment of 'innovative technologies at a breakneck pace'").

[35] *Statement on Policy on Establishing a Government-to-Government Relationship with Indian Tribes*, Policy Statement, 16 FCC Rcd 4078 (2000) ("Tribal Policy Statement").

[36] *Id.* at 4081.

[37] *Wireless Infrastructure NPRM,* 32 FCC Rcd at 3339-40, para. 24.

WIA, as well as additional industry representatives.  Two follow-up meetings with representatives of the same organizations were held on December 6, 2016 and January 10, 2017.  Additional outreach efforts began immediately upon the NPRM's release with a May 25, 2017 conference call during which Commission staff walked through questions asked in the item and took questions and comments from 52 representatives of Tribal governments and Tribal cultural preservation offices, as well as three intertribal organizations.[38]  The plan for subsequent consultation activities included opportunities for direct discussion with the Chairman and Commissioners, meetings with senior advisors from the Chairman's staff, and meetings with WTB and ONAP staff, in formats including group meetings throughout the country, one-on-one consultations with individual Nations, and conference calls.

20.     On May 26, 2017, ONAP sent Tribal leaders notification of the Chairman's first in-person consultation session and announced that the Chairman would also be giving opening remarks and hosting consultations at the NCAI Mid-Year Conference on June 14, 2017, in Uncasville, Connecticut.

21.     The Commission facilitated consultations between the Chairman and Tribal representatives on the Rosebud Sioux Reservation in South Dakota on June 8, 2017.  Twenty-nine Tribal representatives from the Lower Brule Sioux Tribe, Chippewa Cree Tribe, Fort Belknap Indian Community, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Eastern Shawnee Tribe of Oklahoma, Kaw Nation, Cheyenne River Sioux Tribe, and Rosebud Sioux Tribe, as well as a participant representing several Oklahoma Tribes, attended.  Representatives expressed support for TCNS and interest in working together to address the implications of changing technology on the TCNS process. While the meeting announcement and agenda focused on the Section 106 issues in the NPRM, much of the discussion was driven by Tribal representatives interested in discussing service on Tribal lands and the licensing of spectrum.

22.     At the NCAI Mid-Year Conference on June 14, 2017, Chairman Pai participated in one-on-one consultations with the Gila River Indian Community, the Jamestown S'Klallam Tribe, multiple Oklahoma Tribal representatives including the Cherokee and Choctaw Nations, the Organized Village of Kake, the Chippewa Cree Tribe, the Pueblo of Isleta, the Sault Ste Marie Tribe of Chippewa Indians, the Delaware Nation, the Ohkay Owingeh Pueblo, and the Tanana Chiefs.  Chairman Pai also delivered plenary remarks and consulted with representatives of NCAI, USET, and the NATHPO.  Commission staff also held a listening session and briefed both the Telecommunications and Technology Subcommittee and the Human, Religious, and Cultural Concerns Committee.  As at Rosebud Sioux, Tribal leaders guided these discussions.  Tribal leaders shared their concerns to preserve TCNS and expressed the importance of the Commission's respect for Tribal sovereignty as evidenced in allowing their self-determination of areas of interest within the system.  The Chairman also spoke with Tribal leaders about broadband deployment, tele-health, and licensing issues.

---

[38] Participants on the call included representatives of Agua Caliente Band of Cahuilla Indians, Alabama-Coushatta Tribe of Texas, Bad River Band of Lake Superior Tribe of Chippewa Indians, Big Pine Paiute Tribe of the Owens Valley, Blackfeet Nation, Cherokee Nation, Chickasaw Nation, Choctaw Nation of Oklahoma, Citizen Potawatomi Nation, Coeur d'Alene Tribe, Confederated Tribes of the Colville Reservation, Confederated Tribes of the Grand Ronde Community of Oregon, Crow Creek Sioux Tribe, Delaware Nation, Eastern Shawnee Tribe of Oklahoma, Flandreau Santee Sioux Tribe, Forest County Potawatomi Community, Fort Belknap Indian Community, Hopi Cultural Preservation Office, Jena Band of Choctaw Indians, Kialegee Tribal Town, Lummi Nation, Mescalero Apache Tribe, Miami Tribe of Oklahoma, Mohegan Indian Tribe, Muscogee (Creek) Nation, NATHPO, NCAI; Nez Perce Tribe, Northern Cheyenne Tribe, Office of Hawaiian Affairs, Osage Tribe, Ottawa Tribe of Oklahoma, Pawnee Nation, Pueblo of Laguna, Quapaw Tribe of Oklahoma, Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin, Rosebud Sioux Tribe, Sac and Fox Nation in Oklahoma, Santa Ynez Band of Chumash Indians, Seminole Nation of Oklahoma, Shawnee Tribe, Shinnecock Nation, Shoshone-Bannock Tribes, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Thlopthlocco Tribal Town, Tonkawa Tribe, Twenty-Nine Palms Band of Mission Indians, United Keetoowah Band of Cherokee Indians in Oklahoma, Upper Sioux Community of Minnesota, Wichita & Affiliated Tribes, Yakama Nation, and Yurok Tribe.

23.     A member of the Chairman's staff, together with WTB and ONAP staff, consulted with representatives of the Confederated Tribes of the Grand Ronde Community of Oregon, Cow Creek Band of Umpqua Indians, Nez Perce Tribe, and Chippewa Cree Tribe on July 20, 2017, in Eugene, Oregon. They continued to discuss potential solutions to concerns with the Tribal role in the Section 106 review process identified in the NPRM.

24.     A similar FCC group subsequently conducted meetings in Broken Arrow, Oklahoma, on July 24, 2017.  This visit included one-on-one meetings with the Muscogee (Creek) Nation, Navajo Nation, and Delaware Nation that discussed fees, information needs, and changes in technology.  FCC staff also consulted with representatives from the Absentee-Shawnee Tribe of Indians of Oklahoma, Cherokee Nation, Cheyenne-Arapaho Tribes of Oklahoma, Chickasaw Nation, Delaware Nation, Eastern Shawnee Tribe of Oklahoma, Iowa Tribe of Oklahoma, Kaw Nation, Kialegee Tribal Town, Kiowa Indian Tribe, Muscogee (Creek) Nation, Navajo Nation, Osage Nation, Otoe-Missouria Tribe of Indians, Ponca Tribe of Indians of Oklahoma, Quapaw Tribe of Oklahoma, Seminole Nation of Oklahoma, Thlopthlocco Tribal Town, and United Keetoowah Band of Cherokee Indians in Oklahoma who discussed the content of the NPRM and emphasized the importance of improving communications between industry and Tribal Nations.

25.     WTB and ONAP staff held a two-day dialogue session following the NATHPO annual conference on August 10-11, 2017, in Pala, California.  Participants included representatives from NATHPO and over 70 representatives of approximately 50 different Tribal Nations, including the Absentee-Shawnee Tribe of Indians of Oklahoma; Pueblo of Acoma, Agua Caliente Band Of Cahuilla Indians, Bad River Band Of Lake Superior Tribe Of Chippewa Indians, Blackfeet Nation, Bridgeport Colony, Cahuilla Band Of Indians, Cherokee Nation, Comanche Nation, Cow Creek Band of Umpqua Indians, Dry Creek Band of Pomo, Eastern Shawnee Tribe Of Oklahoma, Forest County Potawatomi Community, Fort Belknap Indian Community, Gila River Indian Community, Ho-Chunk Nation Of Wisconsin, Hualapai Tribe, Jamul Indian Village, Jena Band of Choctaw Indians, Lac Du Flambeau Band Of Lake Superior Chippewa Indian,; Mescalero Apache Tribe, Miami Tribe of Oklahoma, Mohegan Indian Tribe; Muscogee (Creek) Nation,  Navajo Nation, Oglala Sioux Tribe, Organized Village Of Kake, Osage Nation, Otoe-Missouria Tribe of Indians, Pala Band of Mission Indians, Pauma/Yuima Band of Mission Indians, Pechanga Band Of Luiseno Indians, Quapaw Tribe of Oklahoma, Reno Sparks Indian Colony Sac and Fox Nation in Oklahoma, Salt River Pima-Maricopa Indian Community, Santa Ynez Band of Chumash Indians, Sauk-Suiattle Indian Tribe, Shawnee Tribe, Shoshone-Bannock Tribe,; Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Soboba Band Of Luiseno Indians, Sokaogon Chippewa Community, Susanville Indian Rancheria, Table Mountain Rancheria, Tejon Indian Tribe, Timbisha Shoshone Tribe, Tohono O'odham Nation, Tule River Reservation, Twenty-Nine Palms Band of Mission Indians, Upper Sioux Community of Minnesota, Ute Mountain Ute Tribe, White Mountain Apache Tribe, and Wichita & Affiliated Tribes.  Topics of discussion included what constitutes consultation, the definition of "previously disturbed" ground, monitoring of construction, the importance of TCNS, Tribal fee policies, batching small cells, and "Twilight Towers."

26.     Chairman Pai, supported by ONAP and WTB staff, traveled to the Navajo Reservation on August 22, 2017, to consult with representatives from an estimated 18 Tribal Nations, including the Ak-Chin Indian Community,, Blue Lake Rancheria, Delaware Tribe of Indians, Gila River Indian Community (Gila River Telecommunications, Inc.), Havasupai Indian Tribe, Hopi Nation (Hopi Telecommunications, Inc.), Jena Band of Choctaw Indians, Kaw Nation, Mescalero Apache Tribe (Mescalero Apache Telecom, Inc.),  Navajo Nation, Nez Perce Tribe, Pascua Yaqui Tribe, Pueblo of Acoma, Pueblo of Jemez, Pueblo of Zia, San Carlos Apache Tribe (San Carlos Apache Telecommunications Utility, Inc.), Tohono O'odham Nation (Tohono O'odham Utility Authority), and Yavapai-Apache Nation and from organizations including the Alaska Native Health Board, Bristol Bay Area Health Corporation, Native Public Media, National Tribal Telecommunications Association, and Tuba City Regional Health Care. The discussion focused on the *Wireless Infrastructure NPRM* and other telecommunications issues affecting Tribal Nations.

27.    Chairman Pai also hosted a consultation meeting in Washington, DC, on October 4, 2017. Participants included representatives from  Chippewa Cree Tribe, Confederated Tribes of the Colville Reservation, Delaware Nation,; Delaware Tribe of Indians, Fort Mojave Indian Tribe (Fort Mojave Telecommunications, Inc.), Kaw Nation, Lac du Flambeau Band of Lake Superior Chippewa Indians, Makah Indian Tribe, Mescalero Apache Tribe (Mescalero Apache Telecom, Inc.), Muscogee (Creek) Nation of Oklahoma, Nez Perce Tribe, Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin, Standing Rock Sioux Tribe, Tanana Chiefs Conference, Thlopthlocco Tribal Town, and Tohono O'odham Nation (Tohono O'odham Utility Authority).  Representatives from the Alaska Native Health Board, Alaska Native Tribal Health Consortium, Bristol Bay Area Health Corporation, NATHPO, NCAI, and the National Tribal Telecommunications Association also attended.  Discussion focused on the *Wireless Infrastructure NPRM* and broadband deployment, as well as other issues affecting Tribal Nations.  The fall meeting at FCC headquarters also provided several Tribal leaders with an opportunity for one-on-one meetings with Commissioners Clyburn and Rosenworcel, as well as Commission staff.

28.    Later in October, WTB and ONAP staff members participated in a listening session at the NCAI Annual Conference in Milwaukee, Wisconsin.  Participants at the NCAI listening session included representatives from Bad River Band of Lake Superior Tribe of Chippewa Indians, Big Pine Paiute Tribe of the Owens Valley, Gila River Indian Community (Gila River Telecommunications, Inc.), Chippewa Cree Tribe, Cherokee Nation, Choctaw Nation of Oklahoma, Delaware Nation, Isleta Pueblo, Jamestown S'Klallam Tribe, Keweenaw Bay Indian Community, Muscogee (Creek) Nation of Oklahoma, Native Village of Port Lions, Nez Perce Tribe, Northern Arapaho Tribe, Ohkay Owingeh Pueblo, Organized Village of Kake, Pueblo of Pojoaque, Pueblo of Tesuque, Sauk-Suiattle Indian Tribe, Sault Ste. Marie Tribe of Chippewa Indians, Tanana Chiefs Conference, Tohono O'odham Nation, and Wyandotte Nation. Representatives from Alaska Tele-Health Network, NATHPO, NCAI, Sante Fe Indian School, Haliwa Saponi Indian Tribe, and USET also participated.  Topics discussed included the challenges posed by new technology, how Tribal Nations use fees, the importance to Tribal Nations of receiving complete information to support their review, and the potential for certain wireless installations to impact culturally significant properties, as well as the provision of service to Tribal lands.

29.    WTB and ONAP staff members also consulted with the USET Culture and Heritage Committee, including representatives of the Wampanoag Tribe of Gay Head-Aquinnah, Catawba Nation, Mohegan Indian Tribe, and Alabama-Coushatta Tribe of Texas, among others, at USET's Annual Meeting in Cherokee, North Carolina.  Topics discussed included the challenges posed by new technology, how Tribes use fees, the importance to Tribal Nations of receiving complete information to support their review, and the potential for certain wireless installations to impact culturally significant properties.

30.    On January 24, 2018, Commission staff consulted with representatives of the Absentee-Shawnee Tribe of Oklahoma, Agua Caliente Band of Cahuilla Indians, Blackfeet Nation, Burns Paiute Tribe, Cherokee Nation, Chippewa Cree Tribe, Choctaw Nation of Oklahoma, Citizen Potawatomi Nation, Coeur d'Alene Tribe, Comanche Nation, Confederated Tribes of the Colville Reservation , Crow Tribe, Delaware Nation, Delaware Tribe of Indians of Oklahoma, Eastern Shawnee Tribe of Oklahoma, Forest County Potawatomi Community, Fort Belknap Indian Community, Houlton Band of Maliseets, Jamul Indian Village, Kaw Nation, Kenaitze Indian Tribe, Kiowa Indian Tribe, Lac du Flambeau Band of Lake Superior Chippewa Indians, Leech Lake Band of Ojibwe, Muscogee (Creek) Nation, Nez Perce Tribe, Northern Cheyenne Tribe, Ottawa Tribe of Oklahoma, Pawnee Nation of Oklahoma, Pechanga Band of Mission Indians, Rincon Band of Luiseño Indians, Sac & Fox Nation in Oklahoma, Santa Clara Pueblo, Shawnee Tribe, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Susanville Indian Rancheria, United Auburn Indian Community, United Keetoowah Band of Cherokee Indians in Oklahoma, Upper Sioux Community, and a representative from NATHPO via a recorded conference call.

To accommodate participants that also wanted their comments to be added to the record verbatim, the Commission transcribed the call, and a transcript was filed in the record.[39]

31.     Commission staff consulted with representatives of Agua Caliente Band of Cahuilla Indians, Blackfeet Nation, Cherokee Nation, Choctaw Nation of Oklahoma, Coeur d'Alene Tribe, Confederated Tribes of the Colville Reservation, Fort Belknap Indian Community, Kaw Nation, Kiowa Indian Tribe, Lac du Flambeau Band of Lake Superior Chippewa Indians, Mescalero Apache Tribe, Muscogee (Creek) Nation, Navajo Nation, Northern Cheyenne Tribe, Osage Nation, Otoe-Missouria Tribe of Indians, Pawnee Nation of Oklahoma, Sac & Fox Nation in Oklahoma, Santa Clara Pueblo, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Skull Valley Band Of Goshute Indians, Thlopthlocco Tribal Town, Upper Skagit Indian Tribe, and Wilton Rancheria via conference call on January 22, 2018, and with representatives of Agua Caliente Band of Cahuilla Indians, Ak-Chin Indian Community, Apache Tribe of Oklahoma, Big Pine Paiute Tribe of the Owens Valley, Burns Paiute Tribe, Cherokee Nation, Chippewa Cree Tribe, Choctaw Nation of Oklahoma, Colorado River Indian Tribes, Comanche Nation, Crow Tribe, Jamul Indian Village, Jena Band of Choctaw Indians, Kaw Nation, Leech Lake Band of Ojibwe, Mescalero Apache Tribe, Miami Tribe of Oklahoma, Muscogee (Creek) Nation, NATHPO, Navajo Nation, Nez Perce Tribe, Northern Arapaho Tribe, Northern Cheyenne Tribe, Organized Village of Kake, Pueblo of Acoma, Rincon Band of Luiseño Indians, Rosebud Sioux Tribe, Santa Clara Pueblo, Santa Ynez Band of Chumash Indians, Seminole Tribe of Florida, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Spokane Tribe of Indians, Standing Rock Sioux Tribe, Table Mountain Rancheria, Thlopthlocco Tribal Town, Upper Sioux Community, Upper Skagit Indian Tribe, White Mountain Apache Tribe, Wilton Rancheria, and a representative from NATHPO on February 5, 2018, to discuss potential clarifications and modifications to the process for Tribal participation in Section 106 review.

32.     Commissioner Carr met with USET's Board of Directors at USET's Washington Impact Week on February 7, 2018.  Tribal Nations whose representatives make up the USET Board of Directors include the Alabama - Coushatta Tribe of Texas, Aroostook Band of Micmac,; Catawba Indian Nation, Cayuga Nation, Chitimacha Tribe of Louisiana, Coushatta Tribe of Louisiana, Eastern Band of Cherokee Indians, Houlton Band of Maliseet Indians, Jena Band of Choctaw Indians, Mashantucket Pequot Tribal Nation, Mashpee Wampanoag Tribe, Miccosukee Tribe of Indians of Florida, Mississippi Band of Choctaw Indians, Mohegan Tribe of Indians of Connecticut, Narragansett Indian Tribe, Oneida Indian Nation, Pamunkey Indian Tribe, Passamaquoddy Tribe – Indian Township Reservation, Passamaquoddy Tribe – Pleasant Point Reservation, Penobscot Indian Nation, Poarch Band of Creek Indians, Saint Regis Mohawk Tribe, New York, Seminole Tribe of Florida, Seneca Nation of Indians, Shinnecock Indian Nation, Tunica-Biloxi Tribe of Louisiana, and Wampanoag Tribe of Gay Head (Aquinnah).  At that meeting, Board members emphasized the importance to them of the Best Practices Agreement that the FCC and USET adopted at the time that TCNS was created and discussed the potential to update the document to address today's technology and associated challenges.

33.     The Chairman, Commissioner Clyburn, Commissioner Carr, and Commissioner O'Rielly subsequently met with Tribal leaders who visited FCC Headquarters on February 15, 2018, while participating in NCAI's Washington meetings.

34.     Commission staff also traveled to Albuquerque, New Mexico, on February 21, 2018, to consult with representatives of the Chippewa Cree Tribe, Crow Creek Sioux Tribe, Flandreau Santee Sioux Tribe, Jicarilla Apache Nation, Kaw Nation, Lac du Flambeau Band of Lake Superior Chippewa Indians, Lower Brule Sioux Tribe, Mescalero Apache Tribe (Mescalero Apache Telecom, Inc.), Navajo Nation, Nez Perce Tribe, Otoe-Missouria Tribe of Indians, Pueblo of Acoma, Pueblo of Laguna, Pueblo of Picuris, Pueblo of San Felipe, Pueblo of Santa Clara, Pueblo of Santo Domingo, Pueblo of Zuni, Sac and Fox Nation in Oklahoma, Seminole Tribe of Florida, Sokaogon Chippewa Community, Southern Ute

---

[39] FCC Transcript of January 24th Tribal Call (filed Feb. 22, 2018).

Tribe, Thlopthlocco Tribal Town, Tonkawa Tribe, Upper Skagit Indian Tribe, and a representative from NCAI about particular reforms to the Section 106 process.

35.     Throughout this process, Commission staff has maintained an open invitation to accommodate Tribal Nations seeking individual consultation on the NPRM and associated issues. Commissioners, senior advisors, and WTB and ONAP staff have continued to meet in person and by phone with Tribal leaders, THPOs, and other Tribal representatives upon receipt of these requests, including with representatives of the Sac and Fox Nation in Oklahoma, Thlopthlocco Tribal Town, Kaw Nation, Eastern Shoshone Tribe, Choctaw Nation of Oklahoma, Crow Creek Sioux Tribe, Omaha Tribe of Nebraska, Wampanoag Tribe of Gay Head-Aquinnah, Pechanga Band of Luiseno Indians, United Keetoowah Band, Pawnee Nation of Oklahoma, Fort Belknap Indian Community, and Quapaw Tribe. Through the consultation process and related engagements, we have discussed with Tribal leaders and their representatives the issues and the competing policy considerations related to the Tribal role in the Section 106 process that we address in this Order.[40]

## III.    EXCLUDING SMALL WIRELESS FACILITIES FROM NHPA AND NEPA REVIEW

36.     In this section, we make a threshold legal determination, and amend Section 1.1312 of our rules to clarify, that the deployment of small wireless facilities by non-Federal entities is neither an

---

[40] We note that some Tribal representatives have argued that the Commission has not adequately consulted with Tribal Nations before moving forward in this proceeding. *See, e.g.*, FCC Transcript of January 24 Tribal Call at 4-6, The Navajo Nation and The Navajo Nation Telecommunications Regulatory Commission Reply at 2-3, NCAI *et al.* Comments at 5, Tonkawa Tribe of Oklahoma Comments at 2, Citizen Potawatomi Nation Comments at 2, Gila River Indian Community Comments at 3, Shoshone-Bannock Tribes Comments at 2, Muscogee (Creek) Nation Comments at 3, Lower Brule Sioux Tribe Comments at 2, Catawba Indian Nation Comments at 2-3, Standing Rock Sioux Tribe Comments at 2, Thlopthlocco Tribal Town Comments at 1, Central California Yokuts Nagpra Coalition Comments at 2, Quapaw Tribe Comments at 2, National Association of Tribal Historic Preservation Officers Comments at 1-2, Letter from John L. Berrey, Quapaw Tribe, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 8, 2018) at 1-2, Letter from Dianne Desrosiers, Sisseton-Wahpeton Oyate, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 9, 2018) at 2, Letter from James T. Graves, Counsel to NATHPO, to Marlene H Dortch, FCC, WT Docket No. 17-79 (filed Mar. 12, 2018) at 1, Letter from Aaron A. Payment, Sault Ste. Marie Tribe of Chippewa Indians, to Marlene Dortch, FCC, WT Docket No. 17-79 (filed Mar. 13, 2018) at 2, Letter from Marissa Turnbull, Mashantucket Pequot Tribal Nation, to Marlene Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 2, Letter from Kaw Nation, WT Docket No. 17-79 (filed Mar. 15, 2018) at 1.  We disagree.  At all of the events noted above, both the ultimate decision makers and expert staff shared their perspectives on the relevant issues and actively engaged with Tribal perspectives and proposals.  The sheer number of these events, held throughout the country and prior to reaching any decisions, demonstrates a good faith effort on the part of the Commission to consult.  To the extent some are concerned that Tribal Historic Preservation Officers and other Tribal representatives rather than elected leaders participated, we note that the Commission consistently invited the participation of Tribal leadership and have responded to Tribal leaders' requests for individual consultation, including meetings with officials at the highest levels of the Commission.  To the extent that some argue that consultation should have occurred before the Commission issued the NPRM, we note the NPRM raised the specific questions about the Section 106 process which established the very framework for consultation.  *See* NTTA Comments at 3 (arguing that the NPRM should have been released after consultation), Navajo Comments at 3 (arguing that the NPRM violated trust responsibilities as it was issued without Tribal consultation), NATHPO Comments at 6 (noting that Tribal consultation was not conducted in the process of developing this NPRM and Tribal Nations are now in a reactive posture to respond to major, proposed changes being considered and without adequate time to do so).  Moreover, as discussed above, the FCC has been engaged in discussions with Tribal Nations on these issues since well before the April 2017 NPRM.  Finally, we agree with ACHP on the importance of effective consultation.  *See* Letter from John M. Fowler, ACHP, to Thomas Johnson, FCC, WT Docket No. 17-79 (filed Mar. 15, 2018) at 2.  We acknowledge our ongoing commitment to consult with Tribal Nations and intend to continue to abide by our existing Tribal policy.

"undertaking" within the meaning of the NHPA nor a "major Federal action" under NEPA.[41]  Although we clarify in this Order that the deployment of small wireless facilities on non-Tribal lands therefore will not be subject to certain federal historic preservation and environmental review obligations, we leave undisturbed the Commission's existing requirement that the construction and deployment of larger wireless facilities, including those deployments that are regulated in accordance with the FCC's antenna structure registration (ASR) system or subject to site-by-site licensing, must continue to comply with those environmental and historic preservation review obligations.

37.    As discussed below, Section 106 of the NHPA mandates historic preservation review for "undertakings," while NEPA mandates environmental review for "major Federal actions."[42]  Courts have treated these two categories as largely coextensive,[43] and have recognized that the question of what constitutes an "undertaking" or a "major Federal action" is an objective inquiry that focuses on the degree of federal control over a particular deployment.[44]  As relevant here, the Commission has previously determined, and the D.C. Circuit has affirmed, that wireless facility deployments associated with geographic area licenses may constitute "undertakings" in two limited contexts:  (1) where facilities are subject to the FCC's tower registration and approval process pursuant to Section 303(q) of the Act because they are over 200 feet or are near airports, and (2) where facilities not otherwise subject to pre-construction Commission authorization are subject to Section 1.1312(b) of the Commission's rules and thus must obtain FCC approval of an environmental assessment prior to construction.[45]  The Commission has referred to the rule governing this latter category of deployments as the FCC's retention of a "limited approval authority."[46]  While the D.C. Circuit held that the Commission acted within its discretion in classifying these two categories of actions as federal undertakings, it noted that the Commission had not engaged in extended analysis of the issue and did not foreclose the Commission from revisiting the scope of these categories at a later time.[47]

38.    Today, we clarify, through amendment of our rules, that the deployment of small wireless facilities by non-Federal entities does not constitute an "undertaking" or "major Federal action," and thus does not require federal historic preservation or environmental review under the NHPA or NEPA.  As explained below, small wireless facilities that meet our definition here are not subject to ASR requirements under Section 303(q) of the Act.  Accordingly, under *CTIA* and the Commission's prior orders, the only remaining basis on which they could be considered an "undertaking" or "major Federal action" is if they are subject to the "limited approval authority" under Section 1.1312(b) of the Commission's rules.[48]  Through this item, we clarify that deployments of small wireless facilities do not fall within the scope of Section 1.1312(b).  Having made the threshold determination that Section 1.1312

---

[41] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3356-57, paras. 76-77 (seeking comment on "whether we should revisit the Commission's interpretation of the scope of our responsibility to review the effects of wireless facility construction under the NHPA and NEPA").

[42] 54 U.S.C. § 306108; 42 U.S.C. § 4332(2)(C).

[43] *See, e.g., Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295-96 (D.C. Cir. 2007); *see also Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir. 2001) ("Because of the operational similarity between the two statutes, courts generally treat 'major federal actions' under the NEPA as closely analogous to 'federal undertakings' under the NHPA.").

[44] *See, e.g., Karst*, 475 F.3d at 1295 ("both [NEPA and the NHPA] impose procedural obligations on federal agencies after a certain threshold of federal involvement").

[45] *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006) (*CTIA*).

[46] *Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process*, WT Docket No. 03-128, Report and Order, 20 FCC Rcd 1073, 1083-84, para. 26 (2004) (*2004 Order*).

[47] *CTIA*, 466 F.3d at 112-18.

[48] 47 CFR 1.1312(b); *see 2004 Order*, 20 FCC Rcd at 1038 n.52.

does not apply to the deployment of small wireless facilities, as defined below, there is no longer any cognizable federal control over such deployments for purposes of the NHPA or NEPA, and hence, those deployments are neither "undertakings" nor "major Federal actions" subject to those federal historic preservation or environmental review obligations.

39.        Apart from our legal conclusion that small wireless facility deployment is not an "undertaking" or "major Federal action," our amendments to Section 1.1312 are reasonable in light of the purposes of the Communications Act as a whole and Congressional mandates that require the Commission to consider the public interest before imposing regulatory burdens on new constructions and deployments.  Although it appears that the Commission previously based its decision to retain "limited approval authority" in Section 1.1312(b) on a public interest determination under Title III of the Communications Act,[49] we have never engaged in a considered analysis of whether the public interest requires such review for *all* wireless facilities.  The Commission last considered this question in 2004, when "virtually every outdoor wireless facility deployed was a 'macro' facility consisting of large arrays of panel antennas mounted on towers, roof tops, or other structures at heights of 100-200 feet or more above ground level."[50]  Today, by contrast, small wireless facility deployments represent a large and increasing share of wireless communications facility deployments.  For example, "[i]n 2017, approximately 62 percent of Verizon's wireless deployments were small cells, a figure that will only grow larger as we deploy 5G in 2018 and beyond."[51]  Based on the extensive record before us, we conclude today that it is consistent with the public interest to clarify that small wireless facility deployments off of tribal lands are not subject to the requirements of Section 1.1312(b).

40.        As explained in more detail in the sections below, we base this public interest analysis on a variety of considerations.  First, our amendments today further our statutory obligations under the Communications Act.  Removing Section 1.1312(b)'s trigger of environmental and historic preservation review for small wireless facilities will help further Congress's and the Commission's goals of facilitating the deployment of advanced wireless services (such as 5G) and removing regulatory burdens that unnecessarily raise the cost and slow the deployment of the modern infrastructure used for those services.  As the record reflects, wireless carriers are facing a seemingly insatiable consumer demand for increased coverage and capacity for data services.  To be able to meet current and future needs, including deployment of advanced 4G and 5G networks, providers will need to deploy tens of thousands of small wireless facilities across the country over the coming years.[52]  As noted above, Verizon states that next generation networks will require 10 to 100 times more antenna locations than previous 3G and 4G networks, while AT&T represents that carriers will deploy hundreds of thousands of wireless facilities-equal to or more than  the number of macro facilities deployed over the last few decades.[53]  It would be impractical and extremely costly to subject each individual small facility deployment to the same requirements that the Commission imposes on macro towers.  A report prepared by Accenture Strategy for CTIA found that 29 percent of wireless deployment costs are related to NHPA/NEPA regulations when reviews are required.[54]  There is also no legitimate reason why next-generation technology should be subjected to many times the regulatory burdens of its 3G and 4G predecessors.

---

[49] *See CTIA*, 466 F.3d at 109 (discussing *Amendment of Environmental Rules*, First Report and Order, 5 FCC Rcd 2942, 2943, para. 11 (1990) (*1990 Order*)).

[50] Letter from Andre J. Lachance, Associate General Counsel, Verizon, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1 (filed Feb. 26, 2018) (Verizon Feb. 26, 2018 *Ex Parte* Letter).

[51] *Id*. (footnote omitted).

[52] *See* Philip Tracy, RCR Wireless News, "What is network densification and why is it needed for 5G?," Nov. 9, 2016, https://www.rcrwireless.com/20161109/fundamentals/network-densification-5g-tag31-tag99.

[53] *See* Verizon Comments at 3; AT&T Comments at 1.

[54] *See* Mar. 13, 2018 CTIA *Ex Parte* Letter at Attach. at 1-2.

41.        Second, our decision is consistent with the history of Section 1.1312.  When the Commission adopted that section, its focus was primarily on the deployment of macrocells and the relatively large towers that marked the deployment of prior generations of wireless service for which site-specific preconstruction review was common even in the absence of a Section 319 construction permit.[55]  Those macrocells and large towers supported legacy technology and because of their size were more likely to have an appreciable environmental impact.  The world of small wireless facility deployment is materially different from the deployment of macrocells in terms of the size of the facility, the importance of densification, and the lower likelihood of impact on surrounding areas.  The Commission simply could not have anticipated that advanced wireless services would require the densification of small deployments over large geographic areas that leave little to no environmental footprint.  Amending Section 1.1312 to make clear that it does not apply to small wireless facility deployment accounts for this reality.

42.        Third, our decision is consistent with the Commission's treatment of small wireless facility deployments in other contexts.  For example, under the Collocation NPA, the Commission already excludes many facilities that meet size limits similar to those defined below from historic preservation review.[56]  Our decision today builds upon the insight underlying these existing rules that small wireless facilities pose little or no risk of adverse environmental or historic preservation effects.

43.        Fourth, under existing practice, the Commission currently does not subject many types of wireless facilities to environmental and historic preservation compliance procedures.  For example, we have not applied—and to a large extent could not realistically apply—these review requirements to consumer signal boosters, Wi-Fi routers, and unlicensed equipment used by wireless Internet service providers.  Thus, the Commission has already, in effect, made a public interest determination that, even if we had the legal authority to do so, the cost of requiring NEPA and NHPA compliance for certain types of facilities outweighs the benefits.  Today's action simply applies that existing paradigm to current circumstances.

44.        Fifth, while our amendment of Section 1.1312 to exclude small wireless facility deployments eliminates the only basis under *CTIA* and Commission precedent for treating such deployments as undertakings or major federal actions subject to NHPA and NEPA review, we conclude that the costs of conducting such review in the context of small wireless facilities outweigh any attendant benefits.  The record in this proceeding demonstrates significant burdens on small facility deployment emanating from these requirements.  We expect these burdens to grow exponentially, as an ever-increasing number of small wireless facilities are deployed.  We also find little environmental and historic preservation benefit associated with requiring environmental or historic preservation assessments for small wireless facility deployment.  While "wireless providers will need flexibility to strategically place thousands of [distributed antenna system] and small cell facilities throughout the country in the next few years," Commission requirements to conduct environmental and historic preservation review pose significant obstacles to that deployment.[57]  We conclude that any marginal benefit that NHPA and NEPA

---

[55] *See, e.g.*, *Amendment of Part 22 of the Commission's Rules to Allow Public Mobile Service applicants to Commence Construction After Filing FCC Form 401, but Prior to Receiving an Authorization*, CC Docket No. 88–475, Report and Order, 4 FCC Rcd 5960, 5967, n.6 (1989); 47 CFR § 22.43(a)(1), (d) (1990).

[56] Nationwide Programmatic Agreement for the Collocation of Wireless Antennas, 47 CFR Part 1, Appx. B, § VI (Collocation NPA); *see also* 47 CFR § 1.1306(c)(1) (excluding certain wireless facilities from NEPA review).

[57] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3343, para. 32.  Distributed Antenna Systems (DAS) networks distribute wireless signals from a central location to remote antenna nodes in areas with poor coverage or inadequate capacity.  Small cells are low-powered wireless base stations that cover smaller areas than larger macrocells.  Both DAS networks and small cells typically target indoor or localized outdoor areas ranging in size from homes and offices to stadiums, shopping malls, hospitals, and metropolitan outdoor spaces.  These small facilities are generally used to provide connectivity to consumers in areas that present capacity and coverage challenges to the larger traditional wide-area macrocell networks.  Whereas small cells are usually operator-managed and support only a

(continued….)

review might provide in this context would be outweighed by the benefits of more efficient deployment of small wireless facilities and the countervailing costs associated with such review. Accordingly, the public interest is not served by requiring small wireless facilities to continue to adhere to this costly review process.

45.    We emphasize that our decision today is limited to small wireless facilities that are deployed to provide service under geographic area licenses and are not subject to ASR. Thus, we do not address whether, or the extent to which, site-by-site licensing or ASR render construction of the licensed or registered facilities a major federal action or undertaking. We also do not revisit the Commission's previous analyses as applied to facilities falling outside the scope of small wireless facilities covered by this Order. To the extent the *Wireless Infrastructure NPRM* sought comment on these questions, they remain pending and may be considered in future items. In addition, transmissions from all facilities that operate pursuant to geographic area licenses remain subject to our rules governing radio frequency (RF) emissions exposure.[58]

### A.    Statutory Background and Commission Precedent

46.    Section 106 of the NHPA requires federal agencies to "take into account" the effects of their "federal or federally assisted undertaking[s]" on historic properties.[59] An undertaking is defined by

_____

(Continued from previous page) ───────────────

single wireless service provider, DAS networks can often accommodate multiple providers using different frequencies and/or wireless air interfaces.

[58] *See* 47 CFR §§ 1.1307, 1.1310. The Commission's authority to adopt and enforce RF exposure limits beyond the prospective limitations of NEPA is well established. *See, e.g.,* Section 704(b) of the Telecommunications Act of 1996, Pub. L. No. 104-104 (directing Commission to "prescribe and make effective rules regarding the environmental effects of radio frequency emissions" upon completing action in then-pending rulemaking proceeding that included proposals for, *inter alia*, maximum exposure limits); 47 U.S.C. § 332(c)(7)(B)(iv) (recognizing legitimacy of FCC's existing regulations on environmental effects of RF emissions of personal wireless service facilities, by proscribing state and local regulation of such facilities on the basis of such effects, to the extent such facilities comply with Commission regulations concerning such RF emissions); 47 U.S.C. § 151 (creating the FCC "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service, . . . for the purpose of [*inter alia*] promoting safety of life and property through the use of wire and radio communications"). *See also* H.R. Rep. No. 204(I), 104th Cong., 1st Sess. 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61 (1996) (in legislative history of Section 704 of 1996 Telecommunications Act, identifying "adequate safeguards of the public health and safety" as part of a framework of uniform, nationwide RF regulations); *Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010) (affirming that FCC regulation of cell phone RF emissions – including those rules addressing health effects – preempted state lawsuit dependent on claims of adverse health effects from FCC-compliant cell phone RF emissions), *cert. denied*, 132 S.Ct. 365 (2011). In *Farina*, 625 F.3d at 130, the U.S. Court of Appeals for the Third Circuit stated that "[p]rotecting public safety [with RF emissions regulation] is clearly within the mandate of the FCC," observing that "although the FCC's RF regulations were triggered by the Commission's NEPA obligations, health and safety considerations were already within the FCC's mandate, 47 U.S.C. §§ 151, 332(a), and all RF regulations were promulgated under the rulemaking authority granted by the [Communications Act of 1934, as amended]." *Id*. at 128. The court also recognized that in promulgating RF exposure standards, the Commission was not only acting in accordance with its public safety mandate, but also in accordance with its mandate to ensure the rapid development of an efficient and uniform nationwide communications system: "In order to satisfy both its mandates to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network, the FCC was required to weigh those considerations and establish a set of standards that limit RF emissions enough to protect the public and workers while, at the same time, leave RF levels high enough to enable cell phone companies to provide quality nationwide service in a cost-effective manner." *Id*. at 125; *Reassessment of FCC Radiofrequency Exposure Limits and Policies*, First Report and Order, Further Notice of Proposed Rulemaking and Notice of Inquiry, 28 FCC Rcd 3498, 3530-31, para. 103, n.176 (2013).

[59] 54 U.S.C. § 306108.

the statute as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval[.]"[60] Court precedent and ACHP guidance make clear that there must be some degree of federal involvement for something to constitute an "undertaking" under the NHPA.[61]  By rule and the Commission's *2004 Order*, the FCC has authority to determine what activities constitute federal undertakings.[62]

47.    NEPA requires federal agencies to identify and evaluate the environmental effects of proposed "major Federal actions."[63]  Similar to an "undertaking," a "major Federal action" under NEPA includes, among other things, "projects and programs entirely or partly . . . approved by federal agencies."[64]  Courts consider "major Federal actions" under NEPA to be largely equivalent to "undertakings" under the NHPA.[65]  Accordingly, like the NHPA's requirements, "[t]he requirements of NEPA apply only when the federal government's involvement in a project is sufficient to constitute 'major federal action.'"[66]

48.    As relevant here, the Commission has historically identified undertakings and major Federal actions, and thus imposed corresponding NHPA and NEPA obligations, based on the Commission's activities in two areas:  ASR and facilities subject to the approval requirement in Section 1.1312 of our rules.[67]  Specifically, the Commission has required environmental and historic preservation

---

[60] 54 U.S.C. § 300320(3); *see also* 36 CFR § 800.16(y) (defining undertaking).  Contrary to arguments in the record, we do not amend this definition.  *See*, *e.g.*, Letter from James T. Graves, Counsel to NATHPO, to Marlene H. Dortch, FCC, WT Docket No. 17-79, (filed Mar. 12, 2018) at 2, Letter from David Sickey, Coushatta Tribe of Louisiana, WT Docket No. 17-79 (filed Mar. 15, 2018) at 2; Letter from Rick Peterson, Red Cliff Band of Lake Superior Chippewa Indians, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1-2. Rather, for the reasons discussed above, we clarify that the deployment of small wireless facilities by non-Federal entities is not an "undertaking" based on the existing definition.

[61] *See, e.g., Karst*, 475 F.3d at 1295 ("both … [NEPA and the NHPA] impose procedural obligations on federal agencies after a certain threshold of federal involvement"); *Ringsred v. City of Duluth*, 822 F.2d 1305, 1309 (8th Cir. 1987) (finding the activity at issue "outside the scope of NHPA" given "the lack of federal involvement"); *Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 120 (D.D.C. 1986) (for a local project to constitute an "undertaking" for purposes of the NHPA a "federal agency must be substantially involved in the local project, either with its initiation, its funding, or its authorization"); Advisory Council on Historic Preservation, 65 Fed. Reg. 77698, 77712 (Dec. 12, 2000) ("The Agency Official is responsible, in accordance with § 800.3(a), for making the determination as to whether a proposed Federal action is an undertaking.  As appropriate, an agency should examine the nature of its Federal involvement taking into consideration factors such as the degree of Federal agency control or discretion; the type of Federal involvement or link to the action; and whether or not the action could move forward without Federal involvement.").

[62] *See, e.g.*, 36 C.F.R. § 800.3(a) ("The agency official shall determine whether the proposed Federal action is an undertaking[.]"); *see also* Nationwide Programmatic Agreement Regarding the Section 106 National Historic Preservation Act Review Process, 47 CFR Part 1, App'x C, § I.B (Wireless Facilities NPA) ("The Commission has sole authority to determine what activities undertaken by the Commission or its applicants constitute Undertakings within the meaning of the NHPA."); Verizon Comments at 61; AAR Comments at 16 n.55.

[63] 42 U.S.C. § 4332(2)(C); *see also* 40 CFR § 1508.18 (defining major Federal action).

[64] 40 CFR § 1508.18(a).

[65] *See, e.g., Karst*, 475 F.3d at 1295-96; *see also Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir. 2001) ("Because of the operational similarity between the two statutes, courts generally treat 'major federal actions' under the NEPA as closely analogous to 'federal undertakings' under the NHPA.").

[66] *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1480 n.23 (10th Cir. 1990); *see also, e.g., Karst*, 475 F.3d at 1295; *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1133-35 (5th Cir. 1992).

[67] *2004 Order*, 20 FCC Rcd at 1082-84, paras. 24-27.  Separately, the Commission also has treated construction under a site-specific license as triggering NHPA and NEPA obligations.

review via two regulatory approval processes.[68]  The first applies only to the subset of towers that exceed 200 feet or are in the vicinity of an airport and thus are required to "be 'registered'" with the Commission pursuant to Section 303(q) of the Communications Act.[69]  The second applies where facilities that are not otherwise subject to pre-construction Commission authorization are nonetheless required to obtain Commission approval of an environmental assessment prior to construction pursuant to Section 1.1312(b) of the Commission's rules.[70]  The Commission has treated its approvals in each of these contexts as rising to the level of "undertakings" or "major Federal actions" that trigger NHPA and NEPA.[71]  And the Commission's approach has been affirmed by the U.S. Court of Appeals for the D.C. Circuit, which held that the Commission acted within its discretion in identifying its pre-construction antenna structure registration requirements under Section 303(q) of the Act and its Section 1.1312 limited-approval authority as undertakings for purposes of NHPA.[72]

49.    The history of the FCC's involvement in this area begins in 1974, when the Commission first promulgated rules implementing NEPA.[73]  At that time, the Commission licensed carriers with authority to operate from a specific site or physical location, and federal law generally required the FCC to issue the provider a construction permit for that site before the agency granted a license to operate.[74]  The Commission thus had a significant, federal role in approving construction of specific wireless communications facilities in a given location, and the Commission treated these activities as undertakings under the NHPA and major Federal actions under NEPA.[75]

50.    In 1982, Congress altered this framework.  In particular, it eliminated the construction permit requirement for certain wireless licenses, while permitting the Commission to retain the requirement if it determined that the "public interest, convenience, and necessity" required it.[76]  As a result of this and associated regulatory changes, the FCC now licenses many services, including most licensees operating in commercial wireless services, to transmit over a particular band of spectrum within a wide geographic area without further limitation as to transmitter locations.[77]

51.    Nonetheless, the FCC has continued by rule to require certain wireless providers previously subject to construction permit requirements to comply with environmental and historic preservation review procedures without regard to the particular type of deployment at issue.  In 1990, the

---

[68] *See Wireless Infrastructure NPRM*, 32 FCC Rcd at 3340, para. 26.

[69] *See* 47 U.S.C. § 303(q) (vesting the Commission with authority to "require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation"); *see also* 47 CFR Part 17; *2004 Order*, 20 FCC Rcd at 1084, para. 27.

[70] *2004 Order*, 20 FCC Rcd at 1083-84, para. 26.

[71] *See 1995 Order*, 11 FCC Rcd 4272, 4289, para. 41 & n.60 (concluding that "registering a structure," *i.e.*, its tower registration process, "constitutes a ... `federal undertaking'" under the NHPA); *1990 Order*, 5 FCC Rcd at 2942, para. 4 (amending Commission rules "to require environmental review before any applicant proceeds with [tower] construction").

[72] *CTIA*, 466 F.3d at 114-15.

[73] *Implementation of the National Environmental Policy Act*, Report and Order, 49 FCC 2d 1313 (1974) (*1974 Order*).

[74] *See* 47 U.S.C. § 319(a) ("No license shall be issued . . . for the operation of any station unless a permit for its construction has been granted by the Commission.").

[75] *See, e.g.*, *1974 Order*, 49 FCC 2d at 1319-20, para. 14.

[76] 47 U.S.C. § 319(d) ("A permit for construction shall not be required for public coast stations, privately owned fixed microwave stations, or stations licensed to common carriers, unless the Commission determines that the public interest, convenience, and necessity would be served by requiring such permits for any such stations.").

[77] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3341, para. 26.

Commission amended Section 1.1312 of its rules, so that that where construction of a Commission-regulated radio communications facility is permitted without prior Commission authorization (*i.e.*, without a construction permit), the licensee must nonetheless comply with historic preservation and environmental review procedures.[78]  As the D.C. Circuit observed, the Commission's 1990 decision "never explicitly addresse[d] whether tower construction is a federal undertaking under section 106 of the NHPA."[79]  Nor did it expressly address whether such construction was a major Federal action under NEPA.  Instead, the Commission's adoption of Section 1.1312 was grounded in the "'public interest benefits of ensuring, in compliance with Federal environmental statutes, that no potentially irreversible harm to the environment occurs.'"[80]  The Commission apparently concluded that this public interest consideration sufficed for the agency to use the Section 1.1312 process to trigger NEPA and NHPA review.

52.     In 1995, the Commission expressly concluded that "registering a structure," that is, our tower registration process, "constitutes a 'federal action' or 'federal undertaking'" under the relevant federal environmental and historic preservation review statutes.[81]  However, as the D.C. Circuit observed, that 1995 decision "contains no analysis of relevant statutes and regulations in support of that conclusion."[82]

53.     In 2004, the Commission addressed the NHPA again in the context of establishing a programmatic agreement.  In that decision, the Commission offered two bases for determining that the construction of communications towers and deployment of antennas require compliance with the NHPA.  First, the Commission relied on the agency's tower registration process and authority.  It indicated that this process "may be viewed as effectively constituting an approval process within the Commission's section 303(q) authority."[83]  Under Section 303(q), the Commission has chosen to implement rules requiring that towers meeting certain height and location criteria be registered with the Commission prior to construction.[84]  Second, as described above, the Commission relied on what it has described as a "limited approval authority."[85]  Specifically, while Section 319(d) states that a construction permit shall not be required for the deployment of certain facilities, the Commission read what it described as "Section 319(d)'s public interest standard" as allowing the Commission to require covered entities to nonetheless comply with environmental and historic preservation processing requirements.[86]  The Commission pointed in particular to Section 1.1312 of the FCC's rules, which states that "[i]f a facility" for which no Commission authorization prior to construction is required "may have a significant environmental impact" then the licensee must submit an environmental assessment to the Commission and the Commission must then rule on that assessment prior to initiation of construction of the facility.[87]

---

[78] *1990 Order*, 5 FCC Rcd at 2942, para. 4.

[79] *CTIA*, 466 F.3d at 109.

[80] *Id.* (quoting *1990 Order*, 6 FCC Rcd at 2943, para. 11).

[81] *Streamlining the Commission's Antenna Structure Clearance Procedure*, WT Docket No. 95-5, Report and Order, 11 FCC Rcd 4272, 4289, para. 41 & n.60 (1995) (*1995 Order*).

[82] *CTIA*, 466 F.3d at 109.

[83] *2004 Order*, 20 FCC Rcd at 1084, para 27.

[84] 47 U.S.C. § 303(q) (authorizing the Commission "to require the painting and/or illumination of radio towers" if it determines there is a "reasonable possibility" that such towers may create a hazard to air navigation); *see also* 47 CFR §§ 17.4, 17.7.

[85] *2004 Order*, 20 FCC Rcd at 10883-84, para. 26.

[86] *Id.*

[87] 47 CFR § 1.1312.

54.     At the same time, the Commission stated that the agency "did not seek comment on the question whether the Commission should, assuming that it possesses statutory authority to do so, continue our current treatment of tower construction as an 'undertaking' for purposes of the NHPA."[88]  Therefore, the Commission "decline[d] to revisit" that question.[89]  Continuing, the Commission observed that "[u]nless and until we undertake the reexamination and determine that it is appropriate to amend our rules . . . we believe our existing policies treating tower construction as an undertaking under the NHPA reflect a permissible interpretation of the Commission's authority under Section 319(d) of the Act to issue construction permits for radio towers, as well as our authority under Section 303(q) governing painting and/or illumination of towers for purposes of air navigation safety."[90]

55.     Two Commissioners dissented in part from the agency's 2004 decision, expressing the view that, in the absence of a construction permit or a site-by-site license, the Commission's retention of jurisdiction to require historic preservation review exceeded its statutory authority.[91]  On appeal, the U.S. Court of Appeals for the D.C. Circuit upheld the Commission's decision against a challenge that it was arbitrary and capricious.[92]

56.     Most recently, in 2014, the Commission found "no basis to hold categorically that small wireless facilities such as DAS and small cells are not Commission undertakings."[93]  But the Commission there was only evaluating the operation of the rule, by its terms, against the backdrop of the specific evidence in the record on that item.  The Commission did not consider whether, in the first instance, it could amend its rules to clarify that small wireless facilities are not Commission undertakings or whether the public interest would be served by doing so.[94]

57.     In the *Wireless Infrastructure NPRM*, the Commission sought comment on updating its approach to environmental and historic preservation review.  Among other things, the Commission "invite[d] comment on whether we should revisit the Commission's interpretation of the scope of our responsibility to review the effects of wireless facility construction under the NHPA and NEPA."[95]  The *NPRM* invited input on "the costs of NEPA and NHPA compliance and its utility for environmental protection and historic preservation for different classes of facilities, as well as the extent of the Commission's responsibility to consider the effects of construction associated with the provision of licensed services under governing regulations and judicial precedent," seeking particular comment regarding the treatment of geographic area service licenses and small wireless facility deployment.[96]

---

[88] *2004 Order*, 20 FCC Rcd at 1082-83, para. 24.

[89] *Id.*

[90] *Id.*

[91] *Id.* at 1230 (Statement of Commissioner Kathleen Q. Abernathy); *id.* at 1233 (Statement of Commissioner Kevin J. Martin).

[92] *CTIA*, 466 F3d. at 105.

[93] *Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, et al.*, WT Docket Nos. 13-238, 23-32, WC Docket No. 11-59, Report and Order, 29 FCC Rcd 12865, 12904-05, para. 84 (2014).

[94] *Id.*

[95] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3356-57, para. 76.

[96] *Id.*

B.      **Legal Analysis**

1.      **By Amending Our Rules, We Clarify that Small Wireless Facility Deployment Is Neither an Undertaking Nor a Major Federal Action.**

58.      Consistent with the D.C. Circuit's decision in *CTIA*, we exercise our discretion today to amend our rules to clarify that the deployment of small wireless facilities does not qualify as a federal undertaking or major federal action.  As explained above, a federal undertaking or major federal action requires a sufficient degree of federal involvement, and the Commission has only ever identified two potential bases by which such involvement exists with respect to the deployment of wireless facilities that do not require site-by-site licensing or construction permits.  The first is the ASR obligations that flow from Section 303(q) and apply to facilities that are over 200 feet in height or are close to airports.  The second is the "limited approval authority" that is codified in Section 1.1312 of the Commission's rules.  Since the deployment of small wireless facilities, as defined herein, is not subject to antenna structure registration requirements under Section 303(q) of the Act, that avenue cannot provide a basis for treating small wireless facilities as an undertaking.  Thus, the only possible basis by which small wireless facility deployments could be federal undertakings would be if they were subject to the Commission's "limited approval authority."

59.      In this Order, we amend our rules to remove small wireless facilities deployment from Section 1.1312 of the rules, eliminating the remaining basis for treating small wireless facility deployment as an undertaking and major Federal action.  Neither the D.C. Circuit's *CTIA* decision nor Commission precedent precludes us from amending that rule, as long as our amendments are otherwise consistent with the Communications Act.  As explained below, the Commission has multiple sound reasons for making this amendment, including that limiting Section 1.1312 to larger wireless facilities is more consistent with the original purpose of the rule and Commission practice with respect to other small deployments.  By clarifying that Section 1.1312 does not apply to small wireless facility deployment, we eliminate the predicate federal involvement required for undertakings and major federal actions.  Accordingly, such deployments are no longer subject to those historic preservation and environmental review obligations.

2.      **Our Amendment of Section 1.1312 of the Rules Is Consistent with the Public Interest.**

60.      We conclude that our actions are consistent with the Commission's statutory mandates under the Communications Act, including its mandate to regulate in the public interest.

61.      Although the Commission appeared to ground the adoption of Section 1.1312 in its public interest authority, the Commission has never squarely addressed whether the public interest is served by exercising this authority in the context of small wireless facility deployment.  Nor did the Commission have at its disposal in 1990 the wealth of evidence now available in the wake of small cell deployment replacing macro deployment as the means by which many providers are choosing to deploy new wireless technology, such as 5G.  We remedy that deficiency today.  In amending the Commission's rules, and after review of the record, we determine that the public interest would not be served by continuing to subject small wireless facility deployment to Section 1.1312's review requirements.  As part of the public interest analysis, we recognize that the approval requirement in Section 1.1312 has the effect of subjecting covered deployments to environmental and historic preservation review under NEPA and the NHPA.  We deem the costs of that resulting review to be unduly burdensome in light of the nature of small wireless facility deployment, the benefits of efficient and effective deployment, and the minimal anticipated benefits of NHPA and NEPA review in this context, as explained in greater detail below.

62.      When exercising our public interest authority to effectuate the purposes of the Communications Act, we must factor in the fundamental objectives of the Act, including the deployment of a "rapid, efficient . . . wire and radio communication service with adequate facilities at reasonable charges" and "the development and rapid deployment of new technologies, products and services for the benefit of the public . . .  without administrative or judicial delays[, and] efficient and intensive use of the

electromagnetic spectrum."[97]  Relatedly, Section 706 of the 1996 Act exhorts the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing, in a manner consistent with the public interest, convenience, and necessity. . . . regulating methods that remove barriers to infrastructure investment."[98]  These statutory provisions do not confer authority but are consistent with the goals of the Communications Act.

63.    Furthermore, a close analysis of Section 319(d) of the Act supports the conclusion that Congress does not want the Commission to place unnecessary regulatory barriers in the way of wireless facilities deployment.  Section 319(d) states, in relevant part, that "[a] permit for construction shall not be required for . . . stations licensed to common carriers, unless the Commission determines that the public interest, convenience and necessity would be served by requiring such permits for any such stations."[99]  By its terms, Section 319(d) eliminates Commission approval requirements for wireless communications facilities and precludes construction permits for those classes of providers unless the FCC makes affirmative public interest findings that such requirements are necessary and expressly imposes them.  That language in Section 319(d) was added in 1982 based on Congress's belief that in many cases the required preapproval "may delay market entry and place an unnecessary administrative and financial burden on both the potential licensee and the Commission."[100]  It appears contrary to the intent of Section 319(d) to replace the eliminated construction permit requirement with a different approval process that, at least in the small wireless facility context, risks replicating the harmful effects that Congress expressly sought to eliminate absent strong evidence of the public interest benefits of doing so.

64.    We find on the record in this proceeding that the public interest does not support applying the Section 1.1312 approval process to small wireless facilities.  To the contrary, encouraging small wireless facility deployment directly advances all of the statutory objectives described above.  We have recognized that small wireless facilities will be increasingly necessary to support the rollout of next-generation services, with far more of them needed to accomplish the network densification that providers require, both to satisfy the exploding consumer demand for wireless data for existing services and to implement advanced technologies like 5G.[101]  The record here also supports our prior conclusions regarding the volume and pace of needed small wireless facility deployments to support the future of advanced wireless services.[102]  We note, for example, that Verizon anticipates that 5G networks will require 10 to 100 times more antenna locations than previous technologies, while AT&T estimates that carriers will deploy hundreds of thousands of wireless facilities – equal to or more than they have

---

[97] 47 U.S.C. §§ 151, 309(j)(3)(A), (D).

[98] 47 U.S.C. § 1302(a).

[99] 47 U.S.C. § 319(d); *see also* 47 U.S.C. § 332(c)(1)(A) ("A person engaged in the provision of service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this Act . . . .").  Although particular advanced wireless services driving the need for small wireless facility deployment might not always fit the categories of services for which Congress, by default, eliminated construction permits in Section 319(d)—rather than those for which a Commission waiver of Section 319 construction permits was authorized—the wireless providers nonetheless typically are providers of services that do fit those categories, and the small wireless facilities are useful for a range of services offered by the providers using them.  In addition, the imposition of conditions under the Commission's other Title III public interest authority likewise requires an affirmative public interest finding in all instances.  *See, e.g.*, 47 U.S.C. §§ 303(r), 316.

[100] H.R. Conf. Rep. No. 97-765, 51-52 (Aug. 19, 1982).

[101] *2017 Pole Replacement Order*, 32 FCC Rcd at 9765, para. 12.

[102] *See, e.g.*, CTIA/WIA Comments at 4-5; Sprint Comments at 8-12, 35-36; T-Mobile Comments at 5-7; Verizon Comments at 3-5, 44-45.

deployed over the last few decades.[103]  Sprint, in turn, has announced plans to build at least 40,000 new small sites over the next few years.[104]

65.    In light of these statistics, the Commission cannot simply turn a blind eye to the reality that the mechanical application of Section 1.1312's requirements to each of these small deployments would increase the burden of review both to regulated entities and the Commission by multiples of tens or hundreds.  Nor can we ignore the record evidence cited above showing the negative impact and high costs associated with subjecting small wireless facility deployments to NHPA and NEPA review.  It would be impractical, extremely costly, and contrary to the purposes of the Communications Act to subject the deployments required for 5G technology to many times the regulatory burdens that the Commission previously imposed on 3G and 4G infrastructure.

66.    We also find that the historical and present application of Section 1.1312 supports the distinction we make today between macrocell and large towers on the one hand and small wireless facilities on the other.  When the Commission amended Section 1.1312 in 1990 to require historic preservation and environmental review procedures for radio communications facilities that did not require pre-authorization permits, it was primarily focused on macrocells and large tower deployments, and it could not have anticipated that many small-cell antennas today would fit inside a space the size of a pizza box or that densification of many hundreds of these antennas would be necessary for deployment of more advanced wireless technologies.  The Commission has nevertheless made common-sense accommodations for types of deployments that have limited potential for environmental and historic preservation effects and for which compliance would be impractical.  For example, the Commission does not subject consumer signal boosters, Wi-Fi routers, or unlicensed equipment used by wireless Internet service providers to Section 1.1312 review.  Through today's Order, we apply similar considerations in determining that it is consistent with the public interest to eliminate NEPA and NHPA compliance requirements for all small wireless facility deployments as defined herein.

67.    We further find, on balance, that the costs of requiring Section 1.1312 review for small wireless facilities outweigh the marginal benefits, if any, of environmental and historic preservation review.[105]

68.    Although commenters assess the magnitude of time and resources required for NEPA and NHPA compliance differently,[106] the record clearly indicates that there are substantial, rising, and

---

[103] *See* Verizon Comments at 3; AT&T Comments at 1.

[104] *See* Letter from Keith C. Buell, Senior Counsel, Sprint, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 at 2 (filed Feb. 21, 2018).

[105] Although TechFreedom discusses ways in which the analysis of costs and benefits could be even more detailed if the Commission were to collect additional information and contends that the notice provided could have been even more specific about this weighing, it offers these suggestions as ways the Commission could "do more than the courts have required."  Letter from Berin Szoka, President, and Graham Owens, TechFreedom, to Marlene H. Dortch, FCC, WT Docket No. 17-79, at 4-9 (field Mar. 15, 2018) (TechFreedom Mar. 15, 2018 *Ex Parte* Letter).  We agree that we have satisfied our notice requirements under the Administrative Procedure Act and that we have reasonably analyzed the information in the record.  We are not persuaded that there would be any incremental benefit to any further delay here, given the robust record already before us and our policy interest in promoting advanced wireless services as soon as possible.

[106] *Compare, e.g.*, CCA Comments at 27-33, 37-43 (expressing concern about fees and review processes); CTIA/WIA Comments at  6-18 (expressing a similar concern) *with, e.g.*, Missouri SHPO Comments at 1 (discussing projects returned due to incomplete reports); Seminole Tribe of Florida Comments at 6-12 (advocating the reasonableness of existing processes and requirements); Letter from Patrick Baird, Nez Perce Tribe, WT Docket No. 17-79 (filed Mar. 15, 2018) at 3 (rejecting assertion that Tribal reviews are a hindrance to timely deployment of wireless facilities) *cf.* AAR Reply at 14 ("the issue of fees and delays transcends the question of who is to blame and whose math is correct").

unnecessary costs for deployment that stem from compliance with NEPA and the NHPA.[107]  Over the last several decades, for example, Sprint estimates that it has done preliminary NEPA checklists for thousands of sites at a cost of tens of millions of dollars.[108]  Of those sites, approximately 250 triggered the requirement that Sprint prepare an environmental assessment that costs approximately $1,300.[109]  Most of those environmental assessments were for historic preservation concerns by state historic preservation officers under Section 1.1307(a)(4) of the Commission's rules because the site was in or near a historic district or historic property, but every one of those assessments resulted in a finding of no significant impact.[110]  In other words, the Commission's rules have required Sprint to spend tens of millions of dollars to investigate a minimal likelihood of harm.

69.       Verizon and AT&T reported similar burdens.  Verizon examined its small wireless facility deployments in 2017 in five urban markets across the United States and found that completing NEPA and NHPA reviews comprised, on average, 26 percent of the total cost for these deployments.[111]  In the five markets Verizon examined, the costs of completing NEPA and NHPA (including Tribal) reviews comprised, on average, 26 percent of the total cost of deployment of small cells, including equipment.[112]  AT&T offered similar figures, stating that 17 percent of its costs to deploy each small wireless facility is directed to NEPA and NHPA compliance.[113]  AT&T further represented that it expects to spend $45 million on NEPA and NHPA compliance for thousands of small wireless facilities in 2018 and that its current NEPA and NHPA costs have direct effects on its broadband deployment initiatives by funneling money away from new small wireless facility projects or the expansion of existing projects.[114]  By contrast, AT&T estimates that a Commission decision that such deployments are not major federal actions or undertakings would reduce small cell NEPA/NHPA compliance costs by up to 80 percent, which would fund over 1,000 additional small cell nodes annually, and reduce the small cell deployment timeline by 60-90 days.[115]  CTIA submitted a report indicating that overall, in 2017, providers spent nearly $36 million on NEPA and NHPA compliance.  The report estimated that, based on providers'

---

[107] We are not persuaded that the costs of review discussed below would be materially affected by the 2016 Amendment to the Collocation NPA, as some speculate, *see, e.g.*, Letter from Gerard Lavery Lederer, Counsel for City of Boston *et al.*, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79, at 3-4 (filed Mar. 14, 2018) (City of Boston *et al.* March 14, 2018 *Ex Parte* Letter), and indeed, we note that record evidence of the costs of review includes time periods after that amendment.

[108] Sprint Comments at 35.

[109] *Id.*

[110] *Id.*

[111] Letter from Tamara Preiss, Verizon, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1 (filed Feb. 23, 2018).

[112] *Id.*  Verizon does not identify the five urban markets in which it conducted this study, and it acknowledges that it made this calculation using sample sizes of 5-19 sites (depending on the availability of data) involving collocations on existing structures (although Verizon notes that approximately 20 percent of its small cell deployments involve construction of new structures).

[113] AT&T Feb. 23, 2018 *Ex Parte* Letter at 2-3.

[114] *Id.*  We disagree with comments suggesting that the steps we take in this order to update and modernize historic preservation and environmental review are unnecessary because 5G technologies are not fully developed and deployed.  *See* City of Rye Mar. 14, 2018 *Ex Parte* Letter at 2.  To the contrary, evidence in the record demonstrates that the substantial costs associated with compliance with the NHPA and NEPA are already affecting wireless facility deployment.

[115] AT&T Feb. 27, 2018 *Ex Parte* Letter at 2-3.

plans to accelerate small facility deployment, NEPA and NHPA costs would increase to $241 million in 2018.[116]

70.     The record also reveals more generally that, even setting aside payments to Tribal Nations, which we address below, review requirements can easily cost well over a thousand dollars per review—and potentially much more.[117]  Even if the time and resource expenditure associated with this review process may not appear substantial in the context of a single facility's deployment, given our prior conclusions based on the record regarding the volume and pace of needed small wireless facility deployments, we expect the aggregate effect of exercising our limited reservation of authority to require environmental and historic preservation review for small wireless facilities to be substantially greater.[118] For example, we estimate that in the last several years thousands of small wireless facility deployments annually have been subject to Tribal review under our rules, representing approximately 80 percent of the total of such reviews.[119]  Given trends in small wireless facility deployment, the number of such reviews is likely to increase further over time.  In addition, although aggregate annual review costs for smaller

---

[116] CTIA Mar. 13, 2018 *Ex Parte* Letter, Attach. at 1-2.

[117] *See, e.g.*, Crown Castle Comments at 43 ("[T]he need to prepare an EA" for siting in a floodplain "incurs consulting fees averaging $2,000-$3,000."); CTIA Comments at 35 (The screen for environmental effects under Section 1.1307 of the Commission's rules costs approximately $2,000 per site.); Sprint Comments at 6 ("[U]nder the Commission's rules, the presence of a 100-year floodplain requires the preparation of an Environmental Assessment.  The Environmental Consultant charges $1,400 for this document."); Sprint Comments at 35 ("The National Environmental Protection Act [sic] has been interpreted by the FCC to require all new sites outside rights of way and new sites more than 20 feet or 10 percent taller than existing structures within a right of way to screen for environmental effects under Section 1.1307 of the Commission's rules. This screen costs approximately $2,000 per site."); AAR Reply at 10 ("AAR's members have submitted at least 710 environmental assessments ('EAs') for floodplain review since May 2014, the average cost of which ranges between $1,000 and $20,000."); Verizon Feb. 26, 2018 *Ex Parte* Letter at 2 (estimating the average cost of a floodplains-related EA at $3,500 each). In addition, Verizon states that historic preservation reviews between 2012 and 2015 "add[ed] almost $4,000 to the cost of each facility," considering "the costs for consultants to review the site and prepare the relevant FCC forms for submission, tribal review and monitoring fees, and fees associated with preparing and submitting environmental assessments and memoranda of agreement to resolve adverse effects."  Verizon Comments at 54 & n.164. Verizon also states that "the average cost [of Tribal reviews] is now almost $2,500 per site," suggesting a cost of $1,500 per review apart from Tribal fees.  Verizon Comments at 44.  Given the increase in Tribal fees over time, that $2,500 amount likely overstates—perhaps substantially—the average Tribal fees paid between 2012 and 2015, and thus understates the cost of review.  And as the Commission elsewhere has observed:  "In 2009, 67 tower registrations required an EA; and in 2010, 69 tower registrations required an EA. In 2011, that number increased to 132, but only 42 of these EAs were for towers taller than 200 feet (61 meters). The [Wireless Telecommunications] Bureau estimates that under the current ASR program, EA preparation for a tower typically costs between $5,000 and $15,000 (with exceptional cases costing up to $25,000), depending on the complexity of issues and resources to be addressed." FCC, *Final Programmatic Environmental Assessment for the Antenna Structure Registration Program*, at 4-27 (Mar. 13, 2012) https://apps.fcc.gov/edocs_public/attachmatch/DOC-312921A1.pdf.

[118] *See, e.g.*, CTIA/WIA Comments at 4-5; Sprint Comments at 8-12, 35-36; T-Mobile Comments at 5-7; Verizon Comments at 3-5, 44-45.

[119] Although the Commission's data are not categorized in a manner that precisely corresponds to the definition of small wireless facility adopted here, we believe that for purposes of estimation looking at deployments under 50 feet in height provides a reasonably proxy. In 2016, there were 14,535 submissions for Tribal review in TCNS, of which 12,152 were under 50 feet (83.6%).  In 2017, there were 15,287 TCNS submissions, of which 12,057 were under 50 feet (78.9%).  Even excluding PTC deployments does not materially change the results.  In 2016, there were 13,529 non-PTC submissions, of which 11,146 were under 50 feet (82.4%), and in 2017 there were 14,715 non-PTC submissions, of which 11,485 were under 50 feet (78.0%).  Apart from data on the number of Tribal reviews, the record reveals that providers likewise report that small wireless facility deployments now represent a clear and increasing majority of their wireless facility deployments.  *See, e.g.*, Verizon Feb. 26, 2018 *Ex Parte* Letter at 1 (reporting that 62% of its deployments in 2017 were small wireless facilities and that it expects the proportion of small wireless facility deployment to increase in the coming years).

providers might well be less than that of entities with a large number of annual deployments, such small businesses also are likely less able to bear those costs.[120]  Although batch processing can have some benefits in reducing the burdens of review, even advocates of batching observe that its benefits may be limited based on characteristics such as batch size, specific type of facility, environmental and/or historic preservation effect, and geographic area.[121]  We thus are not persuaded that batch processing would reduce the burdens of the review process to such a degree that those burdens no longer would be significant.

71.    The potential delay in deployment associated with the review process also appears likely to be substantial.  The record reveals that, given their time and expense, environmental and historic preservation review processes "are generally not started until the municipality has provided its approvals in case the municipality does not approve the initial location."[122]  Thus, environmental and historic preservation review requirements necessarily impose delays above and beyond the time when facilities otherwise could begin deployment.  Although the Commission takes steps to reduce such process delays, even delays of 30 days (let alone more) are substantial enough to weigh in our public interest calculus, particularly when aggregated across all the small wireless facility deployments that will be required in the coming years.

72.    At the same time, as discussed below, the record does not support sufficiently appreciable countervailing environmental and historic preservation benefits associated with subjecting small wireless facility deployments off of Tribal lands to historic preservation and environmental reviews.[123]  Consistent with our precedent, we consider the possible benefits to the environment and historic preservation flowing from a Commission-imposed compliance requirement for small wireless facility deployments.  We conclude on the record here, however, that the specific, limited types of small wireless facility deployments described below do not warrant the imposition of these requirements off of Tribal lands.  On Tribal lands, we leave undisturbed the historic preservation and environmental review processes that we presently have in place for deployments of wireless facilities.  Our determination that the Commission will continue to exercise its limited approval authority for the deployment of small wireless facilities on Tribal land is consistent with our focus in the *Wireless Infrastructure NPRM* on areas of Tribal interest,[124] and supported by our review of the record, which establishes that wireless providers have not experienced the same challenges arising from the historic preservation review process on Tribal lands.[125]  The

---

[120] *See, e.g.*, Monte R. Lee and Company Comments at 2 (discussing review costs and observing that "[w]hile larger members of the telecommunications industry might be able to absorb such steep costs, this negatively affects smaller telecommunications carriers in rural areas the most.").

[121] *See, e.g.*, CCA Comments at 39; CTIA/WIA Comments at 28-29; CCA Reply at 10.

[122] Sprint Comments at 4.

[123] Contrary to the suggestions of some commenters, we do not evaluate the record regarding potential benefits of environmental and historic preservation review or specify an associated definition of small wireless facilities for purposes of determining whether the NHPA and NEPA apply by their terms, or for purposes of determining the extent of any review obligations under those statutes if they applied.  *See, e.g.*, Letter from Jaqueline Pata, NCAI, Kitcki Carroll, USET Sovereignty Protection Fund, WT Docket No. 17-79 (filed Mar. 14, 2018) (NCAI, USET SPF Mar. 14, 2018 *Ex Parte* Letter) at 7, 9; Comments of Seminole Tribe of Florida at 7 (filed March 14, 2018).  Instead, we evaluate that evidence to determine whether there is justification for the Commission to impose an approval requirement under its Communications Act public interest authority.  Under *CTIA*, it is that approval authority, if imposed, that would, in turn, trigger NHPA and NEPA review requirements.  466 F.3d at 114.

[124] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3342-43, para. 35.

[125] *See, e.g.*, CTIA/WIA Comments at 7-8 (distinguishing between projects proposed on Tribal lands versus those proposed on non-Tribal lands and addressing its comments to the latter); Verizon Comments at 44 n. 142 (emphasizing that Verizon was not proposing changes to the process for reviewing facilities to be constructed on Tribal lands).

Commission's public interest determination is also rooted in our ongoing commitment to fulfilling principles of Tribal sovereignty and to our Federal trust responsibility.[126]

73.    As an initial matter, we define the types of facilities excluded from the scope of Section 1.1312 in such a way as to minimize the impact that these facilities, as a class, could have on the environment and historic properties.[127]  We also adopt a definition that ensures that larger facilities continue to be subject to our NHPA and NEPA processes.  We believe that this represents a better allocation of scarce resources.  We thus exclude from our review requirement only facilities that are limited in antenna volume, associated equipment volume, and height.

74.    As to height, our revised rule excludes small wireless facilities if they are deployed on new structures that are either no taller than the greater of 50 feet (including their antennas)[128] or no more than 10 percent taller than other structures in the area.  The rule also excludes any small wireless facility that is affixed to an existing structure, where as a result of the deployment that structure is not extended to a height of more than 50 feet or by more than 10 percent, whichever is greater.[129]  The Commission has previously used similar size specifications to delineate circumstances in which environmental and historic preservation review was unwarranted.  In particular, the Commission has excluded from review those pole replacements that, among other things, "are no more than 10 percent or five feet taller than the original pole, whichever is greater" to guard against the risk of "excluding replacement poles that are substantially larger than or that differ in other material ways from the poles being replaced might compromise the integrity of historic properties and districts."[130]  The Commission's exclusion for pole replacements was further limited in a manner designed to ensure "that the replacement will not substantially alter the setting of any historic properties that may be nearby."[131]  We seek to advance similar ends here through the limits on overall size relative to other structures in the area.  As AT&T observes, for example, "the vast majority of small cell antennas are placed at a height of less than 60 feet on structures located near similarly sized structures in previously disturbed rights-of-way, greatly reducing the likelihood of adversely impacting the surrounding environment."[132]  The 50-foot height

---

[126] Tribal Policy Statement, 16 FCC Rcd at 4080.

[127] The definition we adopt thus is focused on the specific considerations at issue in this order, and does not prejudge definitions that might be used in other contexts.  *See, e.g.*, Letter from Rick Chessen, NCTA, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 1 (filed Mar. 16, 2018).

[128] Even if changes in the height occur, so long as the height is 50 feet or less, this criterion is satisfied.  By contrast, if the height is changed so that it would exceed 50 feet, such changes will be analyzed under the two remaining height limitation criteria.

[129] *See, e.g.*, Verizon Comments at 46-47.  Because we clarify that changes where the height remains under 50 feet satisfy the height element of our definition, we do not adopt Verizon's request, in the alternative, to allow increases in height of 10 feet, rather than 10%.  *See* Letter from Andre. J. Lachance, Verizon, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 2 (filed Mar. 13, 2018) (Verizon Mar. 13, 2018 *Ex Parte* Letter).  Given the limited evidence in the record regarding possible standards for the scope of surrounding structure to be considered, we decline to adopt a bright-line standard in that regard here as some request.  *See, e.g.*, Letter from Rebecca Murphy Thompson, CCA, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 2 (filed Mar. 16, 2018).

[130] *See 2017 Pole Replacement Order*, 32 FCC Rcd at 9767, para. 17.

[131] *Id*. at 9767, para. 18.

[132] AT&T Feb. 23, 2018 *Ex Parte* Letter at 1; *see also, e.g., id*., Attach. at 4 (comparing 30-foot and 60-foot small wireless facility deployments to 70-oot to 300-foot macrocell deployments); Verizon Feb. 26, 2018 *Ex Parte* Letter at 2 ("The shift to deploying small cells warrants reconsideration of the 2004 undertakings finding.  Small cell antenna sizes are much smaller – three cubic feet or less per antenna – and are mounted predominantly on existing (or replacement) structures at a height of 60 feet or less.  In short, these deployments bear little resemblance to the macro facilities that represented most wireless siting in 2004.  Today's small cells are much less likely to affect

(continued….)

threshold we adopt falls within the 60-foot parameter cited by AT&T and others, but we also allow higher deployment in cases where such deployment is only a modest (10 percent) departure from the height of the preexisting facility or surrounding structures.[133]

75.     Our public interest finding here also applies only when certain volumetric limits are met. To qualify as a small wireless facility, the antenna associated with the deployment, excluding the associated equipment, must be no more than three cubic feet in volume.[134]  We agree with commenters that, at this size, small wireless facilities "are unobtrusive and in harmony with the poles, street furniture, and other structures on which they are typically deployed."[135]  This size is analogous to that of facilities the Commission previously has excluded from review under the Collocation NPA.[136]  The Commission has found in other contexts that the size of those facilities fully eliminated the possibility of what already was only a remote potential for historic preservation effects.[137]  This size also is similar to—or smaller than—the antenna volume specified in definitions of small wireless facilities under a number of state laws seeking to facilitate small wireless facility deployment.[138]  We agree with Verizon that at "three cubic feet

(Continued from previous page)

historic properties." (footnote omitted)); ExteNet Comments at 2; Verizon Comments at 46-47; Letter from Keith C. Buell, Sprint, to Marlene H. Dortch, FCC, WT Docket No. 17-79, at 1 (filed Mar. 8, 2018).

[133] *See, e.g.*, 47 CFR § 1.1306(c)(1)(iii) (excluding from review facilities that meet certain characteristics, including that they will not "[i]ncrease the height of the tower or non-tower structure by more than 10% or twenty feet, whichever is greater, over existing support structures that are located in the right-of-way within the vicinity of the proposed construction"); *see also* Verizon Comments at 46-47.

[134] Although antennas may be in enclosures, the three-cubic foot limit applies specifically to the antenna, and not the enclosure.  We note that the Collocation NPA and state laws describe their approaches to applying volumetric limits for antennas in different ways.  Some approaches frame the limit in terms of the antenna while others frame the limit in terms of the enclosure.  At the same time, many state laws adopt much larger volumetric limits than the three-cubic foot limit we adopt.  Because we look to the prior definitions of small wireless facilities as a guide to establishing a reasonable definition, rather than seeking to replicate any particular approach, we believe our overall approach strikes a reasonable balance.  Thus, here we adopt a smaller volumetric limit than some definitions, but apply that limit just to the antenna and not the enclosure.  More generally, we decline some commenters' requests to attempt to replicate the nuances of various prior definitions of small wireless facilities, whether in terms of cumulative size limits or other considerations.  *See, e.g.*, City of Boston *et al.* March 14, 2018 *Ex Parte* Letter at 6-7 (filed Mar. 14, 2018) (discussing the Commission's 2016 Amendment to the Collocation Agreement and various state laws).  Some details of these prior definitions vary in ways that would make it infeasible to precisely mirror all of them, nor are we persuaded that there is any single prior definition that should be treated as dispositive.  Rather, we look to a variety of sources to inform the definition we adopt here, which we conclude focuses on the most relevant size considerations and reasonably corresponds to the record we rely on in our public interest analysis regarding the significant costs and *de minimis* benefits of review.  We thus are not persuaded by speculation that we should include additional limitations or criteria beyond those specified in our definition in this section to ensure our public interest analysis remains valid.  *See* Letter from Colorado State Historic Preservation Office, WT Docket No. 17-79 (filed Mar. 15, 2018) at 3.

[135] AT&T Feb. 23, 2018 *Ex Parte* Letter at 1; Verizon Feb. 26, 2018 *Ex Parte* Letter at 2.  As AT&T explains, "NEPA and NHPA regulations" were "originally designed for large macrocell towers" that contrast markedly to the antenna size and height characteristics of small wireless facility deployments.  AT&T Feb. 23, 2018 *Ex Parte* Letter at 1 & Attach. at 4; *see also, e.g.*, Verizon Feb. 26, 2018 *Ex Parte* Letter at 2 (distinguishing small cell antennas from macro facilities).

[136] Collocation NPA, §VI.A.5.a.

[137] *Acceleration of Broadband Deployment By Improving Wireless Facilities Siting Policies, et al.*, WT Docket Nos. 13-238, 11-59, 13-32, Report and Order, 29 FCC Rcd 12865, 12907, para. 92 (2014).

[138] *See, e.g.*, Ariz. Stat. § 11-1801(17) (all antennas are in an enclosure of no more than six cubic feet in volume; or if the antenna has exposed elements, it is of a size that could meet that same size limit); Colo. Rev. Stat. § 29-27-402(4)(a)(II) (an antenna in an enclosure of no more than three cubic feet in volume; or if exposed, it is of a size that could meet that same size limit); Del. Code § 1603(17) (an antenna in an enclosure of no more than six cubic feet in

(continued….)

or less per antenna" small wireless facilities "bear little resemblance to the macro facilities that represented most wireless siting" when the Commission conducted its public interest evaluations in the past.[139]

76.      Additionally, the wireless equipment associated with the antenna must be no larger than 28 cubic feet.[140]  We derive this limit from analogous limits on associated equipment in the Collocation NPA[141] and the small wireless facility definitions in many state laws.[142]  The record persuades us that this definition appropriately balances our policy goal of promoting advanced wireless service and our recognition of the importance of environmental and historic preservation concerns where they might

(Continued from previous page)  ─────────────────

volume; or if exposed, it is of a size that could meet that same size limit); Fla. Stat. ch. 337.401(7)(b)(10) (an antenna in an enclosure of no more than six cubic feet in volume; or if exposed, it is of a size that could meet that same size limit); Ind. Code § 8-1-32.3-9 (a)(2) (an antenna that has a volume of no more than six cubic feet); Ia. Code § 8C.2(10a) (an antenna that is no more than six cubic feet in volume); Kan. Stat. § 66-2019(b)(14) (an antenna that is in an enclosure of no more than six cubic feet in volume; or if the antenna has exposed elements, it is of a size that could meet that same size limit); Minn. Stat. § 237.162, Subd. 11 (an antenna that is in an enclosure of no more than six cubic feet in volume; or if exposed, it is of a size that could meet that same size limit); N.C. Gen. Stat. § 160A-400.51(7a) (an antenna that is in an enclosure of no more than six cubic feet in volume; or if the antenna has exposed elements, it is of a size that could meet that same size limit); R.I. Gen. Laws § 39-32-1(8) (an antenna of no more than six cubic feet in volume); Tex. Local Gov. Code § 284.003(a) (an antenna that is in an enclosure of no more than six cubic feet in volume, extends not more than three feet above the existing structure or pole, and does not protrude from the existing structure or pole by more than two feet; or if exposed, is of a size that could meet those same size limits); Va. Code § 15.2-2316.3 (an antenna that is in an enclosure of no more than six cubic feet in volume; or if exposed, it is of a size that could meet that same size limit); Wash. Code § 80.36.375(2)(d) (an antenna that is in an enclosure no more than three cubic feet in volume; or if exposed, is of a size that could meet that same size limit).  Although some commenters criticize the associated regulatory treatment of small wireless facilities under state laws, such as limitations on local control over their deployment, *see, e.g.*, Cityscape Consultants Comments at 2-3, we are not persuaded that those concerns undercut our decision to build on states' threshold determinations of what, in the first instance, constitutes a small wireless facility.

[139] Verizon Feb. 26, 2018 *Ex Parte* Letter at 2; *see also, e.g.*, Sprint Comments at 18; Verizon Comments at 46; AT&T Feb. 23 *Ex Parte* Letter at 3 & Attach. at 2-3; Letter from Andy LaChance, Verizon, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1.

[140] Some commenters have requested that we stipulate that wired backhaul or similar equipment not be included within the scope of our small wireless facility definition.  *See* Letter from Rick Chessen, NCTA, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 9, 2018).  We focus our definition, instead, on equipment that arguably triggers NHPA and NEPA review, consistent with the focus of the Order.

[141] Collocation NPA, §VI.A.5.b.  Because we build on the Collocation NPA, we likewise define the scope of associated equipment to encompass "[a]ll other wireless equipment associated with the structure, including pre-existing enclosures and including equipment on the ground associated with antennas on the structure, but excluding cable runs for the connection of power and other services."  *Id.*

[142] *See, e.g.*, Ariz. Stat. § 11-1801(17) (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume, or 50 cubic feet if ground mounted before August 9, 2017); Del. Code § 1603(17) (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume); Fla. Stat. ch. 337.401(7)(b)(10) (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume); Ind. Code § 8-1-32.3-9 (a)(2) (the primary equipment enclosure with the facility is no more than 28 cubic feet in volume); Ia. Code § 8C.2(10a) (all other associated equipment is no larger than 28 cubic feet in volume); Minn. Stat. § 237.162, Subd. 11 (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume); N.C. Gen. Stat. § 160A-400.51(7a) (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume); R.I. Gen. Laws § 39-32-1(8) (all other associated equipment enclosure is no larger than 28 cubic feet in volume); Tex. Local Gov. Code § 284.003(a) (the primary equipment enclosure no larger than 28 cubic feet in volume); Va. Code § 15.2-2316.3 (all other wireless equipment associated with the facility is in an enclosure no larger than 28 cubic feet in volume).

meaningfully be implicated.  In particular, we agree with commenters that urge us to build on the small wireless facility definitions in the Collocation NPA and state laws, "while retaining flexibility to account for changes in technologies."[143]  Advanced wireless services are migrating from 4G to 5G, and we want to foster that migration.  As T-Mobile observes, "5G systems are still in the early stages of development," and "any small wireless facility definition should accommodate this new, critical phase of broadband deployment."[144]  Commenters identify 28 cubic feet as a workable definition for associated equipment,[145] which will help encourage small wireless facility deployment to a greater extent than relying on some prior, smaller definitions of associated equipment size that would provide more limited relief.[146]  At the same time, just as the Collocation NPA and state laws commonly have adopted a numerical limit on associated equipment, we find a numerical limit warranted here, consistent with our goal of defining these facilities in a way that constrains the potential for environmental and historic preservation effects.  We thus are not persuaded that limits larger than 28 cubic feet—or forgoing any numeric limit on associated equipment at all—would balance that interest as effectively.[147]  We also note, as a practical matter, the general trend toward increasingly smaller equipment deployments, which will make it less likely that associated equipment will need to exceed the 28 cubic feet limit, and also less likely that deployment of associated equipment will have environmental or historic preservation effects.[148]

77.    We are not persuaded to further restrict the definition of small wireless facility by placing an aggregation limit on the number of such facilities on a given structure or pole, as some propose.[149]  We are skeptical that even in scenarios involving multiple small wireless facilities deployed on a single

---

[143] Letter from Cathleen A. Massey, Vice President, Federal Regulatory Affairs, *et al.*, T-Mobile, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 at 3 (filed Feb. 26, 2018) (T-Mobile Feb. 26, 2018 *Ex Parte* Letter).

[144] T-Mobile Feb. 26, 2018 *Ex Parte* Letter at 3.

[145] *See, e.g.*, AT&T Comments at 22-23; ExteNet Comments at 2; Lightower Comments at 16; Verizon Comments at 20, 41, 46, 57; Wireless Infrastructure Association Comments at 5; ExteNet Reply at 4-5; Wireless Infrastructure Association Reply at 21.

[146] *See, e.g.*, Collocation NPA, §VI.A.5.b.ii (adopting a limit of 21 cubic feet for equipment associated with certain collocations on pole structures that can support fewer than 3 providers); *id*. at §VII.B.3 (adopting a limit of 21 cubic feet for equipment associated with certain antenna mounted on a utility pole or electric transmission tower); *Acceleration of Broadband Deployment By Improving Wireless Facilities Siting Policies, et al.*, 29 FCC Rcd at 12907, para. 92 (finding that antennas mounted on existing utility structures have no potential for effects on historic properties when certain circumstances are met, including that the associated equipment is no more than 17 cubic feet in volume).  Thus, although some commenters suggest that, at least in their view, equipment of 28 cubic feet in volume is not something they view as "small," that does not undercut our analysis.  *See, e.g.*, National League of Cities Comments, Attach. at 3; League of Arizona Cities and Towns *et al*. Reply at 13-15.  Our public interest analysis under the Communications Act does not single-mindedly focus on environmental and historic preservation concerns, and the extremely limited record of such harms flowing from small wireless facilities persuades us that drawing our lines where we do—as to the limit on associated equipment and otherwise—is a reasonable action to advance the statutory objective of promoting advanced wireless service.

[147] For example, the Collocation NPA uses a 35 cubic foot limit on associated equipment "for non-pole collocations that can support at least 3 providers."  Collocation NPA, §VI.A.5.b.iii.  The record here does not persuade us that it would be appropriate to rely on that larger size of associated equipment for purposes of a generalized limit on the volume of associated equipment for our small wireless facility definition, particularly given the record support for a 28 cubic foot size for associated equipment and state law definitions relying on smaller limits more consistent with the 28 cubic foot limit we adopt.

[148] *See, e.g.*, AT&T Comments at 16-17; CTIA Comments Attach. 1 at 38, Attach. 2 at 9; CTIA Reply at 5; *Wireless Telecommunications Bureau Announces Execution of First Amendment to the The Nationwide Programmatic Agreement For the Collocation Of Wireless Antennas*, Public Notice, 31 FCC Rcd 8824, 8829 (WTB 2016); *see also, e.g.*, see also Sprint Comments at 12 (noting that Sprint's small wireless facility deployments are typically much smaller than specified in the Collocation NPA's definition).

[149] *See, e.g.*, City of Boston *et al*. March 14, 2018 *Ex Parte* Letter at 6-7.

structure or pole, the resulting aggregate deployment would resemble macrocells or towers of the sort the Commission generally envisioned in its past public interest analysis.[150]  Indeed, there are practical limitations on how many small wireless facilities can fit on a single pole.  However, even if there are deployments where two or more small cells have a larger antenna volume in the aggregate than a single macrocell deployment, we still find our approach reasonable given the economic, technical, and public interest benefits of promoting small wireless facility deployments discussed above.[151]  Finally, nothing we do in this order precludes any review conducted by other authorities—such as state and local authorities—insofar as they have review processes encompassing small wireless facility deployments.[152]  The existence of state and local review procedures, adopted and implemented by regulators with more intimate knowledge of local geography and history, reduces the likelihood that small wireless facilities will be deployed in ways that will have adverse environmental and historic preservation effects.[153]

78.    While a number of commenters argue that review confers environmental and historic preservation benefits, to the extent they provide factual support,[154] they provide no more than generalized

---

[150] *See, e.g.*, AT&T Feb. 23, 2018 *Ex Parte* Letter, Attach. at 4 (comparing 30-foot and 60-foot small wireless facility deployments to 70-foot to 300-foot macrocell deployments); Verizon Feb. 26, 2018 *Ex Parte* Letter at 2 (distinguishing microcell facilities from small wireless facilities with "antenna sizes [that] are much smaller – three cubic feet or less per antenna – and are mounted predominantly on existing (or replacement) structures at a height of 60 feet or less").

[151] *See, e.g.*, *supra* paras. 60-72.

[152] The record refers to a range of such requirements that exist under state or local law.  *See, e.g.*, City of Boston *et al. Ex Parte* Letter at 8 (stating appreciation that this order "does not intend to preempt state and local environmental and historical review, and thus leaves open the possibility that states and localities may be able to provide protections that had been provided through the Section 106 and NEPA processes" and noting that "many states have their own versions of NEPA and Section 106"); Letter from Scott K. Bergmann, CTIA, to Marlene H. Dortch, FCC, WT Docket No. 17-79, at 3 (filed Mar. 16, 2018) (the actions taken here do not "mean that small wireless facilities can be deployed by private parties without environmental and historic protections; state and local zoning, environmental, and historic preservation requirements will continue to apply"); Letter from Kenneth S. Fellman, counsel for Colorado Communications and Utility Alliance *et al.*, to Marlene H. Dortch, FCC, WT Docket No. 17-79, Attach. at 5 (filed Oct. 19, 2017) (discussing Colorado state rights-of-way and Denver zoning requirements for wireless facilities); National League of Cities Comments, Attach. at 4 (discussing examples of factors that local authorities consider in connection with right-of-way access, including environmental and aesthetic considerations); National League of Cities *et al*. Request for Extension of Time at 3 (filed July 7, 2017) (observing that a number of states have enacted small wireless facility siting laws); *see also, e.g.*, *2017 Pole Replacement Order*, 32 FCC Rcd 9760, 9769-70, para. 23 (noting state law requirements for the handling of human or burial remains).  Although this order does not preclude otherwise-existing review by other authorities, it also does not eliminate otherwise-existing limitations on that review, *see, e.g.*, City of Boston *et al. Ex Parte* Letter at 8 (discussing limits under 47 U.S.C. § 1455), but instead leaves the preexisting *status quo* in place at this time.

[153] We recognize that state and local procedures do not mirror the review required under Section 1.1312 of the Commission's rules in all respects.  But these procedures nevertheless act as an independent check and show that our action today will not have the effect of authorizing indiscriminate deployment.  To the extent that review provided for under state and local law differs, those differences presumably reflect the judgment of state and local lawmakers as to the type of review required for a particular geographic area.  We thus find no basis to ignore the role of state and local procedures based on differences in their scope or application cited by commenters.  *See, e.g.*, Missouri SHPO Comments at 4; Texas Historical Commission Comments at 3; City of Boston *et al*. Mar. 14, 2018 *Ex Parte* Letter at 8-9.

[154] Many commenters only make generalized claims.  *See, e.g.*, California State Office of Historic Preservation Comments at 3; Chippewa Cree Tribe Comments at 5-9; Eastern Shawnee Tribe of Oklahoma Comments at 4; National Trust for Historic Preservation Comments at 3; Seminole Nation of Oklahoma Comments, App. at 12; Seminole Tribe of Florida Comments at 3, 5, 11; Letter from Benjamin Barnes, Shawnee Tribe, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 2.

claims of effects of small wireless facility deployment that have been addressed in isolated cases.[155] While other commenters identify specific factual scenarios of concern to them regarding small wireless facility deployment,[156] there is substantial record evidence that actual instances of concern identified by review are few.

79.     For example, Crown Castle states that it has never received a report or a negative response from a Tribal Nation regarding a proposed small cell deployment.[157] Other commenters echo this experience.  Sprint, for instance, remarks that in the thousands of tower and antenna projects it has undertaken since 2004, which included numerous small cell deployments, it has never had a substantive consultation with Tribal Nations that revealed possible adverse impacts on historic properties.[158] Verizon, likewise, represents that between 2012 and 2015, only 0.3% of Verizon's requests for Tribal review resulted in findings of an adverse effect to Tribal historic properties,[159] while AAR states that "more than 99.6 percent of deployments pose no risk to historic, tribal, and environmental interests."[160] Based on these apparently minimal effects of small wireless facility deployment on environmental and historic preservation interests, we believe that the benefits associated with requiring such review are *de minimis* both individually and in the aggregate. And even if, as some contend, the aggregate effects of small wireless facility deployment rendered the benefits of review more than *de minimis*,[161] we nonetheless determine that those benefits would be outweighed by the detrimental effects on the roll-out of advanced wireless service.

80.     As further support for this conclusion, Sprint points in its comment to the Super Bowl as an example of the way that historic preservation review can impede broadband deployment with minimal to no benefit.  In particular, Sprint deployed 23 small cells in Houston to upgrade its network in preparation for the crowds descending on Super Bowl LI.[162] Even though the stadium construction itself did not involve any historic preservation consultation with Tribal Nations under Section 106 of the NHPA (because the stadium construction was not a federal undertaking), carriers building an antenna in the

---

[155] *See, e.g.*, Texas Historical Commission Comments at 1 (stating that 0.25 percent of projects "were found to have an adverse effect on historic properties" since 2014, including at least some projects involving small wireless facility deployments); Letter from A. Elizabeth Brummett, State Coordinator for Project Review, Texas Historical Commission, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 at 1 (filed Mar. 15, 2018) (Texas Historical Commission Mar. 15, 2018 *Ex Parte* Letter) (citing an instance of a potential historic preservation concern associated with a small wireless facility deployment).

[156] *See, e.g.*, Oregon SHPO Comments at 5 (expressing concern that "[s]mall cell and DAS on new towers built for the purpose" could "destroy or damage archaeological sites").

[157] Crown Castle Comments at 34.

[158] Sprint Comments at 6.

[159] Verizon Comments at 44; *see also* CTIA/WIA Reply at 4 (stating that "only 0.33% of the Tribal reviews of wireless infrastructure projects resulted in a finding of adverse effect"); *id.* at 9 (comparing NHPA reviews in other contexts).

[160] AAR Reply at 5.

[161] *See, e.g.*, City of Boston *et al.* March 14, 2018 *Ex Parte* Letter at 7-8; NCAI, USET SPF Mar. 14, 2018 *Ex Parte* Letter at 7-8; Texas Historical Commission Mar. 15, 2018 *Ex Parte* Letter at 2; *see also* Letter from Stacy Hurst, Director & State Historic Preservation Officer, Arkansas Historic Preservation Program, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 at 1 (filed Mar. 18, 2018) (stating that "individual small cells are unlikely to adversely impact individual historic properties or districts" but expressing concern about the cumulative impact from nationwide deployment).  We note that the arguments in this regard involve speculation about possible future scenarios, rather than citing concrete evidence of harms that actually have arisen from the aggregate effect of small wireless facility deployments.

[162] Sprint Comments at 15-16.

parking lot were obligated by FCC rules to engage in the Section 106 process.[163]  And as with Sprint's other reviews since 2004, those reviews did not lead to any substantive consultation with Tribal Nations that revealed adverse impacts.[164]  That nonsensical result was purely a consequence of the Commission's discretionary decision to apply Section 1.1312 to such small deployments.  That the Commission's rule would lead to such an anomalous outcome—requiring environmental and historic preservation review of small wireless facilities deployed in the parking lot of an NFL stadium that did not itself require such review—highlights what we see as the misdirected public interest consequences that would result if we applied Section 1.1312's approval requirement to small wireless facility deployment.[165]

81.    In short, the record evidence persuades us that the costs to small wireless facility deployment attributable to Section 1.1312's approval requirement far outweigh any incremental benefits of such environmental or historic preservation review.

### 3.    Other Considerations Raised by Our Prior Rules and Comments in the Record

82.    *1990 Order.*  As explained above, the Commission's *1990 Order* did not specifically address whether the public interest was served by subjecting small wireless facility deployments to Section 1.1312's requirements.  We now do so and find that it is not.

83.    To the extent the *1990 Order* made a public interest determination with respect to large facilities, we note that we are not bound by that determination because our public interest analysis for small wireless facilities presents materially different considerations than the Commission confronted in the past.  Although the Commission anticipated that Section 1.1312 would "establish[] an appropriate balance between section 319(d)'s purpose of expediting the delivery of communications services to the public" and potentially countervailing environmental considerations,[166] the reasoning in the *1990 Order* turns on materially different facts and assumptions than apply in the case of small wireless facility deployment.[167]  In particular, the Commission anticipated that its requirement would not "significantly

---

[163] *Id.*

[164] *Id.* at 16.

[165] We thus are unpersuaded that imposing Section 1.1312 of our rules on small wireless facility deployment would guard against disparate environmental and historic preservation review requirements for entities engaged in different types of deployment or construction. *See* Delaware DOT Comments at 3 *attached to* American Association of State Highway and Transportation Officials Comments.

[166] *Amendment of Environmental Rules*, GN Docket No. 88-387, Notice of Proposed Rulemaking, 3 FCC Rcd 4991, 4991, para. 5 (1988); *see also, e.g.*, *2004 Order*, 20 FCC Rcd at 1083-84, para. 26 (stating that "the Commission, upon consideration of Section 319 and federal environmental statutes, retained these limited approval requirements for facilities constructed in connection with geographic area licenses," but declining "[f]or purposes of this proceeding, . . . [to] decide whether circumstances might arise in which it would be appropriate to strike a different balance under section 319(d)'s public interest standard").

[167] When the first Commission-created compliance requirement was adopted for the Safety and Special Radio Services in rules implementing NEPA in 1974, the Commission summarily asserted—without elaboration—that its action "reflects the Commission's acceptance of responsibility for making the environmental determination and our belief that it would be neither wise nor responsible to permit construction to go forward before that determination is made." *1974 Order*, 49 FCC 2d at 1332, para. 44.  In 1985, the Commission adopted an approach to environmental and historic preservation review for the potentially broader universe of services for which no construction approval otherwise would be required in light of Congress's amendments to Section 319(d), but offered no rationale for that action at all. *1985 Order*, FCC 85-626, 60 Rad. Reg. 2d 133, para. 18.  The limited or nonexistent rationales in those decisions thus lend no support to any finding that a Commission-created compliance requirement to trigger environmental and historic preservation review for small wireless facility deployments is warranted in the public interest.

affect construction or . . . have any effect on the vast majority of facilities covered by the rule."[168]  In a world in which a relatively small number of large structures were being built, such predictions might have made sense.[169]  But with the high volume of small wireless facility deployments that we anticipate being necessary to facilitate the provision of advanced wireless services, we anticipate that absent Commission action significant numbers of deployments—in fact, the vast majority of them—will be significantly delayed and detrimentally affected without any actual historic preservation or environmental benefit.

84.     *Geographic Area Licenses.*  In determining that small wireless facilities are not subject to historic preservation or environmental review obligations, we reject the position offered by some commenters that mere issuance of a broad geographic area service license constitutes sufficient federal action to convert small wireless facility deployments into undertakings and major federal actions, triggering NHPA and NEPA review.  Indeed, the Commission has never taken the position that every form of license or authorization demonstrates a sufficient federal nexus to convert the separate deployment of facilities into a federal undertaking or major federal action.[170]  Nonetheless, certain commenters make general assertions that a geographic area service license could be sufficient to implicate NHPA and NEPA.[171]  We disagree and find the Commission's role regarding such deployment too limited to render the deployments "undertakings" under the NHPA or "major Federal actions" under NEPA.[172]

85.     As discussed above, the key consideration in determining whether a particular deployment is a federal undertaking is the degree of federal involvement, and the Commission has

---

[168] *1990 Order*, 5 FCC Rcd at 2943, para. 11.

[169] *See, e.g.*, Verizon Comments at 59 (observing that prior Commission decisions regarding the application of environmental and historic preservation requirements were "made in reference to a previous generation of cellular technology, which relied on macro cells mounted on large purpose-built towers"); Letter from Rebecca Murphy Thompson, CCA, to Marlene H. Dortch, FCC, WT Docket No. 17-79, at 2 (filed Feb. 5, 2018) ("small cells and DAS are materially different than their tower and macrocell predecessors, regarding both size and visual or actual impact").  Although some commenters argue that the Commission was at least aware of small wireless facility deployments at the time of the *2004 Order, see, e.g.*, City of Boston *et al*. March 14, 2018 *Ex Parte* Letter at 3, the Commission declined to perform its own public interest analysis under the circumstances there.  *2004 Order*, 20 FCC Rcd at 1083-84, para. 26.

[170] As indicated above, for instance, the FCC has never treated the authorized use of signal boosters or wi-fi deployments as enough to transform the deployment of those facilities into federal undertakings or major federal actions.  The authorization in those instances, as here, is for the use of spectrum—not the deployment of infrastructure.  This contrasts with other FCC licensing decisions, such as site-specific authorizations, which the FCC has treated as sufficient to trigger NEPA/NHPA obligations.

[171] *See, e.g.*, AAR Comments at 3-4; American Bird Conservancy Comments at 4; Choctaw Nation of Oklahoma Comments at 2-3; Missouri SHPO Comments at 5; Nez Perce Tribe Comments at 6; Seminole Tribe of Florida Comments at 3; *see also* Letter from John M. Fowler, Executive Director, ACHP, to Thomas M. Johnson, Jr., General Counsel, FCC, WT Docket No. 17-79 (filed Mar. 15, 2018).

[172] To the extent that certain statements made on delegated authority suggest that a geographic area service license would itself be sufficient to trigger NHPA and NEPA requirements for wireless facility deployment in connection with that license—even absent a condition imposing such a compliance requirement—we disavow them in that specific respect for the reasons explained herein.  *See, e.g., CGB's Office of Native Affairs and Policy and WTB Release Scoping Document to Initiate Tribal Consultation On a Proposed Program Comment to Govern Review of Positive Train Control Facilities Under Section 106 of the National Historic Preservation Act*, Public Notice, 28 FCC Rcd 13870, Attach. at 13876 (CGB, WTB 2013) ("PTC involves the construction of facilities in order to use radio spectrum that is licensed by the FCC.  Therefore, the FCC considers the installation of PTC infrastructure to be an FCC undertaking under the NHPA.").  We do not address—and thus do not otherwise disavow (or affirm)—those Bureau statements or holdings in other respects.  Thus, PTC deployments going forward will not require environmental and historic preservation processing if they fit the category of small wireless facilities excluded from review here, and we otherwise do not take up in this Order the question of other possible changes to the treatment of PTC deployments.

discretion to make the threshold determination as to whether that involvement exists.  We conclude that the Commission's issuance of a license that authorizes provision of wireless service in a geographic area does not create sufficient Commission involvement in the deployment of particular wireless facilities in connection with that license for the deployment to constitute an undertaking for purposes of the NHPA.[173]  Applying the relevant statutory text, the geographic area service license does not result in wireless facility deployment being "carried out by or on behalf of a Federal agency."[174]  To the contrary, geographic area service licensing does not provide for Commission involvement in wireless facility deployment decisions.  Geographic area service licenses also do not provide "Federal financial assistance" for wireless facility deployment.[175]  Nor is the geographic area service license "a Federal permit, license or approval" that must be obtained before wireless facility deployment can proceed.[176]  In particular, although geographic area service licenses are a legal prerequisite to the provision of licensed wireless service, and can affect entities' economic incentives to deploy small wireless facilities—insofar as the facilities can be used to offer the licensed service—neither the geographic area service license nor any other Commission approval is a legal prerequisite to the deployment of those particular facilities.[177]  In addition, viewing the deployment of small wireless facilities as an undertaking on the basis of geographic area service licenses is inconsistent with the manner in which Commission licensing occurs.  In particular, although NHPA requires agencies to evaluate the effects of their undertakings before those undertakings occur,[178] the FCC does not require any such determinations to take place prior to issuance of these licenses—thus, confirming that the issuance of the geographic area license itself is not the federal undertaking.  Indeed, the conduct at issue here—the physical deployment of particular infrastructure—occurs in a manner and at locations that the Commission cannot foresee at the time of licensing, as discussed in greater detail below.[179]  Under the geographic area service license, it is generally state and local zoning authorities that

---

[173] *See infra* note 183; *see also*, *e.g.*, AAR Comments at 17; CCA Comments at 47; Verizon Comments at 61.

[174] 54 U.S.C. § 300320; *see also* 36 CFR § 800.16(y).

[175] *Id*.  One of the dissents urges the Commission to consider whether small wireless facility deployment may be an undertaking based on the potential for future "projects carried out with Federal financial assistance," citing the Mobility Fund as a potential example.  We have never previously identified any Commission deployments as undertakings based on provision of federal financial assistance.  In addition, the record is devoid of any analysis or evidence showing that small wireless facility deployment should be deemed an undertaking based on provision of federal financial assistance, apart from one comment that speculates that 5G small cells "may well involve federal funding . . ."  TechFreedom Comments at 9.  We therefore find no basis in the present record to decide, nor do we take a position on, whether there ever may be cases in which the receipt of federal funds constitutes sufficient federal involvement to render a specific deployment an undertaking.

[176] 54 U.S.C. § 300320.

[177] *See, e.g.*, *Western Mohegan Tribe and Nation of New York v. New York*, 100 F.Supp.2d 122, 127 (N.D.N.Y 2000) (Army Corps of Engineers "permit itself is insufficient to transform the Park into a federal project" subject to the NHPA where the "permit merely allows the state access to contiguous property," and thus "the federal permit here did not go to the [state] project's authorization or regulation, but merely its practical feasibility").  Similarly, the Commission's regulation of RF emissions is directed at the provision of service and not the deployment of facilities, and thus, contrary to some claims, also provides no basis for concluding small wireless facility deployment is an undertaking.  *See, e.g.*, City of Boston *et al*. March 14, 2018 *Ex Parte* Letter at 4.

[178] *See* 54 U.S.C. § 306108.

[179] In addition, we are not persuaded that Commission rules providing timeframes for certain state or local review of modifications to towers or base stations, with a 'deemed grant' after that time has passed, require a different outcome as to any small wireless facility deployment implicated by that rule.  *See, e.g.*, City of Boston *et al*. March 14, 2018 *Ex Parte* Letter at 4-5 (discussing the Commission's rule); *see also* 47 CFR § 1.40001(c).  That rule does not provide for any Commission review of covered modifications, nor does it provide the Commission with authority to regulate any aspects of the deployment—environmental and historic preservation, or otherwise.  We thus find insufficient Commission involvement in the details of deployment under that rule that would trigger the NHPA or NEPA,  *See, e.g.*, *Sierra Club v. FERC*, 827 F.3d 36, 47 (D.C. Cir. 2016) ("Where, as here, an agency 'has

(continued….)

exercise their lawful authority regarding the placement of wireless facilities by private parties. We thus do not find the issuance of a geographic area service license, in itself, to provide the requisite level of Commission involvement in wireless facility deployment to render that deployment an undertaking under relevant court precedent and ACHP guidance.[180]

86.     For the same basic reasons, we conclude that the geographic area service license is insufficient to render deployment of wireless facilities in connection with that license a "major Federal action" under NEPA.[181] As explained above, the geographic licensing does not cause associated wireless facility deployment to be "carried out by or on behalf of" the Commission, the licensing does not involve the provision of federal funding for such deployments, nor is the license technically required before wireless facility deployment can proceed (in other words, while carriers generally obtain a geographic

---

(Continued from previous page)

no ability to prevent a certain effect due to' that agency's 'limited statutory authority over the relevant action[ ],' then that action 'cannot be considered a legally relevant 'cause' of the effect' for NEPA purposes" (quoting *Public Citizen*, 541 U.S. at 771); *Vieux Carre Property Owners, Residents and Assoc., Inc. v. Brown*, 948 F.2d 1436, 1445 (5th Cir. 1991) ("[A]s long as the park project is under federal license and the Corps has the ability to require changes that could conceivably mitigate any adverse impact the project might have on historic preservation goals, the park project remains a federal undertaking and NHPA review is required"); *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156, 169 (D.C. Cir. 1988) ("NEPA does not expand an agency's substantive powers. Any action taken by a federal agency must fall within the agency's appropriate province under its organic statute(s)." (citation omitted)). To the contrary, the Commission made clear that any formal legal resolution of a provider's authority to engage in covered facilities modification in the absence of a state or local determination would come from a court, rather than the Commission. *Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies, et al.*, WT Docket Nos. 13-238, 23-32, WC Docket No. 11-59, Report and Order, 29 FCC Rcd 12865, 12936, paras. 235-36 (2014).

[180] *See, e.g.*, *Karst*, 475 F.3d at 1295; *Ringsred*, 822 F.2d at 1309; *Techworld Dev. Corp.*, 648 F.Supp. at 120; Advisory Council on Historic Preservation, 65 Fed. Reg. 77698, 77712 (Dec. 12, 2000) ("The Agency Official is responsible, in accordance with § 800.3(a), for making the determination as to whether a proposed Federal action is an undertaking. As appropriate, an agency should examine the nature of its Federal involvement taking into consideration factors such as the degree of Federal agency control or discretion; the type of Federal involvement or link to the action; and whether or not the action could move forward without Federal involvement."); *see also, e.g.*, Verizon Comments at 58-59 ("Where the federal agency's role in private activity is *de minimis*, that activity does not constitute a federal undertaking."). We recognize that Congress amended the definition of "undertaking" in 1992, but that does not undercut our consideration of the reasoning in cases we cite from prior to that date. Although the D.C. Circuit has found that "Congress intended to expand the definition of an 'undertaking' – formerly limited to federally funded or licensed projects – to include projects requiring a federal 'permit' or merely federal 'approval,'" *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995), the analysis we consider from pre-amendment cases did not turn on the distinction between a "license" and some other "permit" or "approval." We disagree with arguments that we should disregard this precedent and ACHP guidance based on claims that considering the extent of federal involvement has no foundation in the text of the "undertaking" definition. *See, e.g.*, Letter from Terry Clouthier, Thlopthlocco Tribal Town THPO, to Marlene H. Dortch, FCC, WT Docket No. 17-79, at 11, 13, 15, 21 (filed Mar. 13, 2018) (Thlopthlocco Tribal Town Mar. 13, 2018 *Ex Parte* Letter). It is reasonable to consider the extent of federal involvement when evaluating the scope activities that meet the standard of being "funded . . . under the direct or indirect jurisdiction of a Federal agency" and that are subject to the specific types of "Federal" involvement listed in the "undertaking" definition. 36 CFR § 800.16(y); 54 U.S.C. § 300320. In addition, the ACHP notes that its rules direct agencies to consider the reasonably foreseeable effects of an undertaking, but that rule does not speak to whether something is an undertaking in the first instance. ACHP Comments at 7 (citing 36 CFR § 800.5(a)(1)).

[181] For the reasons discussed here and below, we thus reject claims that the geographic service license is itself sufficient to trigger NEPA obligations for small wireless facility deployment. *See, e.g.*, Letter from Natural Resources Defense Council (NRDC), WT Docket No. 17-79, (filed Mar 15, 2018) at 5 (NRDC Mar. 15, 2018 *Ex Parte* Letter). We also reject arguments that the only way for small wireless facility deployment to avoid review under NEPA is through a categorical exclusion established consistent with the CEQ's rules, *see, e.g.*, *id*. at 6-7, since a categorical exclusion only would be relevant if NEPA applied in the first instance.

**Federal Communications Commission** FCC 18-30

area service license before they deploy the facilities through which they will eventually provide that service, they are not legally required to obtain the license until they want to provide service).[182]  As noted above, courts treat "major Federal actions" under NEPA similarly to "undertakings" under the NHPA.[183]  Indeed, the ACHP points out "major Federal actions" are arguably narrower than "undertakings" in various ways.[184]  Insofar as "major Federal actions" under NEPA are narrower than the universe of "undertakings" under the NHPA, our conclusion regarding NEPA necessarily will be the same as that for NHPA.  Court precedent directly applying NEPA in the first instance likewise supports our view that the virtually nonexistent Commission involvement in the deployment of wireless facilities under a geographic area service license takes wireless facility deployment outside the scope of "major Federal action."[185]  We thus find the geographic area license itself insufficient to render wireless facility deployment in connection with that license "major Federal action" under NEPA.

87.    We distinguish precedent cited by American Bird Conservancy, in which the Commission found that "[t]he fact that a carrier's construction of facilities is authorized by rule rather than by action on an individual application does not eliminate the existence of federal action or affect our obligation to comply with NEPA and other federal environmental statutes."[186]  In that case, however, the Commission rule at issue directly authorized the construction of particular facilities.  Here, by contrast, the geographic area license itself only authorizes transmissions.  We find this is an insufficient connection to in itself cause the construction to constitute an undertaking under the NHPA or major Federal action under NEPA.

88.    In addition, we emphasize that issuance of geographic service licenses is remote in both time and regulatory reach from the deployment of small wireless facilities.[187]  Any wireless facility deployment will happen after the Commission has issued the geographic service licenses, and will occur in a manner and at locations that the Commission cannot reasonably foresee at the time of licensing.[188]  As to geographic service licenses issued in the past, at the time the licenses were issued, it is unlikely that

---

[182] These conclusions discussed above in the context of the NHPA correspond to considerations of what constitute "actions" under the CEQ's NEPA rules, such as whether the relevant activity is "entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 CFR § 1508.18(a), particularly as the full concept of "major Federal action" triggering NEPA has been interpreted by courts.

[183] See, e.g., Karst, 475 F.3d at 1295-96; Sac and Fox Nation of Mo., 240 F.3d at 1263; see also, e.g., AAR Comments at 18.

[184] ACHP Comments at 8.

[185] See, e.g., Village of Los Ranchos de Albuquerque, 906 F.2d at 1480 n.23; Karst, 475 F.3d at 1295; Save Barton Creek Ass'n., 950 F.2d at 1133-35; see also, e.g., Sugarloaf Citizens Ass'n v. FERC, 959 F.2d 508 (4th Cir. 1992) (quoting Tenth Circuit precedent that "for a major Federal action to exist 'the federal agency must possess actual power to control the nonfederal activity'"); Dugong v. Rumsfeld, 2005 WL 522106, *12 (N.D. Cal. Mar. 2, 2005) ("Major federal actions have been described as 'legal condition[s] precedent.' . . .  Factors to consider in evaluating major federal actions include (1) the agency's degree of discretion over the federal aspects of the project, (2) whether federal aid has been given, and (3) whether the overall level of federal involvement is sufficient to transform 'essentially private action into federal action.'" (quoting Ringsred, 828 F.2d at 1308)).

[186] American Bird Conservancy Comments at 4 (quoting Amendment of Environmental Rules; Amendment of Part 63 of the Commission's Rules Relating to Common Carriers, GN Docket No. 88-387, Second Report and Order, 6 FCC Rcd 1716, 1716, para. 4 (1991)).

[187] We do not address here any potential for effects associated with the actual provision of licensed service, such as RF issues.

[188] We disagree with commenters that contend that the mere fact of parties' limited economic incentives to deploy small wireless facilities absent a service license render those facilities an undertaking by virtue of that license, see, e.g., NCAI, USET SPF Mar. 14, 2018 Ex Parte Letter at 9; Thlopthlocco Tribal Town THPO Mar. 13, 2018 Ex Parte Letter at 15-16, 22, but in any case, we independently conclude that the geographic service license does not trigger environmental and historic preservation review requirements for the reasons discussed here and below.

significant small wireless facility deployment itself would have been reasonably foreseeable.[189]  The deployment of small wireless facilities today is a function of marketplace decisions by private actors in light of applicable regulatory regimes, such as any state or local zoning requirements.

89.    These characteristics of the Commission's regulatory approach to geographic service licensing support the view that NHPA and NEPA do not require Commission evaluation of any effects of small wireless facility deployment based on the issuance of such licenses.  NHPA and NEPA require agencies to evaluate the effects of their undertakings or major Federal actions in advance of those undertakings or actions.[190]  Under the rules implementing NEPA and the NHPA and relevant court precedent, agencies need not consider effects of agency actions if they are not reasonably foreseeable.[191]  Because there is no plausible way for the Commission to meaningfully assess environmental and historic preservation effects associated with the deployment of small wireless facilities at the time geographic service licenses issue, we conclude that there are no reasonably foreseeable effects that "a person of ordinary prudence would take into account" prior to issuing such licenses.[192]

90.    The Commission also does not possess authority it could exercise to regulate small wireless facility deployment to address environmental and historic preservation concerns given the public interest findings we make in this order.  Agencies have no obligation to consider potential effects under NEPA or the NHPA if they cannot exercise authority to address them under their organic statutes.[193]  As relevant here, addressing environmental and/or historic preservation effects of small wireless facility

---

[189] *See, e.g., Amendment of the Commission's Rules With Regard To Commercial Operations In the 3550-3650 MHz Band*, GN Docket No. 12-354, Notice of Proposed Rulemaking and Order, 27 FCC Rcd 15594, 15610, para. 44 (2013) (discussing small wireless facilities as an emerging technology); Small Cell Forum, *Small cells market status report December 2017*, at 1 (Dec. 2017) (discussing the increased importance of small wireless facility deployments in the mid- to late-2000s), available at http://scf.io/en/documents/050_-
_Small_cells_market_status_report_December_2017.php; Presentation of Allen Dixon, Business Development Manager, Corning Mobile Access, Inc., at 3 (Feb. 1, 2012) (explaining that commercial DAS deployment was in its infancy in the early- to mid-1990s), available at https://www.fcc.gov/news-events/events/2012/02/augmenting-mobile-broadband-in-your-community-an-overview-of-distributed-antenna-systems-and-small-cell-solutions.

[190] *See* 42 U.S.C. § 4332; 54 U.S.C. § 306108.

[191] CEQ rules implementing NEPA define "effects" to include, in addition to direct effects, "[i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 CFR § 1508.8.  ACHP rules implementing the NHPA similarly state that "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative."  36 CFR § 800.5(a)(1).  Courts have enunciated various formulations of the standard, but ultimately make clear that there must be a "'reasonably close causal relationship'" for an effect to require consideration.  *DOT v. Public Citizen*, 541 U.S. 752, 767 (2004) (*Public Citizen*) (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)); *see also, e.g., Public Citizen*, 541 U.S. at 767 (even "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations."); *Sierra Club v. FERC*, 827 F.3d at 46-47 (under NEPA, FERC need not "examine everything for which the Projects could conceivably be a 'but-for' cause. . . .  Instead, the effect must be ''sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'"); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1163 (9th Cir. 1998) (Under NEPA, "'[a]gencies must consider only those indirect effects that are 'reasonably foreseeable.' They need not consider potential effects that are highly speculative or indefinite.'" (quoting *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir.1992))).  While these cases dealt most directly with NEPA, ACHP explained when adopting the relevant rule language implementing NHPA that it "is intended to amplify the indirect effects concept, similar to the NEPA regulations, which calls for consideration of such effects when they are reasonably foreseeable effects."  Advisory Council on Historic Preservation, *Protection of Historic Properties*, 65 Fed. Reg. 77698, 77720 (Dec. 12, 2000).

[192] *Sierra Club v. FERC*, 827 F.3d at 47.

[193] *See, e.g., Sierra Club v. FERC*, 827 F.3d at 47; *Vieux Carre Property Owners, Residents and Assoc., Inc. v. Brown*, 948 F.2d at 1445; *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d at 169.

deployment would necessitate a review process to identify such concerns- but we have found such a review process unwarranted under our public interest determination above.[194]  Because we find that such a requirement is not in the public interest for the deployment of small wireless facilities, we cannot exercise the public interest authority to impose such duties.  A contrary interpretation of our public interest authority under the Communications Act would require us to treat concerns under the NHPA and NEPA as dispositive.  We find no grounds to believe that Congress intended the Commission, when exercising its Title III public interest authority, to summarily cast aside policy objectives of the Communications Act itself when interests implicated by NHPA or NEPA might be present.  Instead, we conclude that our approach of giving due consideration to the policy goals under federal communications law along with those of the NHPA and NEPA better enables all relevant interests to be weighed in the public interest analysis.  As clarified by our modification of Section 1.1312 of the rules, our geographic service licensing regime thus reflects neither any intent or ability to regulate the deployment of small wireless facilities after this order.[195]

91.     We also do not interpret language in the *1990 Order* to suggest that the Commission believed that federal environmental statutes required it to adopt a condition that triggered those statutes for construction not otherwise subject to Commission approval.[196]  The *1990 Order* does not include an analysis of the degree of federal control required to trigger federal environmental and historic preservation statutes.  Rather, the *1990 Order* addressed whether changes to an already-existing review requirement were warranted.[197]  To the extent that the Commission weighed historic preservation and environmental considerations in determining whether to amend its rules, we read those statements as part of its broader public-interest evaluation, not as an analysis of whether the rule's requirements constituted sufficient federal involvement to rise to the level of a "federal undertaking" or "major Federal action."

92.     *Other Comments.*  Our public interest balancing also is not materially altered by claims that the potential for Commission-imposed review can alter decisions about how and where to deploy

---

[194] *See supra* Section II.B.2.

[195] *See, e.g.*, *Public Citizen*, 541 U.S. at 767 (directing consideration of a regulatory regime's underlying policies).  Our lack of authority in this regard is no different whether we are focused on individual small wireless facility deployments or aggregations of such deployment, such as if multiple small wireless facilities are deployed on a single pole or other structure.

[196] *See, e.g.*, *1990 Order*, 5 FCC Rcd at 2942, para. 4 ("The Commission instituted this rule making proceeding to ensure that the Commission fully complies with Federal environmental laws in connection with facilities that do not require pre-construction authorization."); *id.* at 2943, para. 10 ("[O]ur responsibility under the environmental laws is to consider potential harm to the environment before it occurs, not simply to await environmental damage and then attempt to rectify it.").

[197] At the time of the *1990 Order*, for wireless facilities not requiring a construction permit under Section 319, the Commission conducted environmental review in conjunction with the Commission's evaluation of the associated service license.  *1985 Order*, FCC 85-626, 60 Rad. Reg. 2d 133, para. 18; *see also Amendment of Environmental Rules*, GN Docket No. 88-387, Notice of Proposed Rulemaking, 3 FCC Rcd 4991, para. 4 (1988).  Those preexisting requirements by which the Commission reviewed wireless facility construction could have been seen as already triggering review requirements under environmental and historic preservation statutes at the time of the *1990 Order*.  In addition to the environmental-specific review requirement in place at the time of the *1990 Order*, the Commission's licensing regime for certain wireless services nominally had forgone any construction permit requirement under Section 319, but had collapsed that more general preconstruction review into its service licensing process.  *See, e.g.*, *Amendment of Part 22 of the Commission's Rules to Allow Public Mobile Service applicants to Commence Construction After Filing FCC Form 401, but Prior to Receiving an Authorization*, CC Docket No. 88–475, Report and Order, 4 FCC Rcd 5960, 5967, n.6 (1989) (explaining that "[a]lthough the Commission no longer issues [Section 319] 'construction permits' to Private Land Mobile Service (PLMS) and cellular applicants, prior authorization is still required under Section 22.43(a)(1) of the rules prior to constructing facilities," but modifying that requirement to allow some pre-authorization construction subject to contrary direction from the Commission in a given instance); *see also* 47 CFR § 22.43(a)(1), (d) (1990).

small wireless facilities by causing providers to tailor the manner or location of such deployments to avoid implicating environmental and historic preservation concerns.[198]  Commenters' arguments in this regard are generalized,[199] and undercut by our conclusion that, as a class, the nature of small wireless facility deployments appears to render them inherently unlikely to trigger environmental and historic preservation concerns.[200]  For example, deployment of small wireless facilities commonly (although not always) involves previously disturbed ground, where fewer concerns generally arise than on undisturbed ground.[201]  In addition, as the Commission recently observed, "[i]n implementing large-scale network densification projects that require deployment of large numbers of facilities within a relatively brief period of time, use of existing structures, where feasible, can both promote efficiency and avoid adverse impacts on the human environment."[202]  Based on the entire record before us, we are not persuaded that requiring federal environmental and historic preservation review for small wireless facility deployments will have a meaningful amount of benefits, particularly when this consideration is balanced against the other public interest considerations associated with promoting the deployment of small wireless facilities.

93.    Because we find the record of claimed potential benefits to be limited and otherwise fundamentally speculative, we also are not persuaded that some more streamlined review process or other alternative to the action we take is warranted in the public interest.  For example, proposals to reduce the length of review would not eliminate the financial burdens of the review process, which would continue to delay deployment, whether required individually or on some aggregated basis.[203]  In addition, arguments that the Commission should exclude small wireless facilities from Section 1.1312 when deployed in a narrower range of circumstances do not demonstrate sufficient benefits to justify the burdens Section 1.1312 imposes even in a narrower context.[204]  We further expect that the more

---

[198] *See, e.g.*, National Trust for Historic Preservation Comments at 3; NCAI *et al*. Comments at 6; Oregon SHPO Comments at 6; Puerto Rico SHPO Comments at 1; Seminole Tribe of Florida Comments at 11.

[199] To the extent that the record includes specific anecdotes in this regard, they appear to focus on towers rather than small wireless facilities.  *See, e.g.*, Blackfeet Indian Nation Comments at 1.

[200] *See, e.g.*, Georgia Historic Preservation Division Comments at 1 ("DAS is the least of HPD worries – these are small cell deployments that are such a small impact, especially in areas where light posts, utility posts, and similar already exist.").

[201] *See, e.g.*, Verizon Comments at 59-60; CCA Reply at 26.  Muscogee (Creek) Nation Comments at 10 (noting that "many installations of small facilities will not disturb the ground at all"); *see also, e.g.*, NCAI *et al*.  Comments at 19-20 (same); Fond du Lac Band of Lake Superior Chippewa Comments at 2.  Accordingly, we are not persuaded by commenters who argue that deployment of small wireless facilities should continue to be subject to environmental and historic preservation review because of the potential for ground disturbance.  *See, e.g.*, Letter from Glenna J. Wallace, Eastern Shawnee Tribe of Oklahoma, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 3; Letter from William Tanant, Seneca-Cayuga Nation of Oklahoma, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 2.

[202] *2017 Pole Replacement Order*, 32 FCC Rcd at 9765-66, para. 13.

[203] *See, e.g.*, Washington DOT Comments at 2 (advocating a 90-day timeline rather than "cutting out NEPA and NHPA review or substantially cutting it back,") *attached to* American Association of State Highway and Transportation Officials Comments.

[204] *See, e.g.*, Delaware SHPO Comments at 4; NCAI *et al*. Comments at 19-20; Muscogee (Creek) Nation Comment at 10; Verizon Comments at 58-62; Letter from Harlan Baker, Chippewa Cree Tribe, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 15, 2018) at 4.  Contrary to some suggestions, we are not persuaded that it would better promote advanced wireless services to retain environmental and historic preservation review under Commission rules in those instances where other agencies rely on the Commission's review in lieu of their own NHPA review in connection with small wireless facility deployment.  *See, e.g.*, Letter from Elizabeth S. Merritt, National Trust for Historic Preservation, to Marlene H. Dortch, FCC, WT Docket No. 17-79 at 4 (filed Mar. 15, 2018).  We recognize that our amendment of Section 1.1312 of the rules makes clear that small wireless facility deployment will not be subject to review under our environmental and historic preservation rules and NPAs.  To the extent that other agencies that previously relied on Commission review in lieu of their own NHPA review encounter

(continued....)

generalized approach we take for small wireless facility deployments will provide greater clarity in implementation, rather than leaving providers with uncertainty about whether a given small wireless facility deployment is excluded.[205] Finally, we are not persuaded that it would be preferable to rely on programmatic agreements or similar measures to streamline or exclude small wireless facility deployment from review.[206] Our amendment of Section 1.1312 of the rules involves a public interest evaluation under the Communications Act—an Act we are responsible for administering—while programmatic agreements involve negotiations among multiple external parties that need not account for such considerations. In addition, given the importance of fostering small wireless facility deployment, we are not persuaded that negotiated agreements would be warranted—even assuming *arguendo* that they ultimately resulted in the same outcome—given the time required for their negotiation and the associated delay in facilitating small wireless facility deployment.

\* \* \*

94.    In sum, directly evaluating the question for the first time here, we are not persuaded that it is in the public interest to exercise our limited reservation of authority to impose Section 1.1312 on small wireless facility deployments and thereby trigger environmental and historic preservation review. Although the record does not enable a precise quantification of costs and benefits, it amply supports our conclusion that environmental and historic preservation review imposes burdens on small wireless facility deployment, and we expect that these burdens will have a significant effect on small wireless facility deployment, at least in the aggregate, given the volume and nature of small wireless facility deployments that we anticipate.[207] Imposing such burdens would be at odds with several of our statutory mandates, and we exercise our predictive judgment in finding that the benefits of eliminating these burdens will include hastening wireless deployment and freeing up funds for additional deployments that will benefit consumers, grow the economy, and strengthen the country's 5G readiness.[208]

95.    We acknowledge, of course, the policy goals expressed by federal environmental and historic preservation statutes.[209] But Congress prescribed specific triggers for the obligations that those

(Continued from previous page) ───────────────

small wireless facility deployments that are undertakings under their own rules, the record provides no reason to expect that those agencies will not conduct their own review or that review -by the Commission would be superior. Nor does the record reveal how frequently or in what particular circumstances this issue would arise with respect to small wireless facilities deployment. And to the extent other agencies simply built upon the conceptual framework of the Commission's review processes, including its NPAs, when designing their own review processes, our action here does not undercut that reliance.

[205] *See, e.g.*, Critical Infrastructure Coalition Comments at 13; T-Mobile Comments at 60-61; Verizon Comments at 60-61.

[206] *See, e.g.*, New Mexico SHPO Comments at 2; Letter from John L. Berrey, Quapaw Tribe, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 8, 2018) (Quapaw Mar. 8, 2018 *Ex Parte* Letter) at 1; Letter from Colorado State Historic Preservation Office, WT Docket No. 17-79 (filed Mar. 15, 2018) at 1-2.

[207] *See, e.g.,* Sprint Feb. 21, 2018 *Ex Parte* Letter at 2 (filed February 21, 2018) ("the $23 million in review fees Sprint has paid could have been used to deploy 657 new sites to provide increased capacity and coverage to its customers").

[208] *See, e.g.*, Verizon Feb. 26, 2018 *Ex Parte* Letter at 2 (eliminating review requirements "will not only speed deployment, but the resulting cost savings will fund the construction of an increased number of facilities"); CTIA Feb. 26, 2018 *Ex Parte* Letter (eliminating review requirements "will allow wireless providers and infrastructure companies to redirect the funds to additional deployments that will benefit consumers, grow the economy, and strengthen the nation's 5G-readiness").

[209] *See, e.g.*, 42 U.S.C. § 4332 ("The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter[.]"); 54 U.S.C. § 300101 ("It is the policy of the Federal Government, in cooperation with other nations and in partnership with States, local governments, Indian tribes, Native Hawaiian organizations, and private organizations and individuals, to" promote or encourage the preservation of historic

(continued….)

statutes impose on federal agencies, persuading us that agencies' consideration of those statutes' more general policy pronouncements is simply to be weighed alongside consideration of our principal duties under our organic statutes. Thus, although the record does not persuade us of meaningful benefits that are likely to result from environmental and historic preservation review of small wireless facility deployments, even assuming *arguendo* that there are some benefits, we are not persuaded that they are likely to overcome the harms that we find run contrary to our responsibilities under the Communications Act, as informed by the Telecommunications Act of 1996. Accordingly, we find no basis to conclude here that it is in the public interest to apply Section 1.1312 to small wireless facility deployment, triggering environmental and historic preservation review.[210]

## IV.    STREAMLINING NHPA AND NEPA REVIEW FOR LARGER WIRELESS FACILITIES

### A.    Clarifying the Section 106 Tribal Consultation Process

#### 1.    Background

96.    Notwithstanding our narrowing the scope of deployments subject to Section 106 and NEPA review, many constructions of wireless facilities will continue to be treated as Commission undertakings under the NHPA because they are subject to site-by-site licensing, they require antenna structure registration, or their size exceeds our definition of small wireless facility. The ACHP's regulations prescribe detailed procedures for the review of proposed undertakings, including consulting with Tribal Nations and NHOs.[211] As authorized under the ACHP's rules,[212] the Commission has entered into two NPAs and the ACHP has issued a program comment, each of which modifies the procedures set forth in the ACHP's rules to tailor them to different classes of Commission undertakings.[213] Section

---

(Continued from previous page)

property in various ways). Some commenters also make brief references to other statutes or regulatory requirements. *See, e.g.*, American Bird Conservancy Comments at 1, 5-6; Cape Cod Bird Club Comments at 1; Defenders of Wildlife Comments at 1; Sault Ste. Marie Tribe of Chippewa Indians Reply at 3; *cf.* AAR Comments at 6 (noting executive orders relating to floodplain management but arguing they leave agencies with discretion). The Commission has not purported to be implementing most of the cited statutes in its environmental and historic preservation review requirements, and in no case do commenters justify the position that those statutes impose obligations on the Commission that it would be failing to fulfill under the analysis and actions in this Order.

[210] Our public interest analysis for small wireless facility deployment, and the associated decision not to apply the Title III public interest condition triggering environmental and historic preservation review under prior precedent, thus distinguishes small wireless facility deployments from the circumstances at issue in the D.C. Circuit's *CTIA* decision. *See, e.g.*, AAR Reply at 16.

[211] 36 CFR §§ 800.3–800.13. *See* 54 U.S.C. § 304108(a) ("The Council may promulgate regulations as it considers necessary to govern the implementation of section 306108 of this title in its entirety.").

[212] 36 CFR § 800.14. The ACHP has noted that its regulations may not always meet the needs of any individual agency's compliance program. Accordingly, the ACHP's rules allow federal agencies to develop program alternatives, including programmatic agreements, exemptions, standard treatments, and program comments, which if approved under the ACHP's procedures may supplement or substitute for Subpart B of the ACHP's compliance regulations. *See* Section 106 Regulations Federal Alternate Procedures, (Apr. 1, 2015) http://www.achp.gov/altpro.html.

[213] *See* Collocation NPA; Wireless Facilities NPA; Program Comment to Tailor the Federal Communications Commission's Section 106 Review for Undertakings Involving the Construction of Positive Train Control Wayside Poles and Infrastructure, Advisory Council on Historic Preservation Program Comment, May 14, 2014, available at http://www.achp.gov/docs/ptc-program-comment.pdf. As part of our effort to remove barriers to infrastructure deployment, the Commission, as of the date of adoption of this item, is working with the ACHP to advance a second Program Comment that would facilitate collocations on "Twilight Towers" constructed between March 16, 2001, and March 7, 2005, that either did not complete Section 106 review or cannot be documented to have completed such review. *See Twilight Towers PN*.

1.1320 of the FCC's rules directs applicants, when determining whether a proposed action may affect historic properties, to comply with the ACHP's rules or one of these program alternatives.[214]

97.    An important component of the Section 106 process involves engaging and consulting with Tribal Nations and NHOs.  Section 101(d)(6) of the NHPA requires federal agencies to consult with any Tribal Nation or NHO that attaches religious and cultural significance to a property eligible for inclusion on the National Register of Historic Places that may be affected by their undertakings.[215]  The ACHP rules implement that provision by requiring that agencies make a reasonable and good faith effort to identify such Tribal Nations or NHOs and invite them to be consulting parties.[216]  Procedures to implement this requirement are set forth in the Wireless Facilities NPA, which became effective in 2005.[217]  Properties to which Tribal Nations and NHOs attach cultural and religious significance are commonly located outside Tribal lands and may include Tribal burial grounds, land vistas, and other sites that Tribal Nations or NHOs regard as sacred or otherwise culturally significant.[218]  The consultation process for undertakings on Tribal lands is covered by separate provisions of the ACHP's rules, and is not addressed in this Order; as previously noted, nothing in this Order disturbs existing Commission practices for Section 106 review on Tribal lands.[219]

98.    In order to efficiently connect parties seeking to construct facilities with Tribal Nations while respecting Tribal sovereignty, the FCC established the Tower Construction Notification System (TCNS).[220]  TCNS is an online, password-protected system that notifies Tribal Nations, NHOs, and State Historic Preservation Officers (SHPOs) (collectively, recipients) of proposed wireless communications facility deployments in areas of interest designated by the recipients.  The system also provides a means for Tribal Historic Preservation Officers (THPOs) and other Tribal or NHO officials to respond directly to applicants as to whether they have concerns about the effects of the proposed construction on historic properties.[221]

---

[214] 47 CFR § 1.1320(a)(1)-(2).

[215] See 54 U.S.C. § 302706.

[216] 36 CFR § 800.3(f)(2); see also id. at § 800.2(c)(2)(ii) (discussing role of Tribal Nations and NHOs as consulting parties in the historic preservation review process).

[217] Wireless Facilities NPA, § IV.

[218] See Advisory Council on Historic Preservation, Consultation With Indian Tribes in the Section 106 Review Process; A Handbook at 7, § III.B (June 2012), http://www.achp.gov/pdfs/consultation-with-indian-tribes-handbook-june-2012.pdf (ACHP 2012 Handbook) (discussing characteristics of historic properties that may be significant to Tribal Nations and NHOs).

[219] See 36 CFR § 800.3(d).

[220] Federal Communications Commission, Wireless Telecommunications Bureau, Towers and Antennas, Tower Construction Notifications: TCNS/E106, http://wireless.fcc.gov/outreach/index.htm?job=tower_notification (last visited Dec. 24, 2017), see also NATHPO and FCC Section 106 Summit, slide 2, available at http://nathpo.org/wp/wp-content/uploads/2015/09/1-NATHPO-FCC-Summit-TCNS-PP-Part-II-FINAL.pdf.

[221] See, e.g., Seminole Nation of Oklahoma Comments at 1-2; NCAI et al. Comments at 3 (received Apr. 18, 2017); Lower Brule Sioux Tribe Comments at 1.  Some commenters contend that, because of the steps we take in this Order, Tribal Nations will no longer make use of the TCNS system for larger deployments.  See, e.g., Letter from Marissa Turnbull, Mashantucket Pequot Tribal Nation, to Marlene Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1 ("…[T]ribal [N]ations will demand direct consultations with the FCC on potentially hundreds of larger tower sites, a far slower process than the tribal-industry process.").  As stated above, although we narrow the scope of deployments subject to Section 106 and NEPA review, many constructions of wireless facilities will continue to be treated as Commission undertakings subject to the Tribal consultation requirements of the NHPA.  The TCNS system will continue to be available to facilitate Tribal review of such facilities and we encourage its use by both applicants and Tribal Nations.

99.     Tribal demands for fees that are not legally required to review projects submitted through TCNS have increased over the course of time.  And though we have taken steps to address these issues for small wireless facilities, we take further action here to address fee matters as they relate to the ongoing construction of macrocells and other large radio transmission facilities.  We also take steps to make the Tribal participation process more efficient for applicants, Tribal Nations, and NHOs.  The record details multiple issues causing confusion and delay in Tribal consideration of proposals submitted in TCNS.  Many applicants have complained that there is uncertainty concerning how long a Tribal Nation will take in processing an application and that in some instances the process can extend for months or longer.[222] Delays in obtaining Tribal comment on even a few individual sites can cause delays to larger projects and impede delivery of communications services to American consumers.  In response, several Tribal commenters argue that most requests are handled in a timely manner.[223]  Moreover, Tribal governments have indicated that applicants often do not provide sufficient information in TCNS for a THPO or cultural preservation officer to opine as to whether a particular project may affect historic or cultural resources, thereby slowing the Tribal review process.[224]  We address these concerns below.[225]

## 2.    Timeline for Initial Tribal Responses

100.     The NPA states that Tribal Nations and NHOs ordinarily should be able to respond to communications from applicants within 30 days,[226] but applicants are required to seek guidance from the Commission if a Tribal Nation or NHO does not respond to the applicant's inquiries.[227]  The Commission, in 2005, issued a Declaratory Ruling establishing a process that enables an applicant to proceed toward

---

[222] *See, e.g.*, CTIA/WIA Comments at 6; AT&T Comments at 31; CCA Comments at 43; Clearing the Path for America's Wireless Future at 7 (June 8, 2017).

[223] *See* Choctaw Nation of Oklahoma Comments at 1 (97.4% of 1,318 projects since 2014 covering nine states have been responded to within 30 days).

[224] *See, e.g.*, Lower Brule Sioux Comments at 4; Fond du Lac Band of Lake Superior Chippewa Comments at 3 ("If delays arise, it is often because the project applicant did not timely contact the Tribe, or did not provide the Tribe with sufficient information to assess the impacts of the proposed project"); Osage Nation Comments at 6 ("Currently, a tremendous amount of time is wasted waiting on consultants to provide the tribe's requested information"); Standing Rock Sioux Tribe Comments at 4 (delays more often than not caused by industry delay or incomplete applications); Thlopthlocco Tribal Town Comments at 1; NCAI *et al.* Comments at 18 (received Apr. 18, 2017).

[225] In the *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, we also noted that some Tribal Nations have requested in TCNS to be notified of any proposed project within entire states, and sometimes in as many as 20 full states.  We sought comment on whether we should encourage, or require, Tribal Nations to specify their areas of interest by county rather than by state, as well as other potential changes in the process for designating geographic areas of interest.  *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3350, para. 53.  We received comments on this issue, both urging us to exercise greater control over the designation of Tribal areas of interest and defending the current process as empowering Tribal Nations to protect historic properties that are significant to them and respectful of Tribal sovereignty.  We are not taking action on this proposal today in light of both the concerns raised by Tribal Nations and the other reforms we are making here.

[226] Wireless Facilities NPA, § IV.F.4 ("[o]rdinarily, 30 days from the time the relevant tribal or NHO representative may reasonably be expected to have received an inquiry shall be considered a reasonable time" to respond to communications).

[227] Wireless Facilities NPA, § IV.G; *see also id.*, § IV.C (providing that TCNS contact is only an initial effort to contact the Tribal Nation or NHO, and does not in itself fully satisfy the applicant's obligations or substitute for government-to-government consultation unless the Tribal Nation or NHO affirmatively disclaims further interest).

construction when a Tribal Nation or NHO does not timely respond to a TCNS notification.[228]

101.    In the *Wireless Infrastructure NPRM*, the Commission sought comment on the measures, if any, it should take to expedite the review processes for Tribal Nations and NHOs, either by amending the Wireless Facilities NPA or otherwise, while assuring that potential effects on historic preservation are fully evaluated.[229]  The Commission sought comment on whether the procedures established by the *2005 Declaratory Ruling* were adequate to ensure the completion of Section 106 review when a Tribal Nation or NHO is non-responsive.[230]  It also sought comment on whether these processes could be revised in a manner that would permit applicants to self-certify their compliance with the Section 106 process and therefore proceed once they meet the Commission's notification requirements, without requiring Commission involvement.[231]  The Commission asked whether such an approach would be consistent with the Wireless Facilities NPA and with the Commission's legal obligations.[232]  The Commission also asked whether the information in FCC Form 620 or 621 is sufficient to meet the requirement that "all information reasonably necessary" has been provided to the Tribal Nation or NHO.[233]

102.    In response to the *Wireless Infrastructure NPRM*, many commenters contend that further improvements to the process for engaging Tribal Nations and NHOs in Section 106 review are warranted.[234]  Evidence in the record indicates that there are often delays associated with Tribal review and that these delays can significantly affect service providers' ability to complete Section 106 review and move toward deployment.[235]  Delays associated with Tribal engagement can be substantial, with estimates of the average time to complete Tribal review ranging between 75 and 110 days per project where Tribal review is required.[236]  Several Tribal Nations, however, dispute such arguments and note that they provide timely responses to communications from applicants in the vast majority of cases.[237]  With the number of deployments needed to support expanded 4G and 5G network technologies, service providers are increasingly concerned about the delays they are experiencing.  Tribal representatives, however, contend that their ability to provide timely responses is impeded by some applicants who fail

---

[228] *Clarification of Procedures for Participation of Federally Recognized Indian Tribes and Native Hawaiian Organizations Under the Nationwide Programmatic Agreement*, Declaratory Ruling, 20 FCC Rcd 16092 (2005) (*2005 Declaratory Ruling*).

[229] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3351, para. 60.

[230] *Id.* at 3352, para. 61.

[231] *Id.*

[232] *Id.*

[233] *Id.* at 3348, para. 46; *see* Wireless Facilities NPA, § IV.F.3.

[234] *See, e.g.*, CCA Comments at 37-43; CTIA/WIA Comments at 6-7; Sprint Comments at ii-iii; Verizon Comments at 44.  *See also* Miami Tribe of Oklahoma Comments at 1 (recognizing that "technology evolves and that there may be benefits to modernizing the existing TCNS system to improve the TCNS process" and approving, for example, "the concept of a shot clock provided that sufficient time is given for the Tribe to consult and respond").

[235] *See e.g.*, AT&T Reply at 15-16; CTIA/WIA Comments at 11-13; Verizon Comments at 45, 50-51.

[236] We note that this time period represents the average time to complete the full Tribal engagement process per project and not the average time for each Tribal Nation to complete review.  *See* CTIA/WIA Comments at i, 6 (stating that the average time for Tribal Nations to complete a request for consultation is 110 days); Verizon Comments at 51 (stating that for projects it submitted between 2014 and 2016, the average time for Tribal Nations to complete review was 75 days).

[237] Chippewa Cree Tribe Reply at 4 (noting that, of 375 requests received from one provider, 93 percent were reviewed within 30-day timeframe); Choctaw Nation of Oklahoma Comments at 1 (stating that it provided substantive responses within 30 days to 97.4 percent of the TCNS requests it received over the past year); Letter from Elizabeth Toombs, Cherokee Nation, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1 (noting that 100 percent of TCNS requests were responded to within 30 days last year).

initially to provide them with sufficient information to determine their interest in a proposed project.[238] They contend that, without sufficient information, they are forced to go back to applicants and request the information they need and that delays often result from repeated attempts to obtain needed information. For example, Tribal commenters have noted applicants' omission of key information, such as a precise location and a full description of the proposed project, and information needed to assess potential effects.[239]  They also point out that many delays are the result of applicants' error, such as failing to submit information to the Tribal point of contact identified in TCNS, or in some instances, submitting information to the wrong Tribal Nation altogether.[240]

103.     We take several steps in this Order to make the Tribal participation process more efficient for applicants, Tribal Nations, and NHOs.

104.     First, to address Tribal concerns with receiving insufficient information to identify potentially affected historic properties, we clarify that going forward applicants must provide all potentially affected Tribal Nations and NHOs with a Form 620 (new towers) or Form 621(collocations) submission packet in cases where this form is prepared for the SHPO following the requirements established in the Wireless Facilities NPA.  While applicants retain the option of sending an initial notification of a proposed project to Tribal Nations and NHOs through TCNS without a Form 620/621 submission packet to provide an early opportunity for a Tribal Nation or NHO to disclaim interest, as described further below, the time period for a Tribal response will not begin to run until an applicant sends the Form 620/621 submission packet or, when no Form 620/621 is required, the alternative submission discussed below. The Form 620/621 submission packet contains detailed information about proposed facilities, including their proposed location(s); the dimensions, scale, and description of proposed projects; and information about the potential direct effects and visual effects of the project.[241]  It also requires applicants to provide their contact information and to include attachments providing additional detail, such as photographs and maps of the proposed site.  We agree with Tribal Nations and other commenters who contend that providing Tribal Nations and NHOs with this detailed set of information at the initial notification stage will enable them to determine more quickly whether a project may affect historic properties of religious and cultural significance to them.[242]  We emphasize to applicants the importance of completing the Form 620/621 submission packet accurately and completely. Complete and accurate information about proposed facilities, including, for example, a specific and correct site address or a detailed description of the location of proposed facilities if no address is available as well as a complete description of all elements of the proposed facility, is critical to enable Tribal Nations and NHOs to identify potentially affected historic properties.  Thus, if this information is inaccurate or incomplete, we will not consider the time period for Tribal response to have started.

105.     We disagree that requiring applicants to send their Form 620/621 submission packet to

---

[238] *See, e.g.,* Seminole Nation-Oklahoma Comments, Attach. at 15 (stating that delays in processing applications are due to the receipt of incomplete packets and that lack of necessary information must be provided to complete application review); Chippewa Cree Tribe Reply at 12 (citing a 2-month delay in processing caused by an applicant's failure to upload a map of a proposed project); Muscogee (Creek) Nation Comments at 4-5 (noting that it could not complete review where consultant did not provide information such as "address, city, county, zip code, po[le] height, po[le] type, . . .").

[239] Transcript of January 24th Tribal Call at 7-13.

[240] *Id.*

[241] See FCC Form 621, FCC Wireless Telecommunications Bureau Collocation ("CO") Submission Packet, https://www.fcc.gov/Forms/Form621/621.pdf (last visited mar. 13, 2018); Form 620, FCC Wireless Telecommunications Bureau New Tower ("NT") Submission Packet,  https://www.fcc.gov/Forms/Form620/620.pdf (last visited Mar. 13, 2018).

[242] *See* Transcript of January 24th Tribal Call at 8; AT&T Comments at 34; CCA Comments at 41; CTIA/WIA Comments at 24-25; Verizon Comments at 45.

Tribal Nations and NHOs would be inconsistent with the requirements of the Wireless Facilities NPA.[243] To the contrary, the Wireless Facilities NPA requires that applicants provide Tribal Nations and NHOs with "all information reasonably necessary for the [Tribal Nation] or NHO to evaluate whether [h]istoric [p]roperties of religious and cultural significance may be affected."[244] The process we establish here is consistent with this requirement because it provides Tribal Nations and NHOs with more complete information to evaluate proposed projects. Moreover, under the revised process we establish, applicants retain the ability to make initial notifications to Tribal Nations and NHOs before sending them Form 620/621 submission packets.

106. We find that providing the detailed information included in the Form 620/621 submission packet constitutes a reasonable and good faith effort to provide the information reasonably necessary for Tribal Nations and NHOs to ascertain whether historic properties of religious and cultural significance to them may be affected by the undertaking.[245] The record shows that some Tribal Nations request that applicants provide information such as ethnographic reports, SHPO concurrence letters, and other information in excess of what the Wireless Facilities NPA requires to be included in a Form 620/621 submission packet before making an initial determination about their interest in a proposed project.[246] We clarify that to the extent that any such information exceeds what is required under the Wireless Facilities NPA to be included in a Form 620/621 submission packet, we require the applicant to provide it, if necessary, only after a Tribal Nation or NHO has indicated that a historic property may be affected and has become a consulting party. Thus, to the extent that Tribal Nations or NHOs currently have auto replies in TCNS requesting additional information from applicants, the Commission will remove such language.

107. We further clarify that, if a Tribal Nation or NHO conditions its response to an applicant's submission packet on the receipt of additional information beyond that required in the Form 620/621 submission packet, an applicant should respond that the FCC does not require the applicant to provide this information. If the Tribal Nation or NHO subsequently fails to indicate concerns about a historic property of traditional religious and cultural significance that may be affected by the proposed construction, the applicant may make use of the process described below for addressing instances in which Tribal Nations and NHOs do not initially respond. To the extent that Tribal Nations or NHOs seek to clarify information presented in the Form 620/621 submission packet, such as by requesting an explanation of the photographs included in the submission packet, we encourage applicants to provide the requested clarifications, and the parties may copy Commission staff on communications related to such requests. If circumstances require the Commission to help resolve a dispute about whether a Form 620/621 submission packet or alternative submission has been properly completed or other cases that may present unique issues, Commission staff will provide assistance when it is requested. In bringing a dispute to Commission staff, an objecting party should provide a complete and detailed explanation of the basis of the dispute, evidence regarding the information the applicant has provided to the Tribal Nation or NHO, and all communications between the applicant and the Tribal Nation or NHO.

108. In cases in which a Form 620/621 submission packet is not required to be prepared for the SHPO because the construction does not require SHPO review, we adopt a different procedure. The

---

[243] Sprint Comments at 22-23 (objecting to submitting Form 620/621 submission packet unless Tribal Nation has identified an eligible historic property and requested consultation under Section VII of the Wireless Facilities NPA).

[244] Wireless Facilities NPA, § IV.F.3.

[245] *Id.*

[246] *See, e.g.,* CTIA/WIA Comments at 13-15; Sault Ste. Marie Tribe of Chippewa Indians Comments at 7; Pechanga Band of Luiseno Mission Indians Comments at 4. *See also* NCAI *et al.* Reply at 7-8 (arguing that additional information may be essential to reviewing applications and that "[e]ach Tribe, as a sovereign government, has a right to review applications in their own way and determine what information is needed to come to a final decision.").

Wireless Facilities NPA ordinarily excludes from Section 106 review by the SHPO, the Commission, and the ACHP certain categories of undertakings deemed to have minimal to no potential to affect historic properties.[247]  For two of these excluded categories, however, applicants are still required to identify and contact Tribal Nations and NHOs to ascertain whether historic properties of religious or cultural significance to them may be affected.[248]  In these instances where no Form 620/621 submission packet is otherwise prepared, we require applicants to provide Tribal Nations and NHOs with information adequate to fully explain the project and its location.  At minimum, this alternate submission must include contact information for the applicant, a map of the proposed location of the facility, coordinates of the proposed facility, a description of the facility to be constructed including all proposed elements (such as, for example, access roads), and a description of the proposed site, including both aerial and site photographs.  Given that applicants are not otherwise required affirmatively to identify historic properties within the Area of Potential Effects for these undertakings (other than the limited inquiry necessary to determine whether the exclusion applies), we find that this package constitutes an adequate baseline set of information to enable Tribal Nations and NHOs to comment on these projects.  We therefore disagree with the contention that we are required to provide Tribal Nations and NHOs with all the information contained in Form 620/621 in these instances.[249]

109.    We turn next to the timeframe for Tribal Nations and NHOs to respond to notifications by indicating any concerns about potentially affected historic properties.  We clarify that the 30-day period for a Tribal response provided in the Wireless Facilities NPA will begin to run on the date that the Tribal Nation or NHO can be shown to have received or may reasonably be expected to have received the Form 620/621 submission packet (or the alternative submission where no 620/621 packet has been prepared).  Consistent with existing practice, applicants may use TCNS to provide an initial notification to Tribal Nations and NHOs about proposed facility deployments.[250]  As noted above, TCNS automatically notifies Tribal Nations and NHOs of proposed construction within the geographic areas they have identified as potentially containing historic properties of religious and cultural significance to them.[251]  A Tribal Nation or NHO receiving a notification of proposed construction through TCNS, however, is under no obligation to respond until it receives a Form 620/621 submission packet (or alternative submission).  The 30-day period for a response indicating whether the Tribal Nation or NHO has concerns about a historic property of traditional religious and cultural significance that may be affected by the proposed construction will begin to run on the date that the Tribal Nation or NHO can be shown to have been, or may reasonably be expected to have been, notified that a Form 620/621 submission packet or alternative is available for viewing via TCNS.  We are cognizant of Tribal concerns

---

[247] Wireless Facilities NPA, § III.

[248] First, construction of a facility less than 200 feet above ground level in an existing industrial park, commercial strip mall, or shopping center that occupies a total land area of 100,000 square feet or more, provided that the industrial park, strip mall, or shopping center is not located within the boundaries of or within 500 feet of a historic property, is generally excluded from review – though it remains subject to Tribal participation.  Wireless Facilities NPA, § III.D.  Second, construction of a facility in or within 50 feet of the outer boundary of a right-of-way designated by a Federal, State, local, or Tribal government for the location of communications towers or above-ground utility transmission or distribution lines and their associated structures and equipment is generally excluded from review.  Wireless Facilities NPA, § III.E.  This exclusion is limited to situations where the proposed facility would not constitute a substantial increase in size, as defined in the Collocation NPA, and the proposed facility would not be located within the boundaries of a historic property.  Wireless Facilities NPA, § III.E.  Here, too, these proposed facilities remain subject to Tribal participation and review.

[249] Transcript of January 24th Tribal Call at 7-9.

[250] Wireless Facilities NPA, § IV.C.

[251] A Tribal Nation or NHO receiving an initial notification through TCNS may disclaim interest in the proposed project, and, if all Tribal Nations and NHOs receiving a notification disclaim interest in reviewing a proposed project, the applicant will have completed its Tribal outreach obligations.

that applicants sometimes submit information to outdated points of contact or deviate from Tribal Nations' preferred means of communications.[252] Therefore, we remind applicants that, consistent with the requirements in Section IV of the Wireless Facilities NPA, contact and communications shall be made in accordance with preferences expressed by the Tribal Nation or NHO, and misdirected communications will not begin the period for Tribal response unless and until they are actually received.[253] Where the Tribal Nation or NHO is notified by email that a Form 620/621 submission packet has been submitted, the submission packet is presumed to have been received on the day the submission packet is provided. Where the applicant sends the notification through the mail, we will presume that the packet may reasonably be expected to have been received by no later than the fifth calendar day after the date it is sent.[254]

110.    In addition to clarifying when the initial 30-day timeframe for Tribal response begins to run, we also establish a new procedure to address instances in which Tribal Nations or NHOs fail to respond after receiving a Form 620/621 submission packet. As noted above, the *2005 Declaratory Ruling* established a process to enable an applicant to proceed toward construction when a Tribal Nation or NHO does not respond to a TCNS notification in a timely manner. The Wireless Facilities NPA requires that, if an applicant does not receive a response after contacting a Tribal Nation or NHO, the applicant is required to make a reasonable attempt to follow up.[255] Under the *2005 Declaratory Ruling*, if the Tribal Nation or NHO does not respond to a second contact within 10 calendar days after the initial 30-day period, the applicant can refer the matter to the Commission for guidance.[256] Upon receiving a referral, the Commission contacts the Tribal Nation or NHO by letter or email to request that it inform the Commission and the applicant within 20 calendar days whether it has an interest in participating in the Section 106 review.[257] In addition, Commission staff attempts a phone call unless the Tribal Nation or NHO has indicated it does not wish to receive calls.[258] The Commission also informs the applicant when its letter or email has been sent. If the Tribal Nation or NHO does not respond within 20 days of the date of the Commission's written communication, it is deemed to have no interest in pre-construction review and the applicant's pre-construction obligations under the Wireless Facilities NPA are discharged with respect to that Tribal Nation or NHO.[259] Together, these procedures provide for a 60-day process for resolving cases where a Tribal Nation or NHO fails to provide a timely response to an initial notification provided through TCNS.

---

[252] Transcript of January 24th Tribal Call at 8-11.

[253] Wireless Facilities NPA, § IV.F. If a communication is misdirected due to a Tribal Nation or NHO's failure to timely update its contact information, the 30-day period begins to run from the time the applicant properly has submitted its required information. If, however, the applicant has actual notice that the Tribal Nation or NHO's contact information is outdated, the 30-day period does not run. In that case, once the applicant has actual notice of the outdated contact information, the applicant shall notify the Commission, at which time the 30-day period begins to run again and the Commission shall attempt to contact the Tribal Nation or NHO.

[254] If the fifth calendar day falls on a weekend or holiday, the packet will be presumed received on the next business day. *See* Wireless Facilities NPA, § II.C. The 5-day delivery presumption does not apply in cases where a hard copy of the Form 620/621 submission packet is sent via expedited shipping, such as one-day or two-day shipping methods. In these cases, we presume that the packet will be received on the date indicated by the delivery provider.

[255] Wireless Facilities NPA, § IV.F.5 ("applicants should not presume that failure to respond to a single communication establishes that a [Tribal Nation] or NHO is not interested in participating, but should make a reasonable effort to follow up").

[256] *2005 Declaratory Ruling*, 20 FCC Rcd at 16095, para. 7.

[257] *Id.* at 16095, para. 8.

[258] *Id.*

[259] *Id.*

111.    In this *Order*, we replace the procedures outlined in the *2005 Declaratory Ruling* with new procedures that establish a 45-day process for moving forward with construction in cases in which Tribal Nations or NHOs do not respond after having been given the opportunity to review a Form 620/621 submission packet, or when no Form 620/621 submission is required, an alternative submission. Under the process we adopt here, if an applicant does not receive a response within 30 calendar days of the date the Tribal Nation or NHO can be shown or may reasonably be expected to have received notification that the Form 620/621 submission packet (or alternative submission) is available for review, the applicant can refer the matter to the Commission for follow-up.  To facilitate prompt processing of its request, the applicant may submit its referral via TCNS.  Upon receiving a referral, the Commission will contact promptly (and, in any case, within five business days) the Tribal Nation's or NHO's designated cultural resource representative by letter and/or email to request that the Tribal Nation or NHO inform the Commission and applicant within 15 calendar days of the date of the letter and/or email of its interest or lack of interest in participating in the Section 106 review.[260]  The Commission also will inform the applicant when this letter and/or email has been sent, either by copying it on the correspondence or by other effective means.  If the Tribal Nation or NHO does not respond within 15 calendar days,[261] the applicant's pre-construction obligations are discharged with respect to that Tribal Nation or NHO.  As discussed above, we establish here that the information in the Form 620/621 submission packet (or the alternative submission where no 620/621 packet has been prepared) will be considered sufficient for Tribal Nations and NHOs to comment on proposed projects.

112.    We conclude that these revised procedures satisfy the Commission's obligation to make reasonable and good faith efforts to identify Tribal Nations and NHOs that may attach religious and cultural significance to historic properties that may be affected by an undertaking, as specified by the Wireless Facilities NPA and as required under the NHPA and the rules of the ACHP.  The revised procedures we adopt will provide Tribal Nations and NHOs with a total period of 45 days to provide a response to an applicant's notification of a proposed construction.  The 45-day period will also include a Commission-initiated reminder after 30 days have elapsed.  While the process we adopt provides less time for Tribal review than the process established in the *2005 Declaratory Ruling,* it nonetheless allows a longer opportunity to respond than the 30-day period that the Wireless Facilities NPA stipulates as an ordinarily reasonable period for Tribal review.[262]  Overall, we conclude that the procedures we adopt here are reasonable and consistent with our consultation responsibilities.

113.    We reject requests for the Commission to allow applicants to move forward unilaterally

---

[260] In addition, we expect that staff will continue its practice of making efforts to reach out by telephone unless the Tribal Nation or NHO has indicated that it does not wish to receive calls.

[261] If the 15th day falls on a Saturday, Sunday, or federal or state holiday, the time period is extended until the next business day.  *See* Wireless Facilities NPA, § II.C; *see also* 47 CFR § 1.4(e)(1), (j).

[262] Several Tribal Nations oppose reducing the timeframe for Tribal review.  *See, e.g.*, Letter from Joseph H. Webster, Counsel to Seminole Tribe of Florida, WT Docket No. 17-79 (filed Mar. 14, 2018) at 9-10, Letter from J. Michael Chavarria, Santa Clara Pueblo, WT Docket No. 17-79 (filed Mar. 14, 2018) at 5.  These comments, however, do not address evidence in the record indicating that there are often significant delays associated with Tribal review.  We find on balance that the steps we take today are a reasonable means to address the delays that have been occurring while continuing to satisfy the Commission's consultation obligations.  As noted above, the process we establish today allows a longer opportunity to respond than the 30-day period that the Wireless Facilities NPA stipulates as a reasonable period for Tribal review.  In addition, it also provides a longer opportunity to respond than is recommended for USET member Tribes under the FCC-USET Best Practices.  *See* Voluntary Best Practices for Expediting the Process of Communications Tower and Antenna Siting Review Pursuant to Section 106 of the National Historic Preservation Act (Oct. 25, 2004) at §§ III.B (Tribal Nation should respond to initial contact within 14 days), III.C (applicant may ask the Commission to initiate government-to-government consultation if Tribal Nation does not respond to second contact within seven days).

without Commission involvement in the absence of a response from a Tribal Nation or NHO.[263]  The processes we establish herein are consistent with the provisions of the Wireless Facilities NPA that outline applicants' responsibilities with respect to Tribal Nations and NHOs.  Section IV of the Wireless Facilities NPA stipulates that a Tribal Nation's or NHO's failure to respond to a single communication does not establish that the Tribal Nation or NHO is not interested in participating in the review of a proposed construction, and it requires applicants to seek guidance from the Commission in cases where a Tribal Nation or NHO does not respond to the applicant's inquiries.[264]  The revised procedures we adopt here are faithful to these requirements by providing multiple opportunities for Tribal Nations and NHOs to express their interest in proposed constructions and by involving the Commission in the consultation process when an applicant has not received a response to its attempted communications.[265]  Moreover, we expect that the revised procedures we establish here will reduce delays and facilitate resolution of cases where Tribal Nations or NHOs have not provided timely responses.

### 3.      Tribal Fees

114.      In the *Wireless Infrastructure NPRM*, we sought comment on a number of questions related to fees charged by Tribal Nations for their participation in the Section 106 process.[266]  In this section, we interpret the Commission's and applicants' obligations under the NHPA and the Wireless Facilities NPA, in light of ACHP guidance, to clarify that applicants are not required to pay fees requested by Tribal Nations or NHOs that have been invited to participate in the Section 106 process.  We also clarify the circumstances under which an applicant may be required to retain an appropriately qualified expert, who may be a representative of a Tribal Nation or NHO, to perform consultant services for which that expert may reasonably expect to be compensated.

115.      Neither the NHPA nor the ACHP's implementing regulations expressly address fees, nor does the Wireless Facilities NPA, but the ACHP, as the agency charged with implementing the NHPA, has issued guidance on the subject in a 2001 memorandum and as part of a handbook last issued in 2012.  The ACHP's guidance repeatedly makes clear that the proponent of an undertaking is not required to accede to unilateral requests for payment.  Rather, the agency (in our case, through our applicants) "has full discretion" on how to fulfill its legal obligation—namely the obligation to make "reasonable and good faith efforts" to identify historic properties that may be affected by its undertaking and invite potentially interested Tribal Nations and NHOs to be consulting parties.[267]

#### a.      Up-front Fees

116.      Consistent with the Wireless Facilities NPA, once an applicant, through TCNS, has identified that particular Tribal Nations or NHOs may attach religious and cultural significance to historic properties located in the area that may be affected by an undertaking, the applicant contacts each such Tribal Nation or NHO, typically through TCNS, to ascertain whether there are in fact such properties that

---

[263] *See, e.g.,* AT&T Reply at 17; CCA Comments at 37; CTIA/WIA Comments at 27; Crown Castle Reply at 8; Verizon Comments at 50-53; WEC Energy Group Comments at 5-6.

[264] Wireless Facilities NPA, §§ IV.F.5, IV.G.

[265] Maintaining Commission involvement also provides a safeguard in circumstances in which the applicant is using outdated or otherwise erroneous Tribal contact information.  *See* Transcript of January 24th Tribal Call at 8-11.  We note, however, that in some instances Tribal Nations have failed to keep their contact information current in TCNS.  While staff will continue to make best efforts to follow up when our communications cannot be delivered, we consider a contact sent to the most recent address in our records to satisfy our obligations under the procedures set forth in this Order.

[266] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3346-3350, paras. 42-52.

[267] *See* ACHP, *Fees in the Section 106 Review Process* at 1 http://www.achp.gov/feesin106.pdf (Jul. 6, 2001) (ACHP 2001 Fee Guidance).

may be affected.[268]  The record indicates that, at this stage in the Section 106 review, some Tribal Nations are directing applicants to pay an "up-front fee" before the Tribal Nation will respond to the contact.  At no time to date has the Commission explicitly endorsed such up-front fees.  We now clarify, consistent with ACHP guidance, that applicants are not required to pay Tribal Nations or NHOs up-front fees simply for initiating the Section 106 consultative process.

117.    At the time the Wireless Facilities NPA was adopted and TCNS was implemented, Tribal Nations generally did not request fees to review proposed constructions upon receiving notification.  Over time, however, some Tribal Nations began assessing fees at notification, and gradually it became a more common practice.[269]  In addition, the amounts of these fees have increased significantly over the years, and industry commenters assert that the rate of increase itself has risen sharply in recent years.[270]  CCA contends, for example, that one of its member companies reports that the average amount it pays in Tribal fees increased from $381.67 per project in 2011 to more than $6,300 for projects in late 2016 to early 2017.[271]  Consequently, industry commenters ask that the Commission provide guidance on up-front fees.[272]  AT&T, for example, asks the Commission to establish that, "if a carrier does not ask for 'specific information and documentation' from the Tribal Nation, pursuant to the ACHP Handbook, then no contractor relationship has been established and no payment is necessary."[273]  NATHPO, on the other hand, argues that the relative rarity of instances in which tower construction has harmed historic properties demonstrates that the current system works, and it urges the Commission not to take actions that would limit Tribal capacity to become involved in the process.[274]

118.    The ACHP's 2001 fee guidance memorandum addresses the practice of Tribal Nations and NHOs charging fees for their participation in the Section 106 process.  In that memorandum, the ACHP distinguishes between Tribal Nations participating in Section 106 reviews in their capacity as government entities with a designated role in the process versus the possibility that they may be engaged to provide services in a different capacity, that of a consultant or contractor.  The former capacity entails no obligation or expectation for the applicant to pay fees.  The ACHP 2001 Fee Guidance explains that "the agency or applicant is not required to pay the tribe for providing its views."[275]  The ACHP 2012 Tribal Consultation Handbook echoes this guidance, and clearly states that no "portion of the NHPA or the ACHP's regulations require[s] an agency or an applicant to pay for any form of tribal involvement."[276]  Further, "[i]f the agency or applicant has made a reasonable and good faith effort to consult with an Indian tribe and the tribe refuses to respond without receiving payment, the agency has met its obligation

---

[268] Wireless Facilities NPA, § IV.C.

[269] *See, e.g.*, PTA-FLA Comments at 12.

[270] *See, e.g.*, CCA Comments at 30.

[271] *See* CCA Comments at 30.  While it is unclear to what extent these represent up-front fees as opposed to fees assessed later in the process, the implication from CCA's comment is that the bulk of them are up-front fees.

[272] *See* AT&T Comments at 37-38.

[273] *Id*. at 38.  *See* discussion *infra* regarding consultant fees.

[274] NATHPO Comments at 4.

[275] *See* ACHP 2001 Fee Guidance.  *See* Letter from Joseph H. Webster, Counsel to Seminole Tribe of Florida, WT Docket No. 17-79 (filed Mar. 14, 2018) (noting that Tribal fees "are already voluntary …").

[276] ACHP, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook*, at 13 (2012), http://www.achp.gov/pdfs/consultation-with-indian-tribes-handbook-june-2012.pdf (ACHP 2012 Handbook). Similarly, the 2001 Fee Guidance states that neither the NHPA nor ACHP's regulations "requires Federal agencies to pay for any aspect of tribal nor other consulting party participation in the Section 106 process."  ACHP 2001 Fee Guidance at 2.

to consult and is free to move to the next step in the Section 106 process."[277]  The Handbook does acknowledge that there may be circumstances in which payment is reasonably expected, but not merely for acting in the Tribal Nation's governmental capacity:

> …during the identification and evaluation phase of the Section 106 process when the agency or applicant is carrying out its duty to identify historic properties that may be significant to an Indian tribe, it may ask a tribe for specific information and documentation regarding the location, nature, and condition of individual sites, or even request that a survey be conducted by the tribe.  In doing so, the agency or applicant is essentially asking the tribe to fulfill the duties of the agency in a role similar to that of a consultant or contractor.  In such cases, the tribe would be justified in requesting payment for its services, just as is appropriate for any other contractor.[278]

119.     The up-front fees requested by some Tribal Nations for providing their initial assessment as part of the Section 106 review process do not compensate Tribal Nations for fulfilling specific requests for information and documentation, or for fulfilling specific requests to conduct surveys.  They are more in the nature of a processing fee, in exchange for which the Tribal Nation responds to the applicant's contact, and to the extent necessary, reviews the materials submitted before indicating whether the Tribal Nation has reason to believe that historic properties of religious and cultural significance to it may be affected.  In recognition of ACHP guidance and having reviewed the record, we affirm that applicants are not required to pay up-front fees to Tribal Nations and NHOs to initiate Section 106 reviews.[279]  Thus, fees need not be paid to obtain a response to an applicant's initial contact with a Tribal Nation or NHO and, to the extent that Tribal Nations or NHOs currently have auto replies in TCNS requesting that applicants pay up-front fees, the Commission will remove such language.[280]  If a Tribal Nation or NHO nevertheless purports to condition its response to an applicant's TCNS contact on the receipt of up-front compensation, we will treat its position as a failure to respond, and the applicant will be able to avail itself of the process discussed above for when a Tribal Nation or NHO fails to supply a timely response.  We find such an approach to be consistent with the ACHP's guidance that, where the agency or applicant "has made a reasonable and good faith effort to consult with an Indian tribe and the tribe refuses to respond without receiving payment, the agency has met its obligation to consult and is free to move to the next step in the Section 106 process."[281]

120.     A number of Tribal Nations have argued that Tribal sovereignty prohibits the Commission from establishing rules about fees.[282]  We emphasize that no action we take here questions or interferes with Tribal Nations' rights to act as sovereigns.  We do not dictate or proscribe any actions by Tribal Nations.  We simply clarify that nothing in the applicable law of the United States—the NHPA, ACHP rules, and the Wireless Facilities NPA—*requires* applicants (or the Commission for that matter) to

---

[277] ACHP 2001 Fee Guidance at 3.

[278] ACHP 2012 Handbook at 13.

[279] Upfront fees include any charges assessed on the applicant to use a third-party website at the direction of a Tribal Nation or NHO.  While a Tribal Nation or NHO may express a preference that an applicant use such third-party website for communication with the Tribal Nation or NHO, that preference may not be contingent upon the assessment of a fee to use that website.  In the absence of an alternative contact preference, the applicant should contact the Tribal Nation or NHO via TCNS.

[280] *See* NCAI *et al.* Comments at 7-8 (received June 15, 2017) ("With TCNS, industry is put into direct contact with those Tribes with an interest in a potential cell site area…  Industry is not charged for this initial determination of interest").

[281] *See* ACHP 2012 Handbook at 13.

[282] *See, e.g.*, Chippewa Cree Comments at 1-2; Transcript of January 24th Tribal Call at 19, 30; Letter from J. Michael Chavarria, Santa Clara Pueblo, WT Docket No. 17-79 (filed Mar. 14, 2018) at 4, Quapaw Mar. 8, 2018 *Ex Parte* Letter at 2; NCAI, USET SPF Mar. 14, 2018 *Ex Parte* Letter at 12; Letter from Dianne Desrosiers, Sisseton-Wahpeton Oyate, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 9, 2018) at 1.

pay up-front fees as part of the Section 106 process. Accordingly, Tribal Nations remain free to request upfront fees and applicants may, if they choose, voluntarily pay such fees. If, however, a Tribal Nation or NHO opts not to provide its views without an up-front payment, and the applicant does not voluntarily agree to provide the payment, consistent with the ACHP's guidance, our obligations have been satisfied and we may allow our applicant to proceed with its project after the 45-day period described above.

121.    Some Tribal Nations assert that they are entitled to up-front fees to compensate them for the effort or cost of participating in the Section 106 process.[283]  For instance, some Tribal commenters have indicated that they rely upon up-front fees to fund their Section 106 activities or to eliminate the administrative burden of calculating actual costs incurred in reviewing each TCNS submission.[284]  Other Tribal commenters maintain that they should be compensated because their up-front fees are meant to cover their actual average costs associated with reviewing and commenting on commercial projects.[285]  While this may be true, the fact remains that the law and applicable guidance do not require the Commission and its applicants to compensate Tribal Nations and NHOs for providing their comments or views in the context of the Section 106 process.  Moreover, in light of our decision above to require that an applicant provide a completed FCC Form 620/621 or alternative submission when a project is proposed within a Tribal Nation's or NHO's geographic area of interest, we find that in most instances, a Tribal Nation or NHO should have sufficient information to provide comment on the undertaking and its potential to affect an historic property of significance to it.  In assessing the applicant's submission during the initial consultation stage, we believe it reasonable to expect a Tribal Nation or NHO to rely on information already in its possession.  If a Tribal Nation elects to conduct research to obtain this information, however, the ACHP's guidance does not assign responsibility to applicants to fund such research.

122.    While certain commenters claim they should be entitled to a share of revenue from commercial ventures that may impact their cultural heritage,[286] the fact that our applicants frequently are for-profit entities is irrelevant to whether fees for non-consultant services would be required.  Finally, some commenters assert that Tribal Nations act in a consultant capacity and therefore are entitled to compensation at all stages of a project, including from the moment the review process begins.[287]  We disagree, as such an interpretation conflicts with ACHP guidance indicating when fees may be appropriate.[288]  In the section that follows, we discuss the ACHP's guidance on consultant fees.

### b.    Consultant Fees

123.    As noted above, the ACHP's 2001 fee guidance memorandum states that, when a Tribal Nation "fulfills the role of a consultant or contractor" when conducting reviews, "the tribe would seem to

---

[283] *See, e.g.*, Transcript of January 24th Tribal Call at 21.

[284] *See* Choctaw Nation of Oklahoma Comments at 6-8; Osage Nation Comments at 7.

[285] *See, e.g.*, Miami Tribe-Oklahoma Comments at 1; Chippewa Cree Comments at 8; Letter from Loris A. Taylor, Native Public Media, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 2; Letter from Glenna J. Wallace, Eastern Shawnee Tribe of Oklahoma, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 3-4, Letter from Lance M. Foster, Iowa Tribe of Kansas and Nebraska, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1, Letter from David Sickey, Coushatta Tribe of Louisiana, WT Docket No. 17-79 (filed Mar. 15, 2018) at 1-2.

[286] *See, e.g.*, Northern Cheyenne THPO Comments at 1-2; Navajo Nation Comments at 8.

[287] Pechanga Band of Luiseno Mission Indians Comments at 5-6.  *See also* Muscogee (Creek) Nation Comments at 8; Fond du Lac Band of Lake Superior Chippewa Comments at 3.

[288] This interpretation also conflicts with the Wireless Facilities NPA, which distinguishes between TCNS contact and consulting party status, as well as with the FCC-USET Best Practices.  *See* Wireless Facilities NPA, § IV; Voluntary Best Practices for Expediting the Process of Communications Tower and Antenna Siting Review Pursuant to Section 106 of the National Historic Preservation Act (Oct. 25, 2004).

be justified in requiring payment for its services, just as any other contractor," and the applicant or agency "should expect to pay for the work product."[289]  We sought comment in the *Wireless Infrastructure NPRM* on the circumstances under which a Tribal Nation or NHO might act as a contractor or consultant and expect compensation, as well as whether and how the Commission might provide guidance regarding the fees to be paid for such services.[290]  We also sought input on how a Tribal Nation's or NHO's request for fees interacts with the obligation to use reasonable and good faith efforts to identify historic properties.

124.    In addition to requests for up-front fees addressed above, Tribal Nations have requested payment for activities undertaken after the initial determination that historic properties are likely to be located in the site vicinity, including monitoring and other activities directed toward completing the identification of historic properties as well as assessing and mitigating the project's impacts on those properties.  As described more fully below, we find that while an applicant may negotiate and contract with a Tribal Nation or NHO for such services, an applicant is not obligated to hire a Tribal Nation or accede to Tribal requests for fees in the absence of an agreement.

125.    As noted above, ACHP guidance states that no "portion of the NHPA or the ACHP's regulations require an agency or an applicant to pay for any form of Tribal involvement" in Section 106 reviews.[291]  Thus, as discussed above, when a Tribal Nation or NHO is participating in the Section 106 review process in response to a notification or request to consult on the identification of historic properties, payment is not required.  The ACHP acknowledges that an agency or applicant may *ask* a Tribal Nation or NHO to perform work, such as providing specific information or documentation or conducting surveys-just as the applicant may negotiate a commercial agreement with any other qualified contractor.  If the applicant asks the Tribal Nation or NHO to perform work, "the agency or applicant essentially is asking the tribe to fulfill the duties of the agency in a role similar to that of a consultant or contractor.  In such cases, the tribe would be justified in requesting payment for its services, just as is appropriate for any other contractor."[292]  Applying the ACHP's guidance, we find that, if an applicant asks a Tribal Nation or NHO to perform work of the type described by the ACHP, the applicant should expect to negotiate a fee for that work.  If, however, the applicant and the Tribal Nation or NHO are unable to agree on a fee, the applicant may seek other means to fulfill its obligations.  The ACHP Handbook specifically addresses this scenario: "The agency or applicant is free to refuse just as it may refuse to pay for an archaeological consultant, but the agency still retains the duties of obtaining the necessary information for the identification of historic properties, the evaluation of their National Register eligibility, and the assessment of effects on those historic properties, through reasonable means."[293]  In other words, so long as the underlying obligation to make reasonable and good faith efforts to identify historic properties is satisfied, the applicant is not bound to any particular method of gathering information.[294]

126.    We emphasize that while applicants must make reasonable and good faith efforts, they are not required to make every possible effort to identify potentially affected properties.  In fact, the

---

[289] *See* ACHP 2001 Fee Guidance.  *See also* ACHP 2012 Handbook at 13.

[290] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3347-48, 3349-50, paras. 45 and 50-52.

[291] ACHP 2012 Handbook at 13.

[292] *Id.*

[293] *Id.*

[294] *See also* ACHP 2001 Fee Guidance at 1 ("Neither Section 106 … nor ACHP's regulations … require a Federal agency to engage anyone to provide data or information for Section 106 compliance.  While the agency does have an obligation to obtain necessary information to fulfill its legal duties, it has full discretion regarding the means used to meet this obligation.").

ACHP regulations "*do not require* identification of all properties" (emphasis in original).[295]  The ACHP makes this clear in its guidance on "Meeting the 'Reasonable and Good Faith' Identification Standard in Section 106 Review."[296]  In that document, the ACHP states that:

> "[i]t is … important to keep in mind what a reasonable and good faith effort does *not* require:
>
> The "approval" of a SHPO/THPO or other consulting party.  The ACHP, SHPO/THPO and other consulting parties advise and assist the federal agency official in developing its identification efforts, but do not dictate its scope or intensity.
>
> Identification of every historic property within the APE.  One of the reasons the ACHP's regulations contain a post-review discovery provision (36 CFR § 800.13) is that a reasonable and good faith effort to identify historic properties may well not be exhaustive and, therefore, some properties might be identified as the project is implemented."[297]

That is to say, perfection is not required in the Section 106 review process.  Thus, the mere possibility that *every* possible historic property may not be identified does not inherently render the applicant's efforts inadequate.[298]

127.    In addition to charging fees to assist in the identification of historic properties, some Tribal commenters have suggested that they are entitled to compensation for monitoring or other services they find necessary to assess impacts and mitigate adverse effects once historic properties have been identified.[299]  In these instances, the same principle applies as in the case of fee requests to assist in identification of historic properties.  That is, the applicant is ultimately responsible for satisfying its obligations under the FCC's rules, including the Wireless Facilities NPA.  The applicant must invite a Tribal Nation or NHO that identifies a historic property of religious and cultural significance that may be affected to become a consulting party and must provide it with all of the information, copies of submissions, and other prerogatives of a consulting party.[300]  The Tribal Nation or NHO will have the opportunity to provide its views on the potential effect on the identified historic property, and to comment on alternatives to avoid or mitigate any harm.[301]  The applicant is not presumed to be required to engage the services of any particular party, including a Tribal Nation or NHO, either to identify historic properties or to monitor efforts to avoid or minimize harm.  An applicant is free to engage a Tribal Nation or NHO as a paid consultant at any point in the Section 106 process, but it is under no obligation to do so.  While a Tribal Nation or NHO, in certain circumstances, may possess the greatest knowledge relevant to assessing a particular site,[302] the obligation placed on the Commission and applicants under the ACHP rules and the Wireless Facilities NPA requires only a reasonable and good-faith review.[303]

---

[295] *Id.* at 2.

[296] *See* ACHP, Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 Review, *available at* http://www.achp.gov/docs/reasonable_good_faith_identification.pdf.

[297] *Id.* at 3.  We note that the Commission's rules include a provision for post-review discoveries that reflects the requirements in the ACHP's regulations.  *See* Wireless Facilities NPA, § IX.

[298] *See, e.g.*, Sprint Comments at 25 (noting that it is unreasonable to assess fees for every possible construction for the infinitesimal chance there may be impact to a site).

[299] NCAI *et al.* Reply at 12.

[300] 36 CFR § 800.2.

[301] Wireless Facilities NPA, § IV.F.

[302] *See* Nez Perce Tribe Comments at 4 (noting that the Nez Perce Tribe expects applicants to contract with the Tribe for any required ethnographic studies).

[303] 36 CFR § 800.4(b).

128.    Consistent with the ACHP's guidance, we find that an applicant is not required to hire any particular person or entity to perform paid consultant services.  To the contrary, we expect that competition among experts qualified to perform the services that are needed will generally ensure that the fees charged are commensurate with the work performed.  To ignore these dynamics would be fundamentally inconsistent with the notion that an agency and its applicants throughout the Section 106 process are only required to exercise reasonable efforts.[304]  The applicant may generally hire any properly qualified consultant or contractor when expert services are required, whether in the course of identifying historic properties, assessing effects, or mitigation.  The appropriate qualifications will depend upon the work to be performed.  For example, different qualifications may be needed to confirm the presence or absence of archeological properties during a site visit, to apply traditional knowledge in assessing the significance of above-ground features, or to monitor construction.  In any event, the Wireless Facilities NPA stipulates that with respect to the identification and evaluation of historic properties, any assessment of effects shall be undertaken by a professional who meets the Secretary of the Interior's Professional Qualification Standards.[305]

129.    In addition, we find that inherent in the ACHP's guidance recognizing that an applicant may choose to engage a Tribal Nation or NHO to provide services is the corollary that a Tribal Nation or NHO need only be compensated for fulfilling its role as a consultant or contractor where there is an agreement in place between the Tribal Nation and the applicant to perform a compensable service.  Without such an agreement, the applicant has not undertaken to engage the Tribal Nation or NHO, and it is not compelled to comply with a unilateral request for fees.

130.    Finally, there may be individual cases in which the applicant and a Tribal Nation or NHO disagree on whether the applicant has met the reasonable and good faith standard in connection with the hiring of paid consultants, including considerations of whether consultant services are necessary, what qualifications are required, and whether the applicant's chosen consultant meets those qualifications.  In particular, there may be disputes about whether the applicant has obtained a qualified consultant or has unreasonably refused to use a Tribal Nation or NHO as a consultant in light of the amount of the fee requested by the Tribal Nation or NHO for such services.  In such cases, either party may ask the Commission to decide whether the applicant's obligations have been satisfied, and Commission staff will continue to make determinations where it has been provided with complete information and evidence as described below.  In case of a dispute, the applicant will have the burden of stating facts to substantiate its claim that it has met the reasonable and good faith standard in connection with the hiring of paid consultants within 15 days of being directed to do so.  After the applicant has stated such facts, the objecting party will then have the burden of stating facts showing that the applicant has not met such

---

[304] As noted above in the context of up-front fees, some Tribal Nations have argued that their fees are structured to cover their costs, and that their interest in charging fees is not to generate revenue but to preserve their capacity to protect historic properties.  *See, e.g.*, Hualapai Comments at 2; Sault Ste. Marie Tribe Comments at 8.  We do not pass judgment here on the need for any particular service or on the relationship of any Tribal Nation's requested compensation to its costs.  Rather, we set forth general principles, consistent with ACHP guidance, for our applicants to apply in practice.  Rather than punishing some Tribal Nations for the alleged abuses of others, we in fact expect that where Tribal Nations or NHOs offer services necessary to protect historic properties that they are qualified to provide at competitive rates, our applicants will continue to engage them to perform those services. *see e.g.*, Sault Ste. Marie Tribe Comments at 8 (noting that there may be some Tribes charging exorbitant fees); Letter from Steve Bodmer, Pechanga Indian Reservation, Temecula Band of Luiseno Mission Indians to Marlene Dortch, FCC, WT Docket No. 17-79 (filed Mar. 15, 2018) at 2 (noting that while a handful of [T]ribal [N]ations have charged exorbitant fees for review, that does not include all 573 nations).

[305] Wireless Facilities NPA, § VI.E.5.  The National Park Service has established these standards for history archaeology, architectural history, architecture, and historic architecture.  *See* Archaeology and Historic preservation, Secretary of the Interior's Standards and guidelines (https://www.nps.gov/history/local-law/arch_stnds_9.htm).

standard within 15 days of being directed to do so.[306]  In determining whether the reasonable and good faith standard has been met, Commission staff will consider all relevant facts, including but not limited to "the special expertise possessed by Indian tribes and Native Hawaiian organizations in assessing the eligibility of historic properties that may possess religious and culture significance to them;"[307] the nature and significance of the historic property at issue; the fees sought by the Tribal Nation or NHO; the qualifications and expertise of, and fees charged by, other paid consultants, either on the project in question or in comparable situations; the qualifications of any consultant that the applicant wishes to engage in lieu of a Tribal consultant; and all actions the applicant has taken to satisfy its obligations.

### B.  Reforming the FCC's Environmental Review Process

131.    Separate and apart from the Section 106 process, the *Wireless Infrastructure NPRM* sought comment on ways the Commission might streamline our environmental compliance regulations and processes while ensuring it meet its NEPA obligations.  In particular, the Commission sought comment on whether to revise or eliminate Section 1.1307(a)(6) of the rules, which governs EAs or proposed facilities located in floodplains,[308] and on any measures it could take to reduce unnecessary processing burdens consistent with NEPA.[309]  We now take actions to address both of these concerns.

132.    The Commission's rules require an applicant to prepare and file an EA[310] if its proposed construction meets any of several conditions specified in the rules, designed to identify construction that is located in an environmentally sensitive area or that has other potentially significant environmental

---

[306] This general process will also apply when other types of disputes about whether reasonable and good faith efforts have been made, not related to the use of consultants, are brought to the Commission.

[307] ACHP, Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 Review. http://www.achp.gov/docs/reasonable_good_faith_identification.pdf (last visited Mar. 15, 2018).  Several parties have argued that our decision fails to recognize the unique knowledge that Tribal Nations possess to assess their own history.  *See, e.g.*, Letter from James T. Graves, Counsel to NATHPO, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 12, 2018) at 2; Letter from J. Michael Chavarria, Santa Clara Pueblo, WT Docket No. 17-79 (filed Mar 14, 2018) at 4-5; Quapaw Mar. 8, 2018 *Ex Parte* Letter at 3, Letter from Joseph H. Webster, Counsel to Seminole Tribe of Florida, WT Docket No. 17-79 (filed Mar. 14, 2018) at 12-13; Letter from Lane M. Foster, Iowa Tribe of Kansas and Nebraska, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 1-2; Letter from Elizabeth Toombs, Cherokee Nation, to Marlene H. Dortch, FCC, WT Docket No. 17-79 (filed Mar. 14, 2018) at 3; Letter from Navajo Nation and Navajo Telecom. Reg. Commission, WT Docket No. 17-79, (filed Mar. 15, 2018) at 4.  We disagree.  As noted above, we recognize that, in selecting a consultant or contractor, the applicant must determine whether the consultant or contractor possesses the appropriate qualifications to perform the work involved in each particular case.

[308] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3346, 3352-53, paras. 40, 65; 47 CFR § 1.1307(a)(6).

[309] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3352-53, para. 65; *see also id.* 3345-46, para. 40 (seeking comment on costs and environmental benefits of the FCC's NEPA process).

[310] Under the rules of the Council on Environmental Quality (CEQ), an EA is to be prepared for actions that ordinarily may have a significant environmental impact.  *See* 40 CFR §§ 1501.4(b), 1507.3(b)(2)(iii).  If an EA shows that a proposed action will have no significant environmental impact, then the agency issues a Finding Of No Significant Impact, 40 CFR § 1508.13, and the proposed action can proceed.  However, if an EA indicates that the action will have a significant environmental impact, the action cannot proceed unless the agency prepares an environmental impact statement (EIS).  *See* 40 CFR § 1501.4 (requiring an EIS for actions that normally have a significant environmental impact).  CEQ is the Executive Office charged with administering and overseeing NEPA implementation.  Its rules are binding on federal agencies.  *See* 42 U.S.C. § 202 *et seq.*; 40 CFR § 1500.3.

impacts.[311]  All other constructions are categorically excluded from environmental processing[312] unless the processing bureau determines, in response to a petition or on its own motion, that the action may nonetheless have a significant environmental impact.[313]  In implementing NEPA, the Commission has delegated preparation of EAs to applicants.  Nevertheless, the Commission is responsible for the EA's content, scope, and evaluation of environmental issues.[314]

133.    If the applicant files an EA, then members of the public are given the opportunity to file informal complaints or petitions to deny.[315]  Commission staff review the application and any informal complaints or petitions to deny that have been filed, and consider whether the proposed facility will cause any significant impacts on the environment.  If such impacts are found, the applicant is given an opportunity to reduce, minimize, or eliminate the impacts by changing some aspect of the project.[316]  If no such impacts are found, or once any impacts that are found have been reduced below the level of significance, then the Commission staff completes the environmental review process by issuing a Finding of No Significant Impact (FONSI).[317]  The rules forbid the applicant from initiating any construction activities until the FONSI is issued.[318]

134.    The following sections (1) adopt changes to the rules governing facilities located in floodplains; and (2) implement procedural changes to accelerate the environmental review process. Consistent with the Commission's past practice, where other Federal agencies have assumed responsibility for environmental review of proposed facilities, such as the Bureau of Indian Affairs on Tribal lands it oversees, the Commission defers to those agencies' own NEPA practices.[319]  We continue that policy in this order, and therefore the measures adopted below do not apply on Tribal lands.

---

[311] *See* 47 CFR §§ 1.1307(a), 1.1308(a), 1.1312(b).  These are facilities that are to be located in an officially designated wilderness area, an officially designated wildlife preserve, or a flood plain; that may affect listed threatened or endangered species or their critical habitats, or are likely to jeopardize proposed threatened or endangered species or destroy or adversely modify proposed critical habitats; that may affect districts, sites, buildings, structures or objects that are listed, or eligible for listing, in the National Register of Historic Places; that may affect Native American religious sites; that will involve significant change in surface features (*e.g.*, wetland fill or deforestation); that will be located in residential neighborhoods and equipped with high intensity white lights; that will cause human exposure to radiofrequency emissions that exceed specified levels; or that will exceed 450 feet in height.  *See* 47 CFR § 1.1307(a), (b), (d) Note.

[312] *See* 47 CFR §§ 1.1306, 1.1312(c).

[313] *See* 47 CFR § 1.1307(c), (d).  An agency may establish categorical exclusions to cover actions "which do not individually or cumulatively have a significant effect on the human environment" and thus require no EA or EIS. *See* 40 CFR §§ 1508.4, 1507.3(b)(2)(ii).  CEQ regulations require that an agency that chooses to establish categorical exclusions must also provide for "extraordinary circumstances," under which a normally excluded action may have a significant effect.  40 CFR § 1508.4.

[314] 40 CFR § 1506.5.

[315] *See* 47 CFR §§ 1.1307(c), 1.1313.

[316] *See* 47 CFR §§ 1.1308(c), 1.1309.  If the applicant is unable or unwilling to make such changes and the proposed facilities appear likely to have a significant effect on the quality of the human environment, then a Draft Environmental Impact Statement and Final Environmental Impact Statement are required.  47 CFR §§ 1.1305, 1.1308(c), 1.1314, 1.1315, 1.1317, 1.1319.

[317] 47 CFR §§ 1.1308(d), 1.1312(b).

[318] 47 CFR §§ 1.1308(d), 1.1312(b).

[319] 47 CFR § 1.1311(e) ("An EA need not be submitted to the Commission if another agency of the Federal Government has assumed responsibility for determining whether . . . the facilities in question will have a significant effect on the quality of the human environment and, if it will, for invoking the environmental impact statement process.").

1.        **Environmental Assessments of Facilities Located in Floodplains**

135.     In the *Wireless Infrastructure NPRM*, the Commission sought comment on whether to revise or eliminate Section 1.1307(a)(6) of the rules, which governs environmental assessments of proposed facilities located in floodplains.[320]  Specifically, the Commission sought comment on whether to revise its rules to remove the EA requirement for "siting in a floodplain when appropriate engineering or mitigation requirements have been met."[321]  The Commission recognized that many parties advocated that "EAs… be eliminated for deployments on flood plains… if a site will be built at least one foot above the base flood elevation and a local building permit has been obtained."[322]  For the reasons discussed below, we hereby amend this rule to eliminate the requirement for an EA if a proposed facility meets certain engineering requirements intended to mitigate environmental effects.

136.     A floodplain is defined as a relatively flat lowland area adjacent to inland or coastal waters that faces a significant chance of flooding each year.[323]  Large portions of the country lie within floodplains, including areas where an estimated 10 percent of Americans live.[324]  The devastating consequences of large-scale flooding caused by natural disasters—such as Hurricanes Harvey, Irma, Maria, and Nate within the past year—starkly illustrate the potential hazards that flooding may pose to life and property in flood-prone areas.[325]  In particular, the flooding in the wake of these storms "devastated . . . the communications networks that serve" communities and poses concerns about "the resilience of the communications infrastructure [and] the effectiveness of emergency communications" in these areas.[326]

137.     To address these risks, Congress has enacted laws intended to anticipate and minimize flood risks by encouraging development outside flood-prone areas if possible and by promoting land-management policies and construction techniques that reduce or mitigate the risk of flood damage.[327]  The Commission's rule, which references Executive Order 11988, requires the submission of an EA for facilities to be constructed in a floodplain.[328]

---

[320] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3346, 3352-53, paras. 40, 65; 47 CFR § 1.1307(a)(6).

[321] *Wireless Infrastructure NPRM*, 32 FCC Rcd at 3352-53, para. 65.

[322] *Id.* at 3345-46, para. 40.

[323] 44 CFR § 9.4 (definitions in Federal Emergency Management Agency (FEMA) floodplain management rules). Areas with a one percent or greater chance of flooding in any given year are known as "base floodplains" or "100-year floodplains." *Id.*

[324] NYU Furman Center, *Population in the U.S. Floodplains*: Data Brief at 1 (http://furmancenter.org/files/Floodplain_PopulationBrief_12DEC2017.pdf) (December 2017).

[325] *See Final Programmatic Environmental Assessment of the Antenna Structure Registration Program* at 4-9, § 4.5 (Mar. 13, 2012) (https://apps.fcc.gov/edocs_public/attachmatch/DOC-312921A1.pdf) (*Final PEA*).

[326] *See Public Safety and Homeland Security Bureau Seeks Comment on Response Efforts Undertaken During 2017 Hurricane Season*, Public Notice, 32 FCC Rcd 10245, 10245 (PSHSB 2017) (*Hurricane Response PN*).

[327] *See, e.g.*, National Flood Insurance Act of 1968, as amended by Flood Disaster Protection Act of 1973, 42 U.S.C. §§ 4101-4131 (directing FEMA to coordinate land-management programs in flood-prone areas so as to mitigate flood risks and reduce flood damage); 33 U.S.C. § 709a(a) (directing U.S. Army Corps of Engineers to provide flood hazard information, guidance on development in flood plains, and planning advice to ameliorate flood hazards). Executive Order 11988, issued in 1977, directs executive agencies "to evaluate the potential effects of any actions [they] may take in a floodplain [and] to ensure that [their] planning programs . . . reflect consideration of flood hazards and floodplain management[.]"  Executive Order 11988—Floodplain Management, 42 FR 26951, § 2 (May 24, 1977) (E.O. 11988).

[328] *See* 47 CFR § 1.1307(a)(6) (cross-referencing E.O. 11988); *Amendment of Section 1.1305*, Order, 66 FCC 2d 912, 912, para. 1 (1977); *Final PEA* at 4-9, § 4.5.

138.     Section 1.1307(a)(6) of the Commission's rules requires a party proposing to deploy a facility such as a wireless antenna tower in a base floodplain to submit an EA.[329]  The EA requirement under this provision is triggered solely by the facility's location in a floodplain.  The Commission's rules, however, do not identify the criteria an applicant must satisfy to address potential environmental effects of facilities in floodplains.

139.     Informal staff guidelines available on the Commission's website state that EAs for proposed facilities located in floodplains should include (1) a copy of the section of a Federal Emergency Management Agency (FEMA) map showing the proposed site location; and (2) a copy of the building permit issued by the local jurisdiction (or, if such a permit is unavailable, other independent verification) confirming that the proposed structure will be at least one foot above the base flood elevation of the floodplain.[330]  Thus, the primary focus of Commission review in issuing a FONSI is whether the facility is in the floodplain and, if it is, whether the proposed structure is at least one foot above the base flood elevation of that floodplain.[331]

140.     We find that a more streamlined NEPA review framework would be as effective as the existing rules in carrying out our NEPA obligations with respect to facilities located in floodplains and would more efficiently promote our infrastructure deployment goals.  Specifically, as discussed below, we will dispense with the existing requirement that an applicant file an EA solely due to the location of a proposed facility in a floodplain, so long as such proposed facility, including all associated equipment, is at least one foot above the base flood elevation of the floodplain.  By avoiding the direct costs of preparing unnecessary EAs, as well as the costly impact of procedural delays, this change will increase providers' capacity to invest in deploying more facilities; and the time saved by skipping the time-consuming review process will enable them to accelerate such deployments.  At the same time, the one-foot elevation requirement will continue to ensure that such deployments are properly sited to avoid adverse floodplain impacts.

141.     Comments filed by state transportation officials, infrastructure developers, and wireless carriers support our conclusion that the current floodplain-related EA filing and review process imposes excessive burdens that are not justified by offsetting benefits.  The Washington State Department of Transportation points out that communications projects often "can be located in a floodplain without having a direct or indirect impact on floodplain function," and accordingly, suggests that an EA should not be required routinely "solely because an action is sited in a floodplain."[332]  Several infrastructure and service providers report that the vast majority of the EAs they have been required to prepare were for deployments sited in floodplains, yet the Commission staff ultimately issued FONSIs for all of them, with no need for mitigation measures or other changes.[333]  Preparation of such EAs may require consulting

---

[329] 47 CFR § 1.1307(a)(6).

[330] *FCC Environmental Assessment* at 5 (http://wireless.fcc.gov/nepa/EA_checklist.pdf).

[331] This standard is consistent with the floodplain management requirements in FEMA's rules governing the National Flood Insurance Program, as well as other FEMA floodplain management and mitigation standards.  *See* 44 CFR § 60.7(c)(3).  *See also, e.g.,* 44 CFR §§ 206.435(e)(3), 209.10(h)(4); FEMA National Flood Insurance Program, *Floodplain Management Requirements:  A Study Guide and Desk Reference for Local Officials*, Unit 9 at 9-19 (https://www.fema.gov/pdf/floodplain/nfip_sg_unit_9.pdf ) (Feb. 2005) (to qualify for favorable flood insurance rates, a non-residential "building [in a floodplain] must be floodproofed to one foot above the BFE").  A number of states have adopted floodplain management regulations utilizing the same standard.  *See, e.g.,* Colo. Admin. Code 2 CCR 408-1:11(B)(2); Kansas Admin. Regs. 5-44-4(k); 01-672 Maine Code R. 01-672 MCR § 10.25(T)(2)(g); Oklahoma Admin. Code § 785:55-3-2(i).

[332] Washington State Dept. of Transportation Comments at 2-3 (attached to American Ass'n of State Highway and Transportation Officials Comments).

[333] *See, e.g.,* Crown Castle Comments at 43 (95 percent of EAs would not have been necessary but for floodplain siting); Verizon Comments at 63-64 (80 percent).

services that, according to some commenters, often cost thousands of dollars and several months of time.[334]

142.    Many parties argue that EAs for floodplain deployments are redundant because local zoning authorities review the same projects and grant construction permits only after confirming that they comply with floodplain-related requirements in their building codes.[335] These parties contend that the Commission conducts no independent analysis or data-gathering, but rather simply relies on local authorities' building permits to confirm compliance with the identical floodplain-related criterion that the proposed structure will be at least one foot above the base flood elevation.[336] In light of these considerations, many commenters argue that the Commission should revise its rules to require EAs for deployments sited in floodplains *only* if the facilities and associated equipment are *not* located at least one foot above the base flood elevation and/or have not been issued building permits confirming that they satisfy this criterion.[337] Others contend that the Commission's floodplain EA requirement should be eliminated altogether.[338]

143.    We acknowledge concerns raised by commenters about maintaining technical requirements for constructing facilities in floodplains to mitigate the risks of damage caused by hurricanes.[339] The 2017 U.S. hurricane season highlights the critical importance of employing proper engineering and design techniques to mitigate or minimize flood-related risks, assure public safety, maintain the resiliency of communications networks, and protect the natural environment.[340] We note that state and local zoning and construction requirements, FEMA requirements, and other relevant laws will, of course, continue to ensure that these important considerations are addressed.

144.    To address both industry's efficiency concerns and the concerns expressed in the record about the potential effects of inappropriate construction in floodplains, we amend Section 1.1307(a)(6) to eliminate the requirement that applicants file an EA for facilities to be constructed on a flood plain, provided that the facilities, including all associated equipment, are constructed at least one foot above the base flood elevation.[341] We believe that facilities built in compliance with this new rule will "reduce the risk of flood loss [and] minimize the impact of floods on human safety, health and welfare."[342] Accordingly, provided that no other criteria trigger an EA under our rules, such projects will have no significant effects on the quality of the human environment, within the meaning of NEPA, that would

---

[334] *See, e.g.*, Sprint Comments at 6-7; Crown Castle Comments at 43. *See also Final PEA* at 4-27, § 4.9.

[335] *See, e.g.*, ExteNet Comments at 47-48; Sprint Comments at 6-7.

[336] *See, e.g.*, WIA Comments at 63-64.

[337] *See, e.g.*, CTIA Comments at 37; T-Mobile Comments at 58.

[338] *See, e.g.*, WIA Comments at 63-64; Crown Castle Comments at 43.

[339] Email message from Ralph Caruso to Aaron Goldschmidt and David Sieradzki, FCC (Aug. 30, 2017) (entered as an *Ex Parte* filing in the record of WT Docket No. 17-79 on Sept. 5, 2017).

[340] *See, e.g.*, *Hurricane Response PN*, 32 FCC Rcd at 10250 (seeking comment on, *inter alia*, whether "the market and/or government, currently offer sufficient incentives to encourage the build-out and maintenance of resilient communications infrastructure" and "actions that the FCC should take to encourage industry to build and maintain a resilient communications infrastructure").

[341] The text of the new rule is set forth in Appx B, *infra*.

[342] E.O. 11988, § 1. As we find our action today to be consistent with the policy of E.O. 11988 to mitigate impacts of development in flood plains, we reject NRDC's assertion that it conflicts with the Executive Order. *See* NRDC Mar. 15, 2018 *Ex Parte* Letter at 7.

require the preparation of EAs or other environmental processing.[343]

145.    We conclude that this new, streamlined regulatory framework fully satisfies our obligations under NEPA and maintains regulatory oversight to ensure continued implementation of practices that protect against environmental degradation that otherwise could be caused by construction of facilities in floodplains.[344]  At the same time, the elimination of the EA-filing requirement and pre-construction environmental processing by the Commission will enable providers to build these facilities more rapidly and at lower cost.  It thus will make a significant contribution towards advancing our objective of removing regulatory processes and burdens that dampen investment and hamper deployment of wireless communications infrastructure.  As a result, this new framework for floodplain deployment should help promote expedited deployment of the facilities needed to bring advanced technologies and services to consumers across the country.

### 2.    Timeframes for Commission to Act on Environmental Assessments

146.    As noted above, the *Wireless Infrastructure NPRM* sought comment on ways the Commission could reduce unnecessary processing burdens by streamlining the environmental review procedures that it is required to conduct before the deployment of infrastructure is authorized.[345]  Here, we commit to timeframes for reviewing and processing EAs in order to provide greater certainty and transparency to applicants, thereby facilitating broadband deployment.

147.    The FCC's rules require that each filed EA be placed on public notice for a period of 30 days to allow for public input.[346]  For most towers for which an EA is submitted, the Commission issues a Finding of No Significant Impact (FONSI) approximately fifteen days after the close of the notice period.  The fifteen days allows for timely informal complaints and petitions to deny to reach the reviewing staff and for administrative processing.  Delays can occur if an EA is incomplete (*e.g.*, missing permits or other agency approvals), if the underlying application requires perfecting amendments, if an informal complaint or petition to deny is filed in response to the public notice, or if the staff determines additional information is needed in order to meet the Commission's NEPA obligations.

148.    Industry commenters argue that NEPA compliance results in significant delays.[347]  Some commenters complain about delays associated with EAs—which T-Mobile states may "languish for an extended period of time—sometimes years," partly because the Commission is not subject to any

---

[343] *See* 40 CFR § 1508.4 (defining criteria for categorical exclusions from NEPA review for actions that do not have a significant effect on the environment); 40 CFR § 1506.2(c) (directing agencies, "to the fullest extent possible, to reduce duplication between NEPA and comparable state and local requirements"); 47 CFR § 1.1306(a).

[344] In its comments, the NRDC argues that the only lawful method for addressing actions that neither individually nor cumulatively have significant environmental impacts is through a categorical exclusion created in accordance with CEQ rules and policies.  *See,* NRDC Mar. 15, 2018 Ex Parte Letter at 6-7.  Nevertheless, that CEQ issued the conformity letter indicates that the Commission's rule change on EAs for floodplains is legally sufficient.  *See* Letter from Edward A. Boling, Assoc. Director for NEPA, CEQ, to Thomas M. Johnson, Jr., General Counsel, FCC, WT Docket No. 17-79 (filed Mar. 9, 2018) (concluding that the FCC's amendment to its NEPA procedures conforms with NEPA and CEQ regulations that implement the procedural provisions of NEPA).

[345] *Wireless Infrastructure NPRM,* 32 FCC Rcd at 3345-46, para. 40.

[346] For those EAs that are filed with license or broadcast construction permit applications, the 30-day comment period is required by statute.  47 U.S.C. § 309(d); *see also* 47 CFR § 1.939(a).  The Commission has long followed a similar practice for EAs filed with antenna structure registration applications, and this practice was codified in 2011.  47 CFR § 17.4(c)(4); *see also National Environmental Policy Act Compliance for Proposed Tower Registrations, Order on Remand,* 26 FCC Rcd 16700, 16726-27, para. 66 (2011).

[347] *See, e.g.*, Verizon Comments, WT Docket 16-421, at 38-39; Sprint Comments, WT Docket 16-421, at 47-48.  *See also* CCA Comments at 48, T-Mobile, WT Dockets 17-79, at 4-5, 59, Attach. A at 3, 37.

processing timelines or dispute resolution procedures for EAs.[348]  WIA similarly argues that the environmental review process is a significant source of delay for deployment and shot clocks are needed to process EAs and to resolve environmental delays and disputes.[349]  On the other hand, American Bird Conservancy, an environmental organization, claims that industry claims are "unfounded" and that tower applications move through the FCC system on average within 45 days.[350]

149.    We conclude that providing applicants with greater time certainty will benefit both applicants and the public that relies on their services, and will hasten deployment.  In particular, for the great majority of cases in which the EA is complete as submitted and will support a FONSI, we direct staff to complete review and to issue the FONSI within 60 days from placement on notice, either by publication of a public notice or posting on the website (hereafter "on notice").[351]  We conclude that this time period is reasonable and generally attainable for several reasons.  First, staff currently completes review and processing of approximately 75 percent of EAs within 60 days, with most of the remainder completed within 90 days.[352]  We are aware of no reason that the 60-day period for review and processing cannot be extended to all EAs that are complete as submitted, in the absence of public objections or substantive concerns.[353]  At the same time, we believe a 60-day window is necessary in order to accommodate the 30-day notice period, additional time for timely objections to reach the reviewing staff, and administrative processing.  We also note that 60 days is less than the three-month period that CEQ recommends as an outer boundary for agencies to complete their internal processing of EAs.[354]  Of course, to the extent current practice is to complete review and processing in less than 60 days, today's action is not intended to prolong the review process.

150.    Specifically, to accomplish this goal, we direct staff to review an EA for completion and adequacy to support a FONSI within 20 days from the date it is placed on notice.  This review is necessary to determine whether the EA is missing information that is necessary to demonstrate whether the facility would significantly affect the environment for any of the reasons specified in Section 1.1307(a) and (b) or that is otherwise required under the Commission's rules.[355]  Assuming the EA is complete and would substantively support a FONSI without requiring additional information, staff shall notify the applicant that, barring filing of an informal complaint or petition to deny, the bureau will issue a FONSI within 60 days from placement on notice.  This process is in keeping with our obligations under

---

[348] T-Mobile Comments at 60.

[349] WIA Comments at 62-65.

[350] American Bird Conservancy Comments at 4.

[351] Notice of EAs filed via Form 601, 301, 318, 340, or 349 is provided through a Public Notice published in the Daily Digest.  EAs filed via Form 854 are posted on the ASR web page on the date of the applicant's choosing.

[352] From October 1, 2016, through September 30, 2017, the Commission received 382 EAs.  275 of those EAs were processed and received FONSIs within 60 days.  With a handful of exceptions, those that exceeded 60 days were either missing required information or otherwise defective.

[353] Some applications concern sites at which construction began before the applicant completed the environmental review required under the Commission's rules, 47 CFR § 1.1312, and in contravention of NEPA and NHPA requirements.  *See, e.g.*, 40 CFR § 1501.  While staff will attempt to complete its reviews of such sites as expeditiously as possible, we do not subject such applications to review period deadlines in light of the complexities involved in resolving premature construction matters and the potential for rule violations.

[354] According to CEQ, "For cases in which only an environmental assessment will be prepared, the NEPA process should take no more than 3 months, and in many cases substantially less, as part of the normal analysis and approval process for the action."  CEQ's Most Asked Questions Concerning NEPA, Question 35. https://energy.gov/sites/prod/files/G-CEQ-40Questions.pdf.

[355] *See* 47 CFR § 1.1311.

NEPA to review and analyze potential environmental impacts of proposed actions,[356] and to make FONSIs available to the public.[357]

151.    If, however, the EA is missing necessary information or if staff determines that it needs to consider additional information to make an informed determination, staff will notify the applicant of the additional information needed within 30 days after the EA is placed on notice.  The additional period of up to 10 days beyond the initial 20-day review period will give staff an opportunity to prepare a request for more information.  Where the missing information is not of a nature that is likely to affect the public's ability to comment on environmental impacts, then consistent with current practice, the application will not again be placed on notice.  In such cases, staff is directed to complete the review and issue a FONSI, if warranted, within 30 days after the missing information is provided or 60 days after the initial notice, whichever is later.

152.    Where information is missing that may affect the public's ability to comment on significant environmental impacts, the application will again be placed on notice when that information is received.[358]  In addition, Commission staff may identify reasons that a proposal may have a significant environmental impact outside of those the applicant is affirmatively required to consider under the Commission's rules,[359] and in such cases, the applicant's provision of information or amendment of its application to address the concern will ordinarily require additional public notice.[360]  Under these circumstances, a new 60-day period for review and processing will begin upon publication of the additional notice.

153.    Where an informal complaint or petition to deny is filed against an application containing an EA,[361] the Commission's rules afford the applicant an opportunity to respond and the petitioner or objector an opportunity to reply.[362]  In such cases, the staff will endeavor to resolve the contested proceeding within 90 days after the relevant pleading cycle has been completed, or we otherwise have received all information that we have requested from the applicant.[363]

## V.    PROCEDURAL MATTERS

154.    *Paperwork Reduction Analysis.*—This Second Report and Order contains a non-substantive and non-material change to information collection requirements that were previously reviewed and approved by the Office of Management and Budget (OMB) pursuant to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  This non-substantive and non-material change will be submitted to OMB accordingly.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, 44 U.S.C. 3506(c)(4), the Commission previously

---

[356] *See* 42 U.S.C § 4332.  *See also* 40 CFR § 1508.13 (defining a FONSI as "a document by a federal agency briefly presenting the reasons why an action, not otherwise excluded, will not have a significant effect on the human environment," which "shall include the [EA] or a summary of it" and note any other related environmental documents).

[357] *See* 40 CFR § 1501(e).

[358] For example, a Memorandum of Understanding with the US Fish and Wildlife Service addressing effects on endangered species may contain information that would be relevant to public comment.

[359] *See* 47 CFR § 1.1307(d).

[360] *See* 47 CFR § 1.1308(c) (affording applicant the opportunity to amend its application where the Bureau or Commission determines that the proposal will have a significant environmental impact).

[361] *See* 47 CFR § 1.1313.

[362]  47 CFR § 1.45; *see also* 47 CFR § 17.4(c) (pleadings related to environmental notification under ASR).

[363] If the staff requests additional information from the applicant after the pleading cycle closes, the clock will be tolled until the applicant provides all requested material.  In the event an information request is directed to a complainant, the clock will continue running in order to incentivize the complainant to respond promptly.

sought specific comment on how it might further reduce the information collection burden for small business concerns with fewer than 25 employees.[364]

155.     *Congressional Review Act.*—The Commission will send a copy of this Second Report and Order to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

156.     *Regulatory Flexibility Act.*—We note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might "further reduce the information collection burden for small business concerns with fewer than 25 employees."[365]  In addition, we have described impacts that might affect small businesses, which includes most businesses with fewer than 25 employees, in the Final Regulatory Flexibility Analysis in Appendix C, *infra*.

## VI.    ORDERING CLAUSES

157.     Accordingly, IT IS ORDERED, pursuant to Sections 1, 4(i)-(j), 7, 201, 301, 303, 309, 319, and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 154(i)-(j), 157, 201, 301, 303, 309, 319, 332, Section 102(c) of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. § 4332(c), and Section 106 of the National Historic Preservation Act of 1966, as amended, 54 U.S.C. § 306108, that this Second Report and Order in WT Docket No. 17-79 IS hereby ADOPTED.

158.     IT IS FURTHER ORDERED that this Second Report and Order SHALL BE EFFECTIVE sixty days after publication in the Federal Register except for those provisions which contain non-substantive modifications to existing information collection requirements that require approval by the Office of Management and Budget (OMB) under the Paperwork Reduction Act. The non-substantive modifications WILL BECOME EFFECTIVE upon the effective date announced when the Commission publishes a notice in the Federal Register announcing such OMB approval and the effective date.  It is our intention in adopting the foregoing Second Report and Order and the rule changes that, if any provision of the Second Report and Order or the rules, or the application thereof to any person or circumstance, is held to be unlawful, the remaining portions of such Second Report and Order and the rules not deemed unlawful, and the application of such Second Report and Order and the rules to other persons or circumstances, shall remain in effect to the fullest extent permitted by law.

159.     IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Second Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration,

160.     IT IS FURTHER ORDERED that this Second Report and Order SHALL BE sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[364] *Wireless Infrastructure NPRM,* 32 FCC Rcd at 3366, para 101.

[365] *See* 44 U.S.C. § 3506(c)(4)

# APPENDIX A

## Comments and Reply Comments

**Comments**
5G Americas
ACT | The App Association
African American Mayors Association
Alaska Department of Transportation & Public Facilities
Alaska Native Health Board
Alexandra Ansell
American Association of State Highway and Transportation Officials
American Bird Conservancy
American Cable Association
American Petroleum Institute
American Public Power Association
Arctic Slope Regional Corporation
Arizona State Historic Preservation Office
Association of American Railroads
AT&T
Bad River Band of the Lake Superior Tribe of Chippewa
BioInitiative Working Group
CAGW
Cahuilla Band of Indians
California Public Utilities Commission
California State Historic Preservation Officer
Cape Cod Bird Club
Catawba Indian Nation Tribal Historic Preservation Office
Charter Communications, Inc.
Chickasaw Nation
Chippewa Cree THPO
Choctaw Nation of Oklahoma
Chuck Matzker
Cindy Russell
Cities of San Antonio, Texas; Eugene, Oregon; Bowie, Maryland; Huntsville, Alabama; and Knoxville,
     Tennessee (San Antonio *et al.*)
Citizen Potawatomi Nation
City and County of San Francisco
City of Alexandria, Virginia; Arlington County, Virginia; and Henrico County, Virginia
City of Alexandria, Virginia; Arlington County, Virginia; and Henrico County, Virginia
City of Arlington, Texas
City of Austin, Texas
City of Bellevue, City of Bothell, City of Burien, City of Ellensburg, City of Gig Harbor, City of
     Kirkland, City of Mountlake Terrace, City of Mukilteo, City of Normandy Park, City of Puyallup,
     City of Redmond, City of Walla Walla (Washington Munis)
City of Chicago
City of Claremont
City of Eden Prairie, MN
City of Irvine, California
City of Lansing, Michigan
City of New Orleans, Louisiana
City of New York

City of Philadelphia
City of Springfield, Oregon
Cityscape Consultants, Inc.
Coalition for American Heritage
Colorado Communications and Utility Alliance, Rainier Communications Commission, City of
    Seattle,WA; City of  Tacoma, WA; King County, WA; Jersey Access Group; and Colorado
    Municipal League (CO/NJ/WA Munis)
Colorado River Indian Tribes
Comcast Corporation
Community Associations Institute
Competitive Carriers Association (CCA)
Computing Technology Industry Association (CompTIA)
Computer & Communications Industry Association (CCIA)
Consumer Technology Association
Conterra Broadband Services, Southern Light, LLC, Uniti Group, Inc.
Critical Infrastructure Coalition
Crown Castle International Corp.
CTIA
CTIA and Wireless Infrastructure Association (CTIA/WIA)
Defenders of Wildlife
Delaware State Historic Preservation Office (Delaware SHPO)
Diana Welling
Dianne Desrosiers
DuPage Mayors and Managers Conference
East Bay Municipal Utility District
Eastern Shawnee Tribe
Edward Czelada
Elijah Mondy
Elizabeth Doonan
EMF Safety Network and Ecological Options Network
Environmental Health Trust
ExteNet Systems, Inc.
Fairfax County, Virginia
FibAire Communications, LLC d/b/a AireBeam
Fond du Lac Band of Lake Superior Chippewa
Free State Foundation
General Communication, Inc.
Georgia Department of Transportation
Georgia Historic Preservation Division
Georgia Municipal Association, Inc.
Gila River Indian Community
Hongwei Dong
Hualapai Tribal Historic Preservation Officer
Illinois Department of Transportation
Illinois Municipal League
Information Technology and Innovation Foundation
International EMF Scientist Appeal
Jonathan Mirin
Joyce Barrett
Kate Kheel
Kevin Mottus

League of Arizona Cities and Towns; League of California Cities; and League of Oregon Cities
    (AZ/CA/OR Cities)
League of Minnesota Cities
Leo Cashman
Lightower Fiber Networks
Lisbeth Britt
Lower Brule Sioux Tribe
Maine Department of Transportation
Mark N. Salvo
Marty Feffer
Mayor Pat Furey
McLean Citizens Association
Miami Tribe of Oklahoma
Missouri State Historic Preservation Office (Missouri SHPO)
Mobile Future
Mobilitie, LLC
Mohegan Tribe of Indians of Connecticut
Montana SHPO
Muscogee (Creek) Nation
National Association of Telecommunications Officers and Advisors (NATOA)
National Association of Tribal Historic Preservation Officers (NATHPO)
National Black Caucus of State Legislators
National Conference of State Historic Preservation Officers (NCSHPO)
National Congress of American Indians, United South and Eastern Tribes Sovereignty Protection Fund,
    and National Association of Tribal Historic Preservation Officers (NCAI *et al.*)
National League of Cities (NLC)
National Tribal Telecommunications Association (NTTA)
National Trust for Historic Preservation
Navajo Nation President Russell Begaye and the Navajo Nation Telecommunications Regulatory
    Commission (NNTRC)
NCTA – The Internet & Television Association
NEPSA Solutions LLC
New Mexico SHPO
Nina Beety
Nokia
North Carolina State Historic Preservation Office (North Carolina SHPO)
Northern Cheyenne Tribal Historic Preservation
NTCA – The Rural Broadband Association
Oakland County Board of County Road Commissioners
Olemara Peters
ONE Media, LLC
Oregon SHPO
Osage Nation
Pechanga Band of Luiseno Mission Indians (Pechanga)
Pennsylvania State Historic Preservation Office
PTA-FLA, Inc.
Puerto Rico State Historic Preservation Office
Quad Cities Cable Communications Commission
Quapaw Tribe of Oklahoma
R Street Institute
Rebecca Carol Smith
Ronald M. Powell, Ph.D.

Russell L. Martin
S. Quick
Sacred Wind Communications, Inc.
Samsung Electronics America, Inc.
Santa Clara Pueblo
Sault Ste. Marie Tribe of Chippewa Indians
SCAN NATOA, Inc.
Seminole Nation of Oklahoma
Seminole Tribe of Florida
Sisseton-Wahpeton Oyate
Smart Communities and Special Districts Coalition
Soula Culver
Sprint
Standing Rock Sioux Tribe
Starry, Inc.
Swinomish Indian Tribal Community
Telecommunications Industry Association
Texas Department of Transportation
Texas Historical Commission
T-Mobile USA, Inc. (T-Mobile)
Tonkawa Tribe of Oklahoma
Triangle Communication System, Inc.
Twenty-Nine Palms Band of Mission Indians
Utah Department of Transportation
Utilities Technology Council
Verizon
WEC Energy Group, Inc.
Wei Shen
Wireless Infrastructure Association (WIA)
Wireless Internet Service Providers Association
Xcel Energy Services Inc.

**Reply Comments**
Aaron Rosenzweig
Advisory Council on Historic Preservation
American Cable Association
American Public Power Association
Association of American Railroads
AT&T
California Public Utilities Commission
Catherine Kleiber
Chippewa Cree Tribe
Cities of San Antonio, Texas; Eugene, Oregon; Bowie, Maryland; Huntsville, Alabama; and Knoxville,
    Tennessee (San Antonio et al.)
City and County of San Francisco (San Francisco)
City of Baltimore, Maryland
City of Mukilteo
City of New York
City of Philadelphia
Colorado Communications and Utility Alliance, Rainier Communications Commission, City of Seattle,
    WA, City of Tacoma, WA, King County, WA, Jersey Access Group, Colorado Municipal League
    (CO/NJ/WA Munis)

Comcast Corporation
Communications Workers of America
Competitive Carriers Association (CCA)
Confederated Tribes of Grand Ronde Historic Preservation Office
Consumer Technology Association
Conterra Broadband Services, Southern Light, LLC, Uniti Group Inc.
Critical Infrastructure Coalition
Crown Castle International Corp. (Crown Castle)
CTIA
CTIA and Wireless Infrastructure Association (CTIA/WIA)
Dan Kleiber
District of Columbia
Enterprise Wireless Alliance
Environmental Health Trust
ExteNet Systems, Inc.
Fairfax County, Virginia
Florida Coalition of Local Governments
Gary Resnick
Georgia Municipal Association, Inc.
Greenlining Institute
Greywale Advisors
INCOMPAS
Irregulators
Judith E. Bittner
Karen Spencer
Kaw Nation
League of Arizona Cities and Towns, League of California Cities, League of Oregon Cities (AZ/CA/OR
      Cities)
National Association of Regulatory Utility Commissioners (NARUC)
National Association of Telecommunications Officers and Advisors, National League of Cities, National
      Association of Towns and Townships, National Association of Regional Councils, United States
      Conference of Mayors, Government Finance Officers Association (NATOA *et al.*)
National Association of Tribal Historic Preservation Officers (NATHPO)
National Congress of American Indians, United South and Eastern Tribes- Sovereignty Protection Fund,
      National Association of Tribal Historic Preservation Officers (NCAI *et al.*)
National Organization of Black Elected Legislative (NOBEL) Women
National Rural Electric Cooperative Association (NRECA)
Navajo Nation and the Navajo Nation Telecommunications Regulatory Commission
NCTA – The Internet & Television Association
Pala Band of Mission Indians
Pueblo of Acoma
Puerto Rico Telephone Company, Inc. d/b/a CLARO
Quintillion Networks, LLC and Quintillion Subsea Operations, LLC
Rebecca Carol Smith
SDN Communications
Skyway Towers, LLC
SmallCellSite.Com
Smart Communities and Special Districts Coalition
Soula Culver
Sue Present
Telecommunications Industry Association
Texas Municipal League

T-Mobile USA, Inc. (T-Mobile)
Triangle Communication System, Inc.
United States Conference of Mayors
Wireless Infrastructure Association (WIA)
Wireless Internet Service Providers Association (WISPA)
Xcel Energy Services Inc.

**APPENDIX B**

**Final Rules**

Part 1- Practice and Procedure

1.    The authority citation for Part 1 continues to read as follows:


AUTHORITY: 15 U.S.C. 79 et seq.; 47 U.S.C. 151, 154(i), 154(j), 155, 157, 160, 201, 225, 227, 303, 309, 332, 1403, 1404, 1451, 1452, and 1455.


2. Section 1307(a)(6) is revised to read as follows:

   (6)  Facilities to be located in floodplains, if the facilities will not be placed at least one foot above the base flood elevation of the floodplain.


3.    Section 1.1312 is amended by revising subparagraph (e) to read as follows:


(e): Paragraphs (a) through (d) of this section shall not apply:

(1) to the construction of mobile stations; or

(2) where the deployment of facilities meets the following conditions:

   (i)   The facilities are mounted on structures 50 feet or less in height including their antennas as defined in § 1.1320(d), or the facilities are mounted on structures no more than 10 percent taller than other adjacent structures, or the facilities do not extend existing structures on which they are located to a height of more than 50 feet or by more than 10 percent, whichever is greater;

   (ii) Each antenna associated with the deployment, excluding the associated equipment (as defined in the definition of antenna in § 1.1320(d)), is no more than three cubic feet in volume;

   (iii) All other wireless equipment associated with the structure, including the wireless equipment associated with the antenna and any pre-existing associated equipment on the structure, is no more than 28 cubic feet in volume;

   (iv) The facilities do not require antenna structure registration under Part 17 of this chapter;

   (v) The facilities are not located on Tribal lands, as defined under 36 CFR § 800.16(x); and

   (vi) The facilities do not result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in § 1.1307(b).

### APPENDIX C
### Final Regulatory Flexibility Analysis

1.   As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[366] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Notice of Proposed Rulemaking* (*NPRM*), released in April 2017.[367]  The Commission sought written public comment on the proposals in the *NPRM*, including comment on the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[368]

### A.      Need for and Objectives of the Rules

2.   In the *Second Report and Order*, the Commission modifies its rules by eliminating the historic preservation and environmental review processes pursuant to the National Historic Preservation Act (NHPA)[369] and the National Environmental Policy Act of 1969 (NEPA)[370] in certain instances where deploying certain small next-generation wireless broadband infrastructure will have neither a potential effect on historic properties nor a potential environmental impact.  We squarely address for the first time whether the Commission's issuance of geographic area service licenses inherently renders the deployment of wireless communications facilities a federal "undertaking" under the NHPA or "major Federal action" under NEPA, and we conclude that it does not.  Small wireless facility deployment is needed for the widespread availability of advanced services, however, exercising our Title III public interest authority in a manner that triggers federal environmental and historic preservation review requirements burdens that process.  Moreover, in light of the volume and nature of small wireless facility deployments that we anticipate, an FCC-created compliance requirement triggering environmental and historic preservation review could pose barriers to infrastructure investment and hinder the deployment of adequate facilities.  Thus, based on the record in the proceeding, the Commission does not find it in the public interest under Sections 303(r), 316, and 319(d) of the Communications Act to impose an environmental and historic preservation compliance requirement of its own creation on small wireless facility deployments.[371]  Accordingly, the *Second Report and Order* declines to impose such a requirement and amends the rules consistent with our requirements under the NHPA, NEPA and our public interest obligations to mitigate burdens by streamlining construction of next generation wireless infrastructure.  Additionally, we take steps to streamline our NHPA and NEPA reviews for larger facilities.  We address issues related to the participation of Tribal Nations and Native Hawaiian Organizations (NHOs) in historic preservation review pursuant to our obligations under Section 106 of the NHPA.  These issues include fees paid to Tribal Nations and NHOs in connection with their participation in the process, timing of responses provided by Tribal Nations and NHOs to applicants, and the amount of information required to be provided to a Tribal Nation or NHO at the outset of the Section 106 review process.  Finally, pursuant to NEPA, we modify our rules related to when an applicant must submit an Environmental Assessment (EA) for proposed facilities when the project is located in a flood plain, and we establish timelines within which the Commission staff will review submitted EAs.

---

[366] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601 – 612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[367] *See Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Deployment*, Notice of Proposed Rulemaking, 32 FCC Rcd 3330 (2017) (*NPRM* or *2017 Wireless Infrastructure NPRM*).

[368] *See* 5 U.S.C. § 604.

[369] 54 U.S.C. § 300101 *et seq*.

[370] 42 U.S.C. § 4321 *et seq*.

[371] 47 U.S.C. §§ 303(r), 316, 319(d).

B.    **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

3.    There were no comments filed that specifically addressed the rules and policies proposed in the IRFA.  One party—the Smart Cities and Special Districts Coalition—filed comments arguing that some small local governments, special districts, property owners, or small developers might be harmed if the Commission were to adopt certain policy changes discussed in the NPRM relating to (i) batches of zoning applications filed with state or local governments, (ii) the maximum reasonable time for state or local governments to process zoning applications ("shot clock" rules and "deemed granted" remedies), or (iii) limitations on proprietary properties or regulation of their use.[372]  The present Order does not deal with any of the issues in the NPRM that the Smart Cities and Special Districts Coalition addressed in the cited portions of its comments. We will address these comments when we act on the relevant issues in a future order.

C.    **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

4.    Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[373]

5.    The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

D.    **Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

6.    The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein[374]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[375]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[376]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[377]

7.    *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe here, at the outset, three broad groups of small entities that could be directly affected herein.[378]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the SBA's Office of Advocacy, in general a small business is an

---

[372] Smart Communities and Special Districts Coalition Comments at 41, 55, 81.

[373] 5 U.S.C. § 604(a)(3).

[374] *See* 5 U.S.C. § 604(a)(3).

[375] 5 U.S.C. § 601(6).

[376] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[377] 15 U.S.C. § 632(a).

[378] *See* 5 U.S.C. § 601(3)-(6).

independent business having fewer than 500 employees.[379]  These types of small businesses represent 99.9% of all businesses in the United States which translates to 28.8 million businesses.[380]

8.      Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[381] Nationwide, as of August 2016, there were approximately 356,494 small organizations based on registration and tax data filed by nonprofits with the Internal Revenue Service (IRS).[382]

9.      Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[383] U.S. Census Bureau data from the 2012 Census of Governments[384] indicate that there were 90,056 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[385]  Of this number there were 37, 132 General purpose governments (county[386], municipal and town or township[387]) with populations of less than 50,000 and 12,184 Special purpose governments (independent school districts[388] and special

---

[379] *See* SBA, Office of Advocacy, "Frequently Asked Questions, Question 1 – What is a small business?" https://www.sba.gov/sites/default/files/advocacy/SB-FAQ-2016_WEB.pdf (June 2016).

[380] *See* SBA, Office of Advocacy, "Frequently Asked Questions, Question 2- How many small businesses are there in the U.S.?" https://www.sba.gov/sites/default/files/advocacy/SB-FAQ-2016_WEB.pdf (June 2016).

[381] 5 U.S.C. § 601(4).

[382] Data from the Urban Institute, National Center for Charitable Statistics (NCCS) reporting on nonprofit organizations registered with the IRS was used to estimate the number of small organizations.  Reports generated using the NCCS online database indicated that as of August 2016 there were 356,494 registered nonprofits with total revenues of less than $100,000.  Of this number 326,897 entities filed tax returns with 65,113 registered nonprofits reporting total revenues of $50,000 or less on the IRS Form 990-N for Small Exempt Organizations and 261,784 nonprofits reporting total revenues of $100,000 or less on some other version of the IRS Form 990 within 24 months of the August 2016 data release date.  *See* http://nccs.urban.org/sites/all/nccs-archive/html///tablewiz/tw.php where the report showing this data can be generated by selecting the following data fields: Report: "The Number and Finances of All Registered 501(c) Nonprofits"; Show: "Registered Nonprofits"; By: "Total Revenue Level (years 1995, Aug to 2016, Aug)"; and For: "2016, Aug" then selecting "Show Results".

[383] 5 U.S.C. § 601(5).

[384] *See* 13 U.S.C. § 161. The Census of Government is conducted every five (5) years compiling data for years ending with "2" and "7". *See also* Program Description Census of Government *https://factfinder.census.gov/faces/affhelp/jsf/pages/metadata.xhtml?lang=en&type=program&id=program.en.COG#.*

[385] *See* U.S. Census Bureau, 2012 Census of Governments, Local Governments by Type and State: 2012 - United States-States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG02.US01. Local governmental jurisdictions are classified in two categories - General purpose governments (county, municipal and town or township) and Special purpose governments (special districts and independent school districts).

[386] *See* U.S. Census Bureau, 2012 Census of Governments, County Governments by Population-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG06.US01.  There were 2,114 county governments with populations less than 50,000.

[387] *See* U.S. Census Bureau, 2012 Census of Governments, Subcounty General-Purpose Governments by Population-Size Group and State: 2012 - United States – States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG07.US01. There were 18,811 municipal and 16,207 town and township governments with populations less than 50,000.

[388] *See* U.S. Census Bureau, 2012 Census of Governments, Elementary and Secondary School Systems by Enrollment-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG11.US01. There were 12,184 independent school districts with enrollment populations less than 50,000.

districts[389]) with populations of less than 50,000.  The 2012 U.S. Census Bureau data for most types of governments in the local government category show that the majority of these governments have populations of less than 50,000.[390]  Based on this data we estimate that at least 49,316 local government jurisdictions fall in the category of "small governmental jurisdictions."[391].

10.     *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[392]  The appropriate size standard under SBA rules is that such a business is small if it has 1,500 or fewer employees.[393]  For this industry, U.S. Census data for 2012 show that there were 967 firms that operated for the entire year.[394]  Of this total, 955 firms had employment of 999 or fewer employees and 12 had employment of 1000 employees or more.[395]  Thus under this category and the associated size standard, the Commission estimates that the majority of wireless telecommunications carriers (except satellite) are small entities.

11.     The Commission's own data—available in its Universal Licensing System—indicate that, as of October 25, 2016, there are 280 Cellular licensees that will be affected by our actions today.[396]  The Commission does not know how many of these licensees are small, as the Commission does not collect that information for these types of entities.  Similarly, according to Commission data, 413 carriers reported that they were engaged in the provision of wireless telephony, including cellular service, Personal Communications Service (PCS), and Specialized Mobile Radio (SMR) Telephony services.[397]

---

[389] *See* U.S. Census Bureau, 2012 Census of Governments, Special District Governments by Function and State: 2012 - United States-States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG09.US01.  The U.S. Census Bureau data did not provide a population breakout for special district governments.

[390] *See* U.S. Census Bureau, 2012 Census of Governments, County Governments by Population-Size Group and State: 2012 - United States-States - https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG06.US01; Subcounty General-Purpose Governments by Population-Size Group and State: 2012 - United States–States - https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG07.US01; and Elementary and Secondary School Systems by Enrollment-Size Group and State: 2012 - United States-States. https://factfinder.census.gov/bkmk/table/1.0/en/COG/2012/ORG11.US01. While U.S. Census Bureau data did not provide a population breakout for special district governments, if the population of less than 50,000 for this category of local government is consistent with the other types of local governments the majority of the 38, 266 special district governments have populations of less than 50,000.

[391] *Id.*

[392] U.S. Census Bureau, 2012 NAICS Definitions, "517210 Wireless Telecommunications Carriers (Except Satellite)," *See* https://factfinder.census.gov/faces/affhelp/jsf/pages/metadata.xhtml?lang=en&type= ib&id=ib.en./ECN.NAICS2012.517210.

[393] 13 CFR § 121.201, NAICS Code 517312 Wireless Telecommunications Carriers (except satellite).

[394] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series: Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517210.

[395] *Id.*  Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[396] *See* http://wireless.fcc.gov/uls.  For the purposes of this FRFA, consistent with Commission practice for wireless services, the Commission estimates the number of licensees based on the number of unique FCC Registration Numbers.

[397] *See* Federal Communications Commission, Wireline Competition Bureau, Industry Analysis and Technology Division, Trends in Telephone Service at Table 5.3 (Sept. 2010) (*Trends in Telephone Service*), https://apps.fcc.gov/edocs_public/attachmatch/DOC-301823A1.pdf.

Of this total, an estimated 261 have 1,500 or fewer employees and 152 have more than 1,500 employees.[398]  Thus, using available data, we estimate that the majority of wireless firms can be considered small.

12.    *Personal Radio Services.*  Personal radio services provide short-range, low-power radio for personal communications, radio signaling, and business communications not provided for in other services.  Personal radio services include services operating in spectrum licensed under Part 95 of our rules.[399]  These services include Citizen Band Radio Service, General Mobile Radio Service, Radio Control Radio Service, Family Radio Service, Wireless Medical Telemetry Service, Medical Implant Communications Service, Low Power Radio Service, and Multi-Use Radio Service.[400]  There are a variety of methods used to license the spectrum in these rule parts, from licensing by rule, to conditioning operation on successful completion of a required test, to site-based licensing, to geographic area licensing.  All such entities in this category are wireless, therefore we apply the definition of Wireless Telecommunications Carriers (except Satellite), pursuant to which the SBA's small entity size standard is defined as those entities employing 1,500 or fewer persons.[401]  For this industry, U.S. Census data for 2012 show that there were 967 firms that operated for the entire year.[402]  Of this total, 955 firms had employment of 999 or fewer employees and 12 had employment of 1000 employees or more.[403]  Thus under this category and the associated size standard, the Commission estimates that the majority of firms can be considered small.  We note however that many of the licensees in this category are individuals and not small entities.  In addition, due to the mostly unlicensed and shared nature of the spectrum utilized in many of these services, the Commission lacks direct information upon which to base an estimation of the number of small entities that may be affected by our actions in this proceeding.

13.    *Public Safety Radio Licensees.*  Public Safety Radio Pool licensees as a general matter, include police, fire, local government, forestry conservation, highway maintenance, and emergency medical services.[404]  Because of the vast array of public safety licensees, the Commission has not

---

[398] *See id.*

[399] 47 CFR Part 90.

[400] The Citizens Band Radio Service, General Mobile Radio Service, Radio Control Radio Service, Family Radio Service, Wireless Medical Telemetry Service, Medical Implant Communications Service, Low Power Radio Service, and Multi-Use Radio Service are governed by subpart D, subpart A, subpart C, subpart B, subpart H, subpart I, subpart G, and subpart J, respectively, of Part 95 of the Commission's rules.  *See generally* 47 CFR Part 95.

[401] 13 CFR § 121.201, NAICS Code 517312 Wireless Telecommunications Carriers (except satellite).

[402] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series: Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517210.

[403] *Id.*  Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[404] *See* subparts A and B of Part 90 of the Commission's Rules, 47 CFR §§ 90.1-90.22.  Police licensees serve state, county, and municipal enforcement through telephony (voice), telegraphy (code), and teletype and facsimile (printed material).  Fire licensees are comprised of private volunteer or professional fire companies, as well as units under governmental control.  Public Safety Radio Pool licensees also include state, county, or municipal entities that use radio for official purposes.  State departments of conservation and private forest organizations comprise forestry service licensees that set up communications networks among fire lookout towers and ground crews.  State and local governments are highway maintenance licensees that provide emergency and routine communications to aid other public safety services to keep main roads safe for vehicular traffic.  Emergency medical licensees use these channels for emergency medical service communications related to the delivery of emergency medical treatment.  Additional licensees include medical services, rescue organizations, veterinarians, persons with disabilities, disaster relief organizations, school buses, beach patrols, establishments in isolated areas, communications standby facilities, and emergency repair of public communications facilities.

developed a small business size standard specifically applicable to public safety licensees. The closest applicable SBA category is Wireless Telecommunications Carriers (except Satellite) which encompasses business entities engaged in radiotelephone communications. The appropriate size standard for this category under SBA rules is that such a business is small if it has 1,500 or fewer employees.[405] For this industry, U.S. Census data for 2012 show that there were 967 firms that operated for the entire year.[406] Of this total, 955 firms had employment of 999 or fewer employees and 12 had employment of 1000 employees or more.[407] Thus under this category and the associated size standard, the Commission estimates that the majority of firms can be considered small. With respect to local governments, in particular, since many governmental entities comprise the licensees for these services, we include under public safety services the number of government entities affected. According to Commission records, there are a total of approximately 133,870 licenses within these services.[408] There are 3,121 licenses in the 4.9 GHz band, based on an FCC Universal Licensing System search of March 29, 2017.[409] We estimate that fewer than 2,442 public safety radio licensees hold these licenses because certain entities may have multiple licenses.

14.     *Private Land Mobile Radio Licensees*. Private land mobile radio (PLMR) systems serve an essential role in a vast range of industrial, business, land transportation, and public safety activities. These radios are used by companies of all sizes operating in all U.S. business categories. Because of the vast array of PLMR users, the Commission has not developed a small business size standard specifically applicable to PLMR users. The closest applicable SBA category is Wireless Telecommunications Carriers (except Satellite) which encompasses business entities engage*d in radiotelephone communications*.[410] The appropriate size standard for this category under SBA rules is that such a business is small if it has 1,500 or fewer employees.[411] For this industry, U.S. Census data for 2012 show that there were 967 firms that operated for the entire year.[412] Of this total, 955 firms had employment of 999 or fewer employees and 12 had employment of 1000 employees or more.[413] Thus under this category and the associated size standard, the Commission estimates that the majority of PLMR Licensees are small entities.

---

[405] *See* 13 CFR § 121.201, NAICS Code 517312 Wireless Telecommunications Carriers (except satellite).

[406] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series: Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210. https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517210 (last visited Mar. 6, 2018).

[407] *Id*. Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[408] This figure was derived from Commission licensing records as of June 27, 2008. Licensing numbers change daily. We do not expect this number to be significantly smaller today. This does not indicate the number of licensees, as licensees may hold multiple licenses. There is no information currently available about the number of public safety licensees that have less than 1,500 employees.

[409] Based on an FCC Universal Licensing System search of March 29, 2017. Search parameters: Radio Service = PA – Public Safety 4940-4990 MHz Band; Authorization Type = Regular; Status = Active.

[410] U.S. Census Bureau, 2012 NAICS Definitions, "517210 Wireless Telecommunications Carriers (Except Satellite)," *See* https://factfinder.census.gov/faces/affhelp/jsf/pages/metadata.xhtml?lang=en&type= ib&id=ib.en./ECN.NAICS2012.517210 (last visited Mar. 6, 2018).

[411] *See* 13 CFR § 121.201, NAICS Code 517312 Wireless Telecommunications Carriers (except satellite).

[412] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series: Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210. https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517210 (last visited Mar. 6, 2018).

[413] *Id*. Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

15.     According to the Commission's records, a total of approximately 400,622 licenses comprise PLMR users.[414] Of this number there are a total of 3,374 licenses in the frequencies range 173.225 MHz to 173.375 MHz, which is the range affected by the *Second Report and Order*.[415]  The Commission does not require PLMR licensees to disclose information about number of employees, and does not have information that could be used to determine how many PLMR licensees constitute small entities under this definition.  The Commission however believes that a substantial number of PLMR licensees may be small entities despite the lack of specific information.

16.     *Multiple Address Systems*.  Entities using Multiple Address Systems (MAS) spectrum, in general, fall into two categories: (1) those using the spectrum for profit-based uses, and (2) those using the spectrum for private internal uses.  With respect to the first category, Profit-based Spectrum use, the size standards established by the Commission define "small entity" for MAS licensees as an entity that has average annual gross revenues of less than $15 million over the three previous calendar years.[416]  A "Very small business" is defined as an entity that, together with its affiliates, has average annual gross revenues of not more than $3 million over the preceding three calendar years.[417]  The SBA has approved these definitions.[418]  The majority of MAS operators are licensed in bands where the Commission has implemented a geographic area licensing approach that requires the use of competitive bidding procedures to resolve mutually exclusive applications.

17.     The Commission's licensing database indicates that, as of April 16, 2010, there were a total of 11,653 site-based MAS station authorizations.  Of these, 58 authorizations were associated with common carrier service.  In addition, the Commission's licensing database indicates that, as of April 16, 2010, there were a total of 3,330 Economic Area market area MAS authorizations.  The Commission's licensing database also indicates that, as of April 16, 2010, of the 11,653 total MAS station authorizations, 10,773 authorizations were for private radio service.  In 2001, an auction for 5,104 MAS licenses in 176 EAs was conducted.[419]  Seven winning bidders claimed status as small or very small businesses and won 611 licenses.  In 2005, the Commission completed an auction (Auction 59) of 4,226 MAS licenses in the Fixed Microwave Services from the 928/959 and 932/941 MHz bands.  Twenty-six winning bidders won a total of 2,323 licenses.  Of the 26 winning bidders in this auction, five claimed small business status and won 1,891 licenses.

18.     With respect to the second category, Internal Private Spectrum use consists of entities that use, or seek to use, MAS spectrum to accommodate their own internal communications needs, MAS serves an essential role in a range of industrial, safety, business, and land transportation activities.  MAS radios are used by companies of all sizes, operating in virtually all U.S. business categories, and by all types of public safety entities.  For the majority of private internal users, the definition developed by the SBA would be more appropriate than the Commission's definition.  The closest applicable definition of a

---

[414] This figure was derived from Commission licensing records as of September 19, 2016.  Licensing numbers change on a daily basis.  This does not indicate the number of licensees, as licensees may hold multiple licenses.  There is no information currently available about the number of PLMR licensees that have fewer than 1,500 employees.

[415] This figure was derived from Commission licensing records as of August 16, 2013.  Licensing numbers change daily.  We do not expect this number to be significantly smaller today.  This does not indicate the number of licensees, as licensees may hold multiple licenses.  There is no information currently available about the number of licensees that have fewer than 1,500 employees.

[416] *See Amendment of the Commission's Rules Regarding Multiple Address Systems*, Report and Order, 15 FCC Rcd 11956, 12008 para. 123 (2000).

[417] *Id*.

[418] *See* Letter from Aida Alvarez, Administrator, Small Business Administration, to Thomas Sugrue, Chief, Wireless Telecommunications Bureau, FCC (June 4, 1999).

[419] See *Multiple Address Systems Spectrum Auction Closes*, Public Notice, 16 FCC Rcd 21011 (2001).

small entity is the "Wireless Telecommunications Carriers (except Satellite)" definition under the SBA rules.[420]  The appropriate size standard under SBA rules is that such a business is small if it has 1,500 or fewer employees.[421]  For this category, U.S. Census data for 2012 show that there were 967 firms that operated for the entire year.[422]  Of this total, 955 firms had employment of 999 or fewer employees and 12 had employment of 1000 employees or more.[423]  Thus under this category and the associated small business size standard, the Commission estimates that the majority of firms that may be affected by our action can be considered small.

19.    *Broadband Radio Service and Educational Broadband Service.*  Broadband Radio Service systems, previously referred to as Multipoint Distribution Service (MDS) and Multichannel Multipoint Distribution Service (MMDS) systems, and "wireless cable," transmit video programming to subscribers and provide two-way high speed data operations using the microwave frequencies of the Broadband Radio Service (BRS) and Educational Broadband Service (EBS) (previously referred to as the Instructional Television Fixed Service (ITFS)).[424]

20.    *BRS* - In connection with the 1996 BRS auction, the Commission established a small business size standard as an entity that had annual average gross revenues of no more than $40 million in the previous three calendar years.[425]  The BRS auctions resulted in 67 successful bidders obtaining licensing opportunities for 493 Basic Trading Areas (BTAs).  Of the 67 auction winners, 61 met the definition of a small business.  BRS also includes licensees of stations authorized prior to the auction.  At this time, we estimate that of the 61 small business BRS auction winners, 48 remain small business licensees.  In addition to the 48 small businesses that hold BTA authorizations, there are approximately 392 incumbent BRS licensees that are considered small entities.[426]  After adding the number of small business auction licensees to the number of incumbent licensees not already counted, we find that there are currently approximately 440 BRS licensees that are defined as small businesses under either the SBA or the Commission's rules.

21.    In 2009, the Commission conducted Auction 86, the sale of 78 licenses in the BRS areas.[427]  The Commission offered three levels of bidding credits: (i) a bidder with attributed average annual gross revenues that exceed $15 million and do not exceed $40 million for the preceding three years (small business) received a 15 percent discount on its winning bid; (ii) a bidder with attributed average annual gross revenues that exceed $3 million and do not exceed $15 million for the preceding three years (very small business) received a 25 percent discount on its winning bid; and (iii) a bidder with

---

[420] 13 CFR § 121.201, NAICS Code 517312 Wireless Telecommunications Bureau (except satellite).

[421] *Id.*

[422] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series: Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517210.

[423] *Id.* Available census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[424] *Amendment of Parts 21 and 74 of the Commission's Rules with Regard to Filing Procedures in the Multipoint Distribution Service and in the Instructional Television Fixed Service and Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Report and Order, 10 FCC Rcd 9589, 9593, para. 7 (1995).

[425] 47 CFR § 21.961(b)(1).

[426] 47 U.S.C. § 309(j).  Hundreds of stations were licensed to incumbent MDS licensees prior to implementation of Section 309(j) of the Communications Act of 1934, 47 U.S.C. § 309(j).  For these pre-auction licenses, the applicable standard is SBA's small business size standard of 1500 or fewer employees.

[427] *Auction of Broadband Radio Service (BRS) Licenses, Scheduled for October 27, 2009, Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 86*, Public Notice, 24 FCC Rcd 8277 (2009).

attributed average annual gross revenues that do not exceed $3 million for the preceding three years (entrepreneur) received a 35 percent discount on its winning bid.[428]  Auction 86 concluded in 2009 with the sale of 61 licenses.[429]  Of the ten winning bidders, two bidders that claimed small business status won 4 licenses; one bidder that claimed very small business status won three licenses; and two bidders that claimed entrepreneur status won six licenses.

22.      *EBS* - The Educational Broadband Service has been included within the broad economic census category and SBA size standard for Wired Telecommunications Carriers since 2007.  Wired Telecommunications Carriers are comprised of establishments primarily engaged in operating and/or providing access to transmission facilities and infrastructure that they own and/or lease for the transmission of voice, data, text, sound, and video using wired telecommunications networks.  Transmission facilities may be based on a single technology or a combination of technologies.[430]  The SBA's small business size standard for this category is all such firms having 1,500 or fewer employees.[431]  U.S. Census Bureau data for 2012 show that there were 3,117 firms that operated that year.[432]  Of this total, 3,083 operated with fewer than 1,000 employees.[433]  Thus, under this size standard, the majority of firms in this industry can be considered small.  In addition to Census Bureau data, based on Commission data there are presently 2,436 EBS licensees.  All but 100 of these licenses are held by educational institutions.  Educational institutions are included in this analysis as small entities.[434]  Thus, we estimate that at least 2,336 EBS licensees are small businesses based on Commission data.

23.      *Location and Monitoring Service (LMS)*.  LMS systems use non-voice radio techniques to determine the location and status of mobile radio units.  For purposes of auctioning LMS licenses, the Commission has defined a "small business" as an entity that, together with controlling interests and affiliates, has average annual gross revenues for the preceding three years not to exceed $15 million.[435]  A "very small business" is defined as an entity that, together with controlling interests and affiliates, has average annual gross revenues for the preceding three years not to exceed $3 million.[436]  These definitions

---

[428] *Id.* at 8296 para. 73.

[429] *Auction of Broadband Radio Service Licenses Closes, Winning Bidders Announced for Auction 86, Down Payments Due November 23, 2009, Final Payments Due December 8, 2009, Ten-Day Petition to Deny Period*, Public Notice, 24 FCC Rcd 13572 (2009).

[430] U.S. Census Bureau, 2017 NAICS Definitions, "517311 Wired Telecommunications Carriers,", https://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=517110&search=2017 (last visited Mar. 6, 2018).

[431] *See,* 13 CFR § 121.201. The Wired Telecommunications Carrier category formerly used the NAICS code of 517110. As of 2017 the U.S. Census Bureau definition shows the NAICs code as 517311 for Wired Telecommunications Carriers.  *See*, https://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=517311&search=2017.

[432] *See* U.S. Census Bureau, *2012 Economic Census of the United States,* Table No. EC1251SSSZ5, *Information: Subject Series - Estab & Firm Size: Employment Size of Firms: 2012* (517110 Wired Telecommunications Carriers). https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ5//naics~517110.

[433] *Id.*

[434] The term "small entity" within SBREFA applies to small organizations (nonprofits) and to small governmental jurisdictions (cities, counties, towns, townships, villages, school districts, and special districts with populations of less than 50,000).  5 U.S.C. §§ 601(4)-(6).  The Commission does not collect annual revenue data on EBS licensees.

[435] Amendment of Part 90 of the Commission's Rules to Adopt Regulations for Automatic Vehicle Monitoring Systems, PR Docket No. 93-61, *Second Report and Order*, 13 FCC Rcd 15182, 15192 para. 20 (1998); *see also* 47 CFR § 90.1103.

[436] *Id.*

have been approved by the SBA.[437]  An auction for LMS licenses commenced on February 23, 1999 and closed on March 5, 1999.  Of the 528 licenses auctioned, 289 licenses were sold to four small businesses.

24.      *Television Broadcasting*.  This Economic Census category "comprises establishments primarily engaged in broadcasting images together with sound."[438]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[439]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA has created the following small business size standard for such businesses: those having $38.5 million or less in annual receipts.[440]  The 2012 Economic Census reports that 751 firms in this category operated in that year.[441]  Of that number, 656 had annual receipts of $25,000,000 or less, 25 had annual receipts between $25,000,000 and $49,999,999 and 70 had annual receipts of $50,000,000 or more.[442]  Based on this data we therefore estimate that the majority of commercial television broadcasters are small entities under the applicable SBA size standard.

25.      The Commission has estimated the number of licensed commercial television stations to be 1,387.[443]  Of this total, 1,258 stations (or about 91 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on November 16, 2017, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission has estimated the number of licensed noncommercial educational (NCE) television stations to be 395.[444]  Notwithstanding, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.  There are also 2,367 low power television stations, including Class A stations (LPTV) and 3,750 TV translator stations.[445]  Given the nature of these services, we will presume that all of these entities qualify as small entities under the above SBA small business size standard.

26.      We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations must be included.[446]  Our estimate, therefore likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of

---

[437] *See* Letter from Aida Alvarez, Administrator, Small Business Administration to Thomas J. Sugrue, Chief, Wireless Telecommunications Bureau, FCC (Feb. 22, 1999).

[438] U.S. Census Bureau, 2017 NAICS Definitions, "515120 Television Broadcasting," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515120&search=2017+NAICS+Search&search=2017.

[439] *Id*.

[440] 13 CFR § 121.201; 2012 NAICS Code 515120 Television Broadcasting.

[441] U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515120 Television Broadcasting). https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~515120.

[442] *Id*.

[443] *Broadcast Station Totals as of* December 31, 2017, Press Release (MB, rel. Jan. 5, 2018) https://apps.fcc.gov/edocs_public/attachmatch/DOC-3485706998A1.pdf.

[444] *Id*.

[445] *Id.*

[446] See 13 CFR § 21.103(a)(1) "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both."

operation. We are unable at this time to define or quantify the criteria that would establish whether a specific television broadcast station is dominant in its field of operation. Accordingly, the estimate of small businesses to which rules may apply does not exclude any television station from the definition of a small business on this basis and is therefore possibly over-inclusive. Also, as noted above, an additional element of the definition of "small business" is that the entity must be independently owned and operated. The Commission notes that it is difficult at times to assess these criteria in the context of media entities and its estimates of small businesses to which they apply may be over-inclusive to this extent.

27.    *Radio Stations.* This Economic Census category "comprises establishments primarily engaged in broadcasting aural programs by radio to the public. Programming may originate in their own studio, from an affiliated network, or from external sources."[447] The SBA has established a small business size standard for this category as firms having $38.5 million or less in annual receipts.[448] Economic Census data for 2012 show that 2,849 radio station firms operated during that year.[449] Of that number, 2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more.[450] Therefore, based on the SBA's size standard the majority of such entities are small entities.

28.    According to Commission staff review of the BIA/Kelsey, LLC's Publications, Inc. Media Access Pro Radio Database (BIA) as of January 2018, about 11,261 (or about 99.92 percent) of 11,270 commercial radio stations had revenues of $38.5 million or less and thus qualify as small entities under the SBA definition.[451] The Commission has estimated the number of licensed commercial AM radio stations to be 4,639 stations and the number of commercial FM radio stations to be 6,748, for a total number of 11,387.[452] We note, that the Commission has also estimated the number of licensed NCE radio stations to be 4,116.[453] Nevertheless, the Commission does not compile and otherwise does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.

29.    We also note, that in assessing whether a business entity qualifies as small under the above definition, business control affiliations must be included.[454] The Commission's estimate therefore likely overstates the number of small entities that might be affected by its action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, to be determined a "small business," an entity may not be dominant in its field of operation.[455] We further note, that it is difficult at times to assess these criteria in the context of media entities, and the estimate of small businesses to which these rules may apply does not exclude any radio station from the definition of a small business on these basis, thus our estimate of small businesses may therefore be over-inclusive. Also, as noted above, an additional element of the definition of "small business" is that the entity must be

---

[447] U.S. Census Bureau, 2017 NAICS Definitions, "515112 Radio Stations," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515112&search=2017+NAICS+Search&search=2017 (last visited Mar. 6, 2018).

[448] 13 CFR § 121.201, NAICS Code 515112 Radio Stations.

[449] U.S. Census Bureau, *2012 Economic Census of the United States*, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* NAICS Code 515112, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~515112.

[450] *Id.*

[451] BIA/Kelsey, MEDIA Access Pro Database (viewed Jan. 26, 2018).

[452] *Id.*

[453] *Id.*

[454] 13 CFR § 121.103(a)(1). "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other, or a third party or parties controls or has power to control both."

[455] 13 CFR § 121.102(b).

independently owned and operated.  The Commission notes that it is difficult at times to assess these criteria in the context of media entities and the estimates of small businesses to which they apply may be over-inclusive to this extent.

30.     *FM Translator Stations and Low Power FM Stations.*  FM translators and Low Power FM Stations are classified in the category of Radio Stations and are assigned the same NAICS Code as licensees of radio stations.[456]  This U.S. industry, Radio Stations, comprises establishments primarily engaged in broadcasting aural programs by radio to the public.[457]  Programming may originate in their own studio, from an affiliated network, or from external sources.[458]  The SBA has established a small business size standard which consists of all radio stations whose annual receipts are $38.5 million dollars or less.[459]  U.S. Census Bureau data for 2012 indicate that 2,849 radio station firms operated during that year.[460]  Of that number, 2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more.[461]  Therefore, based on the SBA's size standard, we conclude that the majority of FM Translator Stations and Low Power FM Stations are small.

31.     *Multichannel Video Distribution and Data Service (MVDDS).*  MVDDS is a terrestrial fixed microwave service operating in the 12.2-12.7 GHz band.  The Commission adopted criteria for defining three groups of small businesses for purposes of determining their eligibility for special provisions such as bidding credits.  It defined a very small business as an entity with average annual gross revenues not exceeding $3 million for the preceding three years; a small business as an entity with average annual gross revenues not exceeding $15 million for the preceding three years; and an entrepreneur as an entity with average annual gross revenues not exceeding $40 million for the preceding three years.[462]  These definitions were approved by the SBA.[463]  On January 27, 2004, the Commission completed an auction of 214 MVDDS licenses (Auction No. 53).  In this auction, ten winning bidders won a total of 192 MVDDS licenses.[464]  Eight of the ten winning bidders claimed small business status and won 144 of the licenses.  The Commission also held an auction of MVDDS licenses on December 7,

---

[456] *See*, U.S. Census Bureau, 2017 NAICS Definitions, "515112 Radio Stations," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=515112&search=2017+NAICS+Search&search=2017 (last visited Mar. 6, 2018).

[457] *Id.*

[458] *Id*.

[459] 13 CFR § 121.201, NAICS code 515112 Radio Stations.

[460] U.S. Census Bureau, *2012 Economic Census of the United States*, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* NAICS Code 515112,https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~515112 (last visited Mar. 6, 2018).

[461] *Id.*

[462] Amendment of Parts 2 and 25 of the Commission's Rules to Permit Operation of NGSO FSS Systems Co-Frequency with GSO and Terrestrial Systems in the Ku-Band Frequency Range; Amendment of the Commission's Rules to Authorize Subsidiary Terrestrial Use of the 12.2–12.7 GHz Band by Direct Broadcast Satellite Licensees and their Affiliates; and Applications of Broadwave USA, PDC Broadband Corporation, and Satellite Receivers, Ltd. to Provide A Fixed Service in the 12.2–12.7 GHz Band, *Memorandum Opinion and Order and Second Report and Order*, 17 FCC Rcd 9614, 9711, para. 252 (2002).

[463] *See* Letter from Hector V. Barreto, Administrator, U.S. Small Business Administration, to Margaret W. Wiener, Chief, Auctions and Industry Analysis Division, Wireless Telecommunications Bureau, FCC (Feb. 13, 2002).

[464] *See* "*Multichannel Video Distribution and Data Service Spectrum Auction Closes; Winning Bidders Announced*," Public Notice, 19 FCC Rcd 1834 (2004).

2005 (Auction 63). Of the three winning bidders who won 22 licenses, two winning bidders, winning 21 of the licenses, claimed small business status.[465]

32.     *Satellite Telecommunications.* This category comprises firms "primarily engaged in providing telecommunications services to other establishments in the telecommunications and broadcasting industries by forwarding and receiving communications signals via a system of satellites or reselling satellite telecommunications."[466] Satellite telecommunications service providers include satellite and earth station operators. The category has a small business size standard of $32.5 million or less in average annual receipts, under SBA rules.[467] For this category, U.S. Census Bureau data for 2012 show that there were a total of 333 firms that operated for the entire year.[468] Of this total, 299 firms had annual receipts of less than $25 million.[469] Consequently, we estimate that the majority of satellite telecommunications providers are small entities.

33.     *All Other Telecommunications.* The **"**All Other Telecommunications" category is comprised of establishments that are primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[470] This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[471] Establishments providing Internet services or voice over Internet protocol (VoIP) services via client-supplied telecommunications connections are also included in this industry.[472] The SBA has developed a small business size standard for "All Other Telecommunications," which consists of all such firms with gross annual receipts of $32.5 million or less.[473] For this category, U.S. Census data for 2012 show that there were 1,442 firms that operated for the entire year.[474] Of these firms, a total of 1,400 had gross annual receipts of less than $25 million and 42 firms had annual receipts of $25 million to $49, 999,999.[475] Thus, a majority of "All Other Telecommunications" firms potentially affected by our action can be considered small.

---

[465] *See* "*Auction of Multichannel Video Distribution and Data Service Licenses Closes; Winning Bidders Announced for Auction No. 63*," Public Notice, 20 FCC Rcd 19807 (2005).

[466] U.S. Census Bureau, 2017 NAICS Definitions, "517410 Satellite Telecommunications," https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=517410&search=2017+NAICS+Search&search=2017.

[467] 13 CFR § 121.201, NAICS Code 517410 Satellite Telecommunications.

[468] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ4, *Information: Subject Series - Estab and Firm Size: Receipts Size of Firms for the United States: 2012*, NAICS Code 517410, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~517410 (last visited Mar. 6, 2018).

[469] *Id.*

[470] *See* U.S. Census Bureau, 2017 NAICS Definitions, NAICS Code "517919 All Other Telecommunications", https://www.census.gov/cgi-bin/sssd/naics/naicsrch?input=517919&search=2017+NAICS+Search&search=2017 (last visited Mar. 6, 2018)

[471] *Id.*

[472] *Id.*

[473] 13 CFR § 121.201, NAICS Code 517919 corresponding to "All Other telecommunications").

[474] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ4, *Information: Subject Series - Estab and Firm Size: Receipts Size of Firms for the United States: 2012*, NAICS code 517919, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~517919

[475] *Id.*

34.      *Fixed Microwave Services*.  Microwave services include common carrier,[476] private-operational fixed,[477] and broadcast auxiliary radio services.[478]  They also include the Local Multipoint Distribution Service (LMDS),[479] the Digital Electronic Message Service (DEMS),[480] the 39 GHz Service (39 GHz),[481] the 24 GHz Service,[482] and the Millimeter Wave Service[483] where licensees can choose between common carrier and non-common carrier status.[484]  The Commission has not yet defined a small business size standard for microwave services.   The closest applicable SBA category is Wireless Telecommunications Carriers (except Satellite) and the appropriate size standard for this category under SBA rules is that such a business is small if it has 1,500 or fewer employees.[485]  U.S. Census Bureau data for 2012, show that there were 967 firms in this category that operated for the entire year.[486]  Of this total, 955 had employment of 999 or fewer, and 12 firms had employment of 1,000 employees or more.  Thus, under this category and the associated small business size standard, the Commission estimates that  a majority of fixed microwave service licensees can be considered small.

35.      According to Commission data in the Universal Licensing System (ULS) as of September 22, 2015 there were approximately 61,970 common carrier fixed licensees, 62,909 private and public safety operational-fixed licensees, 20,349 broadcast auxiliary radio licensees, 412 LMDS licenses, 35 DEMS licenses, 870 39 GHz licenses, and five 24 GHz licenses, and 408 Millimeter Wave licenses in the microwave services.  The Commission notes that the number of firms does not necessarily track the number of licensees.  The Commission also notes that it does not have data specifying the number of these licensees that have more than 1,500 employees, and thus is unable at this time to estimate with greater precision the number of fixed microwave service licensees that would qualify as small business concerns under the SBA's small business size standard.  The Commission estimates however, that virtually all of the Fixed Microwave licensees (excluding broadcast auxiliary licensees) would qualify as small entities under the SBA definition.

36.      *Non-Licensee Owners of Towers and Other Infrastructure*.  Although at one time most communications towers were owned by the licensee using the tower to provide communications service, many towers are now owned by third-party businesses that do not provide communications services

---

[476] *See* 47 CFR Part 101, Subpart I.

[477] Persons eligible under parts 80 and 90 of the Commission's rules can use Private-Operational Fixed Microwave services.  *See* 47 CFR Parts 80 and 90.  Stations in this service are called operational-fixed to distinguish them from common carrier and public fixed stations.  Only the licensee may use the operational-fixed station, and only for communications related to the licensee's commercial, industrial, or safety operations.

[478] See 47 CFR Parts 74, 78 (governing Auxiliary Microwave Service) Available to licensees of broadcast stations, cable operators, and to broadcast and cable network entities.  Auxiliary microwave stations are used for relaying broadcast television signals from the studio to the transmitter, or between two points such as a main studio and an auxiliary studio.  The service also includes TV pickup and CARS pickup, which relay signals from a remote location back to the studio.

[479] *See* 47 CFR §§ 101, 1001-101, 1017.

[480] *See* 47 CFR §§ 101, 101.501-101.538.

[481] *See* 47 CFR Part 101, Subpart N (reserved for Competitive bidding procedures for the 38.6-40 GHz Band).

[482] *See id.*

[483] *See* 47 CFR §§ 101, 101.1501-101.1527.

[484] *See* 47 CFR §§ 101.533, 101.1017.

[485] 13 CFR § 121.201.

[486] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ5, *Information: Subject Series, "Estab and Firm Size: Employment Size of Firms for the U.S.: 2012* NAICS Code 517210, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSZ5//naics~517210 (last visited Mar. 6, 2018).

themselves but lease space on their towers to other companies that provide communications services.  The Commission's rules require that any entity, including a non-licensee, proposing to construct a tower over 200 feet in height or within the glide slope of an airport must register the tower with the Commission's Antenna Structure Registration ("ASR") system and comply with applicable rules regarding review for impact on the environment and historic properties.

37.    As of March 1, 2017, the ASR database includes approximately 122,157 registration records reflecting a "Constructed" status and 13,987 registration records reflecting a "Granted, Not Constructed" status.  These figures include both towers registered to licensees and towers registered to non-licensee tower owners.  The Commission does not keep information from which we can easily determine how many of these towers are registered to non-licensees or how many non-licensees have registered towers.[487]  Regarding towers that do not require ASR registration, we do not collect information as to the number of such towers in use and therefore cannot estimate the number of tower owners that would be subject to the rules on which we seek comment.  Moreover, the SBA has not developed a size standard for small businesses in the category "Tower Owners."  Therefore, we are unable to determine the number of non-licensee tower owners that are small entities.  We believe, however, that when all entities owning 10 or fewer towers and leasing space for collocation are included, non-licensee tower owners number in the thousands.  In addition, there may be other non-licensee owners of other wireless infrastructure, including Distributed Antenna Systems (DAS) and small cells that might be affected by the measures on which we seek comment.  We do not have any basis for estimating the number of such non-licensee owners that are small entities.

38.    The closest applicable SBA category is All Other Telecommunications, and the appropriate size standard consists of all such firms with gross annual receipts of $32.5 million or less.[488]  For this category, U.S. Census data for 2012 show that there were 1,442 firms that operated for the entire year.[489]  Of these firms, a total of 1,400 had gross annual receipts of less than $25 million and 15 firms had annual receipts of $25 million to $49, 999,999.[490]  Thus, under this SBA size standard a majority of the firms potentially affected by our action can be considered small.

### E.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

39.    The *Second Report and Order* streamlines the process of deploying next-generation wireless broadband by eliminating the need for historic preservation and environmental review for construction of these small wireless facilities, modifies and clarifies certain aspects of the Tribal engagement process pursuant to Section 106 of the NHPA, eliminates the requirement to prepare an Environmental Assessment when certain conditions are met, and sets timeframes for staff review of EAs.  The Commission does not impose any additional reporting, recordkeeping or other compliance requirements relating to the deployment of small wireless facilities.  Instead, the Commission eliminates NHPA and NEPA compliance requirements, resulting in the removal of regulatory burdens for a specific set of defined small wireless infrastructure, which will benefit small entities as well as entities of other sizes that deploy small wireless facilities.

40.    The exclusion from the NHPA and NEPA review requirements is limited to small wireless facilities meeting certain volume and height requirements.  As to height, our revised rule will

---

[487] We note, however, that approximately 13,000 towers are registered to 10 cellular carriers with 1,000 or more employees.

[488] 13 CFR § 121.201, NAICS Code 517919 All Other Telecommunications.

[489] U.S. Census Bureau, *2012 Economic Census of the United States*, Table EC1251SSSZ4, *Information: Subject Series - Estab and Firm Size: Receipts Size of Firms for the United States: 2012,* NAICS code 517919, https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~517919 (last visited Mar. 5, 2018).

[490] *Id.*

exclude small wireless facilities if they are mounted on new or existing structures no taller than the greater of 50 feet (including their antennas), no more than 10 percent taller than other structures in the area, or where the small wireless facility is affixed to an existing structure, that structure is not extended in height by more than 10 percent as a result of the deployment.[491]  As to volume, our public interest finding here applies only when certain volumetric limits are met.  Each antenna associated with the deployment, excluding the associated equipment, must be no more than three cubic feet in volume.  Additionally, the wireless equipment associated with the structure, including the wireless equipment associated with the antenna and any pre-existing associated equipment on the structure must be no more than 28 cubic feet in volume.

41.     With respect to deployment of larger wireless facilities, the actions we take today clarify that, where applicable, all potentially affected Tribal Nations and NHOs must be provided an accurate and complete Form 620/621 in order to start the time period for the Tribal review process. The completion of the Form 620/621 is already required under our rules; thus, the focus of our clarification is to ensure that the accurate and complete information contained in these forms is provided to Tribal Nations and NHOs. In cases where the Form 620/621 submission is not required, we now require applicants to provide Tribal Nations and NHOs with information adequate to fully explain the project and its location.  At minimum, this alternate submission must include contact information for the applicant, a map of the proposed location of the facility, coordinates of the proposed facility, a description of the facility to be constructed including all proposed elements (such as, for example, access roads), and a description of the proposed site, including both aerial and site photographs.  We find that this package constitutes an adequate baseline set of information to enable Tribal Nations and NHOs to comment on these projects.  We also clarify the timelines within which a Tribal Nation or NHO must respond to a project submitted to it through the TCNS process and create a 45-day process for moving forward in cases where a Tribal Nation or NHO does not respond after proper receipt of the required information.  Additionally, we clarify that applicants are not required to pay Tribal Nations or NHOs fees to commence the Section 106 review process and that any fee for consulting services should be agreed upon by both the Tribal Nation or NHO and the applicant.  Finally, with respect to NEPA compliance, we adopt a rule change that when a proposed facility is located in a floodplain, if certain construction requirements are met, we will no longer require the submission of an EA and we implement procedural changes to substantially accelerate the environmental review process.

## F.     Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

42.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[492]

43.     The steps taken by the Commission in the *Second Report and Order* declining to apply a Commission-created compliance requirement for small wireless facility deployments and thereby trigger environmental and historic preservation review will minimize significantly the economic impact on small as well as other small entities.  While the record does not enable a precise quantification of costs and benefits, we know that environmental and historic preservation review imposes burdens on small wireless facility deployment.  We also anticipate that such burdens would have a significant effect on small wireless facility deployment, at least in the aggregate, given the volume and nature of small wireless

---

[491] *See* Verizon Comments at 46-47.

[492] 5 U.S.C. § 603(c)(1) - (4).

facility deployments that we expect.  Therefore by eliminating these requirements, the Commission is removing the associated cost burdens, and enabling significant public interest benefits to the extent the absence of these review requirements will facilitate the speedy deployment of advanced wireless networks.

44.      We anticipate that adoption of this rule excluding certain small wireless facilities from the environmental and historic preservation review requirements will provide significant efficiencies in the deployment of such facilities, particularly for small entities that may not have the compliance resources and economies of scale of larger entities, while still avoiding adverse impacts on the environment and historic properties.  By adopting this updated standard, the Commission will continue to fulfill its statutory responsibilities regarding historic and environmental preservation, while reducing the burden on small entities by removing unnecessary impediments to the rapid deployment of small cell facilities and other wireless infrastructure across the country.

45.      As discussed above, the overall approach the Commission has taken is to remove certain regulatory requirements associated with NHPA and NEPA compliance by finding that their removal is consistent with applicable law and our public interest obligations, and to simplify and clarify the existing requirements applicable in other contexts.  In crafting this regulatory relief, we have not identified any additional steps that could be taken with respect to small entities that could not also be applied to all entities that construct or deploy wireless infrastructure.  While the new exclusion for small wireless facilities is not specifically directed at small entities, our actions in the *Second Report and Order* can potentially decrease costs for small entities and all those subject to NHPA and NEPA obligations.

46.      With respect to deployment of larger wireless facilities, the steps we take today are designed to accelerate deployment of wireless services by reducing costs and establishing timelines for reviews by Tribal Nations and NHOs.  First, we establish a 45-day timeline within which a Tribal Nation or NHO must provide a response to an applicant's request for comment on a proposal for a construction project.  As part of this process, we clarify what information must be provided by applicants in order to trigger the timeline.  We further reduce costs by clarifying that our applicants are not required to pay Tribal Nations or NHO's up-front fees simply for initiating the Section 106 consultative process and that, with respect to consultant fees, while an applicant may negotiate and contract with a Tribal Nation or NHO for consulting services and must obtain the appropriate expertise, an applicant is not obligated to accede to Tribal requests for fees in the absence of an agreement.

47.      Finally, we take steps to streamline our NEPA review framework while maintaining the efficacy of our rules in carrying out our NEPA obligations with respect to facilities located in floodplains.  The actions we take today eliminate the need for costly Environmental Assessments to be prepared when proposed facilities, located in floodplains, are proposed to be constructed at least one foot above the base flood elevation.  Preparation of such EAs may require consulting services that, according to some commenters, often cost thousands of dollars and take several months.[493]  For proposed facilities which continue to require the preparation of an Environmental Assessment, the steps we take to establish timelines for the Commission to complete review of these submissions will enable small as well as other sized entities to avoid the costly impact of procedural delays, thereby reducing potentially significant economic impacts.  At the same time, our actions will increase the capacity for small entities and other providers to invest in deploying more facilities more rapidly, and at lower cost.

## G.      Report to Congress

48.      The Commission will send a copy of the *Second Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[494]  In addition, the

---

[493] *See, e.g.*, Sprint Comments at 6-7; Crown Castle Comments at 43.  *See also Final PEA* at 4-27, § 4.9.

[494] 5 U.S.C. § 801(a)(1)(A).

Commission will send a copy of the *Second Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA. The *Second Report and Order* and FRFA (or summaries thereof) also will be published in the *Federal Register*. [495]

---

[495] *Id.* § 604(b).

### STATEMENT OF
### CHAIRMAN AJIT PAI

Re:    *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure
       Investment*, WT Docket No. 17-79

If the United States is going to lead the world in 5G, we need to modernize our wireless
infrastructure regulations.  Our efforts to unleash spectrum for consumer use are necessary, but they
aren't sufficient to secure our 5G future.  In fact, they'll be pointless if carriers can't deploy the physical
infrastructure needed to bring next-generation services to the American people.

And unfortunately, our current wireless infrastructure rules are a poor fit for the 5G networks of
the future.  They were designed with 200-foot towers in mind, not the highly-densified networks of small
cells that will be common in the 5G world.

That's why today's *Order* is so important.  We take a giant leap forward in updating our wireless
infrastructure rules.  By cutting unnecessary red tape, we'll make it substantially easier for carriers to
build next-generation wireless networks throughout the United States.  That means faster and more
reliable wireless services for American consumers and businesses.  That means more wireless innovation,
such as novel applications based on the Internet of Things.  And ultimately, that means American
leadership in 5G.

Specifically, we clarify today that small cells are inherently different from large towers.  So they
shouldn't face identical regulatory review under the National Historic Preservation Act and National
Environmental Policy Act.  We also streamline the process for Tribal review notifications through our
Tower Construction Notification System.

In developing today's Order, we have engaged extensively with Tribal Nations, intertribal
organizations, and state and local historic preservation officers.  These consultations have improved our
work product.

For example, Tribes complained that wireless companies sometimes give them insufficient
information about proposed macro tower deployments that could potentially affect historic properties.
Today's Order therefore requires infrastructure siting applicants to give potentially affected Tribal
Nations and Native Hawaiian Organizations a standardized set of information for undertakings going
forward.  Providing this information at the initial notification stage will enable Tribes to more efficiently
determine whether projects may affect historic properties of religious or cultural significance.

But we also heard from numerous parties seeking to deploy infrastructure about abuse of the
review process, including some Tribal Nations charging upfront fees even before a response.  For
instance, one company recently paid over $12,000 to install one small cell outside a steel factory in
Indiana, where all ultimately agreed there was no effect on historic property.  Another company paid over
$15,000 to install a single small cell in downtown Milwaukee.  Yet another company stated that 26% of
small-cell deployment costs, including for equipment, came from historic preservation and environmental
review alone.  Extrapolating that out to the thousands of small cells needed for next-generation services, it
becomes clear:  You can stick with the regulatory status quo or you can have 5G.  You cannot have both.

To address that issue, we are going back to following the law.  Aside from deterring deployment,
upfront fees contradict Advisory Council on Historic Preservation guidance.  Because these fees are
inconsistent with both law and consumer welfare, we will not coerce private entities into paying them
going forward.

The other main piece of today's Order speeds wireless infrastructure deployment by eliminating
the requirement that applicants file Environmental Assessments solely due to the location of a proposed

facility in a floodplain, as long as certain conditions are met.  Here too, we're reducing unnecessary barriers to the construction of next-generation networks.

Today's Order would not have been possible without the hard work of Commissioner Carr, who is leading our efforts on the wireless infrastructure front.  I'd like to thank him and his staff for their skillful work on this Order, and I look forward to collaborating with them as we address additional barriers to deployment in the months to come.  And I'd also like to thank all of the staff who have diligently worked on wireless infrastructure issues over the past year, and in particular, those who worked on this item.  Thanks to Saurbh Chhabra, Aaron Goldschmidt, Garnet Hanly, Leon Jackler, Dan Margolis, Darrel Pae, Erica Rosenberg, Jennifer Salhus, Dana Shaffer, David Sieradzki, Jill Springer, Jeffrey Steinberg, Don Stockdale, Suzanne Tetreault, and Mary Claire York from the Wireless Telecommunications Bureau; Ashley Boizelle, Deborah Broderson, Thomas Johnson, Marcus Maher, and Linda Oliver from the Office of General Counsel; Matthew Duchesne, Barbara Esbin, and Patrick Webre from the Consumer and Governmental Affairs Bureau; Adrienne Denysyk, Holly Saurer, and Michael Wagner from the Media Bureau; Cathy Williams from the Office of Managing Director; Chana Wilkerson from the Office of Communications Business Opportunities; Chris Anderson, Kenneth Burnley, Megan Henry, David Plotinsky, and Michael Wilhelm from the Public Safety and Homeland Security Bureau; and, Kathy Harvey, Jason Koslofsky, JoAnn Lucanik, Aspa Paroutsas, Kevin Pittman, and Michael Scurato from the Enforcement Bureau.

* * *

Lately, there's been a lot of talk about American leadership in 5G.  But talk is cheap; action is what actually matters.  And now is the time for action.  A vote for this Order is a vote for concrete action that will help the United States lead the world in 5G.  It's a vote for better, faster, and cheaper mobile broadband for the American people.  It's a vote for making the United States the best home for wireless innovation and investment.  And it's a vote to extend digital opportunity to more of our citizens.  That future is a bright one, and it's one I'm determined to deliver by supporting this *Order*.

### DISSENTING STATEMENT OF
### COMMISSIONER MIGNON. L CLYBURN

Re:    *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket No. 17-79

Next generation commercial wireless services deserve next generation wireless infrastructure policies.  On that we can agree.  But our nation's infrastructure policies must be aligned, with existing Congressional mandates and the needs of local communities.

Congress, through the Communications Act, directed the Federal Communications Commission, to develop spectrum management and infrastructure deployment policies, that promote competition, enable economic opportunities and ensure that new and innovative technologies are readily accessible to all Americans.  The National Environmental Policy Act and the National Historic Preservation Act, require every federal agency, including the FCC, to also consider the extent to which any action and undertaking that their policies enable, could impact the natural environment and historic aspects of communities.  To achieve the right balance of these statutory objectives, the Commission is expected to approach its infrastructure proceedings collaboratively, and include the perspectives of as many communities as possible.

When the Commission has followed this approach, I have consistently voted to approve those decisions.  I supported the Orders leading up to the three commercial wireless spectrum auctions, because they established a competitive foundation where all communities stood to benefit from the launch of next generation 5G services.  I approved the bulk of decisions made in the Spectrum Frontiers proceeding, because they allowed a diverse group of companies to contribute to the deployment of 5G services, in both rural and urban areas, using spectrum bands above 24 GHz.  And I voted in favor, of several Orders to streamline the review and approval of communication towers, and other wireless infrastructure equipment.  It is true that at times, I have pushed for edits and various approaches to infrastructure challenges, that would enable industry to address the concerns of rural and other areas.  Notably, it was this approach that I took in 2014, with the Order that streamlined review of the collocation of towers to 60 days.  But I would not agree to vote for that 60-day deadline, until industry associations agreed to work with resource constrained localities, to find ways to more quickly review those applications.

As I began my review of today's draft Order, as I often like to say, I started from the 50-yard line.  And after hearing the concerns of Tribal Nations and local governments, I began discussing possible proposals that might address those concerns with Commissioner Carr's office.  But after many open and direct exchanges, my major concerns could not be addressed and following a full, comprehensive review of the record (that included multiple conversations with numerous stakeholders) about the concerns raised by Tribal Nations, environmental protection advocates, and local government representatives, I concluded that the best course for all parties was to delay today's vote.  At this juncture, the potential adverse impact of these proposed rules on Tribal Nations, historic sites, and the natural environment were severe and had yet to be fully addressed.  Unfortunately, my request to delay the vote, was rejected.

But let me clearly reiterate for the record:  I strongly support efforts to facilitate the deployment of 5G next generation wireless services.  Each of us has seen how brilliant minds in the fields of technology, software, and communications industries are working to make a difference in so many areas such as health care, education, energy efficiency, and manufacturing.  There is no question we will all see phenomenal benefits when (and if) 5G is fully deployed in all communities.  And we have already shown the rest of the world that we can still lead in the deployment of 4G LTE services while complying with federal statutes designed to protect the environment and historic sites.  So for me, it is clear and the evidence is convincing that winning the 5G race, need not come at the expense of those important statutory goals.  Because this Order sacrifices those goals, I am forced to dissent from this Order.

## STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

Re:     *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket No. 17-79

I wholeheartedly support the item before the Commission, and I commend the Chairman and Commissioner Carr for bringing it forward. In essence, it addresses two main barriers to wireless tower and antenna siting — unnecessary delays and outrageous fees. I have talked about and sought needed reforms in this area for years. In reality, we are finally completing an issue initiated by former Chairman Wheeler in a bipartisan fashion during the previous Commission. In doing so, our efforts will help facilitate the deployment of wireless broadband throughout our nation, including 5G wireless services, which is critical to preserving America's preeminent leadership position and something that I am committed to making sure happens. We are also setting the stage for future actions, hopefully later this summer, against similar state and local governmental barriers.

While the first part of this item approaches the barriers problem differently than I may have done, it gets to the same, welcome outcome. The item declares that wireless small cells do not generate a "federal undertaking" for purposes of NHPA or a "major federal action" under NEPA. This decision is meticulously explained and justified in the text that should more than satisfy judicial review.

In sum, we are interpreting, as is our right and obligation, certain Commission functions to be below a threshold necessary for the statutory requirements of either law to come into play. To find otherwise, as some have tried to do in this record, is to interpret those two statutes in a way that would treat the agency's geographic license as a trigger for unnecessary action and review, far exceeding Congress' original intent. As the item states, the Commission's issuance of a geographic license does not involve the Commission in any decisions regarding the deployment of any actual facilities. Such extreme readings of the law would effectively make any Commission action a federal undertaking under NHPA and eliminate the "major" before "federal action" in NEPA. This would improperly allow environmental and historic preservation concerns to be placed above any other consideration, which is illogical, and would effectively grant a de facto veto over any activity to those that pose as "defenders" of these laws.

The second portion of the item is no less important, as it makes abundantly clear that no communications provider is required to pay the outrageous fees or hire hand-picked individuals demanded by select Tribes as part of Section 106 reviews. The current procedures, which I have repeatedly criticized, have turned into a perverse game whereby some Tribes have sought money and consulting roles for areas that their ancestors never travelled, as a means to raise revenues and address Tribal unemployment, a jobs program if you will. And the problem is only getting worse, as such practices are turning tower and antenna siting into the latest cash cow.

I have cited many data points to highlight the issue of extraordinarily high fees in previous speeches, but the examples just keep coming. The record contains accounts of AT&T paying a total of $13,525 in fees to 36 Tribes for the collocation of one antenna on a Minnesota hotel.[496] Another provider paid $19,550 in Tribal review costs to cover fees from 38 Tribes for a tower in Wyoming.[497] The same applicant built a similar tower in the same town a year earlier and the fees were over $6,000 cheaper. Sprint paid $12,200 in total fees to 25 Tribes for a small cell outside a steel factory in Indiana, which was

---

[496] AT&T Ex Parte, WT Docket No. 17-79, Feb. 23, 2018, at 2 ("AT&T Ex Parte").

[497] CCA Ex Parte, WT Docket No. 17-79, Feb. 26, 2018, at 2.

determined to have no effect on Tribal historic properties.[498]  Further, some Tribes are receiving the payments, but then never respond as to whether there is actual concern, causing endless delays.

More generally, AT&T reports that Tribal fees have increased by 1,400 percent in the Northeast and 2,500 percent in the Southeast in the last seven years.[499]  And, Sprint paid $23 million in review fees in the past two years, which could have paid for 657 additional sites that would increase coverage and capacity for consumers.[500]  This is not sustainable if we want to actually get broadband to all Americans, including those on Tribal lands.

In fairness, I would have gone further than just clarifying that providers don't need to pay the fees or contract for consultative functions with Tribes.  As currently structured, the language states that providers don't have to do these things, but we all know that some Tribes will still try to force this permissive activity on providers anyway.  This is a little too loosey-goosey for me.  Instead, I would have preferred that such practices be prohibited.  Additionally, the item should have made clear that applicants are not required to provide additional information or hire a professional contractor without a showing – even if provided confidentially – that there is a historic property of religious and cultural significance in the project's area.  While there is a complaint process after the fact, requiring proof up front may decrease the chance that more information and professional contractors could be requested for every potential siting project and reduce Commission workload and application delays.

On that note, I do have to raise a couple of other small issues with the item.  Specifically, I want to be on record restating my longstanding views that section 1 of the Communications Act and section 706 of the Telecommunications Act do not provide the Commission with authority to do anything.  The item cites these two provisions in a paragraph with questionable value.  I thank Commissioner Carr for clarifying the language that these sections do not confer any authority.

I also wish that we could have done some more work to provide relief for macro towers in the first portion of the item.  Instead, it states that the issue remains pending and may be the subject of future items.  But, I am concerned that there is only so much appetite to engage on the issue of wireless siting.  Fatigue generally starts to set in, especially as the work gets more contentious and the opposition much louder.  I intend to make sure that won't be the case here and that we consider further historic preservation and other relief for macro towers as soon as possible.

For too long, we have allowed a small subset of Tribes acting in bad faith to unnecessarily slow communications network buildout.  This brings a bad name to the rest of the American Tribes that really do try to work in good faith with wireless providers on behalf of consumers.  However, the need to address barriers to the placement of wireless towers and antennas for expanded coverage and the initiation of new services is not new.  It has been a longstanding problem.  And, every time an action is proposed we get calls for more collaboration and cooperation by the very same parties that have been dragging their heels.  The private sector has tried collaboration and cooperation until they've turned blue in the face.  The Commission has also tried collaboration and cooperation with similar results.  The consultations and meetings have occurred, as detailed in the order and the record.  It's time to move past the talking stage.  I am pleased that we are doing just that today.

---

[498] Sprint Ex Parte, WT Docket No. 17-79, Feb. 21, 2018, at 1 ("Sprint Ex Parte").

[499] AT&T Ex Parte at 2.

[500] Sprint Ex Parte at 2.

**Federal Communications Commission**                                    FCC 18-30

## STATEMENT OF
## COMMISSIONER BRENDAN CARR

Re:     *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure
        Investment*, WT Docket No. 17-79

The race to 5G is on.  Winning this race will mean more broadband for more Americans.  It will
mean new opportunities for unserved and underserved communities.  And it will mean unleashing the
next wave of American innovation.

In the U.S., the private sector is doing its part.  Entrepreneurs are hard at work developing
cutting-edge technologies that will run on 5G networks—everything from smart city applications to
autonomous cars, from connected homes and virtual reality to precision agriculture.  And wireless
providers are poised to invest the $275 billion necessary to deploy these 5G networks—investments that
can create 3 million new jobs and add a half a trillion dollars to the GDP.

But there's a problem.  We will not win this race—consumers in the U.S. will not realize these
benefits—if we don't do our part at the FCC.  That means moving aggressively to free up new spectrum
bands, as we've been doing, and moving with equal dispatch to ensure that providers can deploy the

Our regulatory counterparts around the world are well aware that the United States led the world
in 4G.  They are eager to leapfrog us to 5G.  A central part of their 5G agenda is to update their
infrastructure deployment rules.  That's why today's vote is so important—it's a chance for the FCC to
demonstrate our commitment to seeing the United States and American consumers win the race to 5G.

The focus on infrastructure reform only makes sense.  After all, 5G networks will look very
different from the networks of today.  Those tall, 100-foot towers that we associate with current
generations of wireless service will be supplemented by new small cell facilities, many of which will be
no larger than a backpack.  Going forward, upwards of 80% of new deployments are expected to be small
cells.  But while technology is advancing, our infrastructure deployment rules have been stuck in the
analog era.

Our outdated approach to NEPA and NHPA, for instance, is costing Americans tens of millions
of dollars per year and delaying the rollout of new services.  One provider spent over $23 million on
NHPA review over the last two years—money that could have been used to deploy 657 new cell sites to
expand service or add capacity.  In 2017, providers spent $36 million on NHPA and NEPA reviews.

The problem is getting worse, not better.  Without reform, the projected costs for these reviews
will spike to $241 million this year as 5G deployments ramp up.

So what is the public getting for these millions in fees?  The record shows that in all but 0.33% of
cases, the reviews have not resulted in any changes to planned deployments.  And that percentage
presumably skews towards those larger towers that will continue to undergo NEPA and NHPA review.

The disproportionate fees are the product of a broken and outdated system.  When one provider
deployed 23 cells at NRG Stadium in Houston ahead of last year's Super Bowl, Section 106 fees
exceeded $173,000.  And remember: that was for placing cells on previously-disturbed ground in a
parking lot and on an NFL stadium, neither of which required our historic and environmental reviews
when they were constructed.

6

Unfortunately, this example is not a one-off.  Today, out of the total cost of deploying a small cell—the equipment, the labor, the permitting—nearly 30% is consumed by our outdated NEPA and NHPA procedures.

This threatens to hold us back in the race to 5G or limit the business case to densely populated or affluent areas.  That's not success.  But with today's Order, we can flip the business case for thousands of communities.

Here's how:

First, we will exempt small cells from NEPA and NHPA review, given their much different size and footprint than large towers.  This will extend the same regulatory treatment to those deployments that the Commission has always applied to other types of infrastructure, including Wi-Fi routers and consumer signal boosters.  Moreover, our decision will not greenlight any particular deployment—they will continue to undergo appropriate state or local review.

Second, the Order will streamline the federal procedures that will continue to apply to those larger deployments, including by putting the FCC itself on a clock.

In all of this, our approach benefited from extensive engagement with Tribal Nations—consultations that spanned three years.  Indeed, when the prior Commission took steps to update our infrastructure rules, I am not aware of the FCC engaging in any similar effort.  In this case, FCC leadership and staff participated in consultations in at least nine different states, including Oklahoma, South Dakota, California, New Mexico, and Arizona.  FCC officials attended Tribal conferences, hosted Tribal representatives at the FCC, and conducted dozens and dozens of meetings and conference calls concerning the subject matter we are voting on today.

These consultations resulted in significant outcomes.  For instance, the Order maintains the current approach to small cell and other deployments on Tribal lands, given the feedback we received.  It adopts reforms that will give Tribes more information, earlier in the process for those reviews that go through NHPA procedures.  It rejects requests to limit the geographic area where Tribes can express interests and participate in the process.  It also expressly recognizes the circumstances in which Tribes can be paid fees for their consulting services.  And in those cases, the Order rejects calls that we limit or otherwise regulate the fees that Tribes can charge.

In the end, we have been able to reach a better outcome based on the extensive consultation process.  And we are maintaining and focusing the federal review on those deployments that are more likely to raise concerns.

By taking these steps today, we will deliver immediate results to communities around the country.  In fact, a recent Accenture study determined that excluding small cells from federal reviews will result in at least $1.56 billion in savings.  That capital could be used to deploy in excess of 55,000 new cell sites and create more than 17,000 jobs.  That's billions of dollars for more broadband, and not one penny comes from new taxes or fees on consumers.

$1.6 billion.  57,000 new cells.  17,000 jobs.

Those are big numbers.  They're tough to wrap your head around in the abstract.  So to get some perspective, I took a road trip through the Shenandoah Valley two weeks ago.  At a roundtable, I spoke with residents and small business owners who discussed the lack of high-speed broadband in their rural communities.  They talked about sending their kids to school early, or letting them stay late, just so that they could work off of a good Internet connection.  Infrastructure reform can help close this gap.  One

local provider, Shentel, noted that streamlining the federal review process will free up enough capital for the company to deploy 13 new cell sites in the Shenandoah Valley. That could be the first high-speed broadband for those families or perhaps the first competitive offering.

I've seen the same opportunity in urban areas. Last week, I drove up to Baltimore. I visited a neighborhood in east Baltimore called C.A.R.E., which stands for Caring Active Restoring Efforts. There still are some boarded up rowhouses in C.A.R.E., but if you keep your eyes open, you can see new opportunity on the rise. And if you really know what you're looking for, you can see it in the dozens of small cells that have been deployed throughout the neighborhood. Two providers noticed that the macrocell serving C.A.R.E. was running out of capacity because, for many families in the area, their wireless connection provides their only high-speed Internet access. So to provide broadband capacity, those carriers attached a series of small cells to street lights running down the main avenues.

We can replicate these results in even more communities, we can get more broadband to more Americans, if we reform our infrastructure rules.

So in the weeks since we released our draft decision, it's been heartening to see the diverse coalition that supports this effort—that is serious about seeing the U.S. win the race to 5G: tech advocates like The App Association, INCOMPAS, CCIA, and CTA; smaller broadband providers at CCA and CTIA; voices from underserved communities like the League of United Latin American Citizens, LGBT Tech, and National Grange; job creators like the Small Business & Entrepreneurship Council and the U.S. Chamber, and other organizations including the Progressive Policy Institute, Citizens Against Government Waste, FreedomWorks, and the U.S. Small Business Administration.

These are not groups that find common ground on all telecom issues. But it is a broad coalition that understands the need to get our regulatory structures 5G ready.

Since the Chairman asked me to take the lead on the FCC's wireless infrastructure proceeding five months ago, I have welcomed the chance to work with all stakeholders on developing our approach. This decision is the product of many, many hours of work from Commission staff, especially the talented team in our Wireless Telecommunications Bureau. I want to recognize and thank you all for your work in addition to significant contributions from the Office of General Counsel and the Office of Native Affairs and Policy. I know you all have spent years on these issues, and the Order before us has greatly benefited from your expertise. It has my full support.

## DISSENTING STATEMENT OF
## COMMISSIONER JESSICA ROSENWORCEL

Re:    *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT Docket No. 17-79

A wireless revolution is underway. The shift to fifth generation—or 5G—wireless is much more than incremental change. It will foster a whole new world of mobile connectivity—and no matter who you are or where you live you will need access to have a fair shot at 21st century success.

Let's be frank: It is not a sure thing that the United States will lead the world in 5G wireless. In fact, the available evidence is that we're falling behind.

If we want to lead in 5G, we unconditionally need a spectrum auction this year. South Korea, Germany, Australia, the United Kingdom, and Romania are now leading the way with definitive plans for wireless auctions in 2018. We do not do that here.

If we want to lead in 5G, we need policies to encourage deep fiber investments. Our wireless facilities will need to be connected to millions of miles of fiber, requiring creative thinking about everything from permitting to securing access to rights of way. We do not do that here.

If we want to lead in 5G, we need serious policies to address our equipment supply chain challenges. That means developing a real plan rather than relying on opaque decisions issued from behind the closed doors of the Committee on Foreign Investment in the United States. We do not do that here.

If we want to lead in 5G, we need to modernize our approach to wireless infrastructure. We need to streamline the process for the deployment of small cells because over the next eight years we will require as many as 800,000 of them. That's daunting. At the same time, we need to modernize our approach to larger wireless facilities—and that's daunting, too. A solution to this infrastructure challenge is long overdue—and while today's decision purports to be one—it misses the mark. It runs roughshod over the rights of our Tribal communities and gives short shrift to our most basic environmental and historic preservation values. Moreover, too much of its policy and legal analysis is lacking the heft necessary to support the result.

What we have here will not help us lead—or even be 5G ready. Our work deserves a delay so we can fix these deficiencies and move forward together. Because we do not take the time to remedy these problems—when we can and should—I dissent.

This decision takes three main actions. All three have problems.

First, this decision cuts Tribal authorities from their rightful role reviewing wireless facilities. While I believe this process would clearly benefit from modernization, in this decision we fail to fulfill our federal trust relationship with respect to 5G deployment. We have long-standing duties to consult with Tribes before implementing any regulation or policy that will significantly or uniquely affect Tribal governments, their land, or their resources. This responsibility is memorialized in the FCC's Policy Statement on Establishing a Government-to-Government Relationship with Indian Tribes. But we do not honor it here. While the decision lists every minor contact this agency has had with Tribal authorities remember this: Not a single Tribe has expressed support for today's action.

Second, this decision removes small cells from the purview of the National Historic Preservation Act and National Environmental Policy Act. This approach has both policy and legal frailties.

9

With respect to policy, it's no secret that rural and low-income communities trail our urban areas when it comes to broadband access. But not a single comment in this proceeding has suggested that the root of that problem is our historic or environmental review process. Rather, it's simple economics— these communities are difficult to serve because they do not provide the return on investment that supports build out. We don't tackle that hard truth here—or seek commitments to ensure deployment in hard to serve areas. But we should.

With respect to the law, the problems with our small cell analysis are real. For starters, this decision asserts that a federal undertaking under the National Historic Preservation Act is the same as a "major federal undertaking" under the National Environmental Policy Act. But this interpretation is not right. In fact, the Advisory Council on Historic Preservation—the body entrusted with interpreting the law—has said as much in their comments to this agency. We shouldn't ignore them. We should work with them.

In addition, our interpretation of the National Historic Preservation Act is flawed—and likely to have messy consequences for future wireless deployment. The law defines an "undertaking" as a "project, activity, or program funded in whole or part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval." Count them—there are three elements to that definition: projects carried out by a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license, or approval. But today's decision addresses only the first and last elements.

In effect, the FCC reads "projects carried out with Federal financial assistance" out of the law. Yet going forward, it is highly likely that small cells are going to be deployed using federal financial assistance—for example, using the Mobility Fund. That's the universal service fund that will support updated wireless service in rural areas—to the tune of $4.53 billion. That's not a small amount and we won't improve 5G deployment in rural areas by sweeping this legal problem under the rug. This is especially true when there are different paths we can take. For instance, even if small cell deployment is determined to be an undertaking, the FCC has authority to find, consistent with the Advisory Council on Historic Preservation's rules, that it "has no further obligations under section 106" if deployment has no more than a de minimis impact on historic properties. In short, there are other ways to address these issues. I wish we could explore them here.

Third, and finally this decision removes many larger wireless facilities from environmental oversight. If our environmental assessment process is too complex or too lengthy, we should fix it. But tossing this process out is unsupported by the record. In fact, there is so little discussion of the consequences of this change in our docket, the White House Council on Environmental Quality wrote us a letter on this subject that is devoid of any substantive analysis and offers only the most superficial support. We should do better than this.

In sum, this decision does not clear the way for 5G. It does not make us 5G ready. It only guarantees that a messy series of legal challenges will follow in its wake. I regret that we did not delay today's vote to fix these problems. I can only hope that with this crude effort we do not further risk our leadership in 5G as a result.